FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

2007 AUG -9  PM 2: 09

STEPHEN R. LUDWIG, CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. **2 : 0 7 C V 2 6 2 PS** |
| v. | ) | |
| | ) | |
| JUPITER ALUMINUM CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff, the United States of America, by the authority of the Attorney General of the

United States and through the undersigned attorneys, acting at the request of the United States

Environmental Protection Agency ("U.S. EPA"), alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action brought pursuant to Section 113(b) of the Clean Air Act, 42

U.S.C. § 7413(b), ("the Act" or "the CAA") for injunctive relief and the assessment of civil

penalties against Defendant Jupiter Aluminum Corporation ("Jupiter" or "Defendant") for

violations of the Act arising from its non-compliance with the National Emission Standards for

Hazardous Air Pollutants ("NESHAP") for secondary aluminum processing, codified at 40

C.F.R. Part 63, Subpart RRR (2006). The violations at issue in this action occurred at Jupiter's

Hammond, Indiana Secondary Aluminum Processing Facility.

## JURISDICTION, AUTHORITY, VENUE, AND NOTICE

2.     This Court has jurisdiction over the subject matter and over the parties pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355(a).

3.     Authority to bring this action is vested in the United States Department of Justice pursuant to Section 305(a) of the Act, 42 U.S.C. § 7605(a), and pursuant to 28 U.S.C. §§ 516 and 519.

4.     Venue properly lies in this district pursuant to 42 U.S.C. § 7413(b) and 28 U.S.C. §§ 1391(b) and 1395(a) because the alleged violations occurred within this district at a facility located in Hammond, Indiana.

5.     Notice of the commencement of this action has been given to the Indiana Department of Environmental Management in accordance with Section 113(b) of the Act, 42 U.S.C. § 7413(b), and to the Hammond Department of Environmental Management.

## DEFENDANT

6.     Jupiter is incorporated under the laws of the State of Illinois and does business in the State of Indiana.  At all times relevant to this Complaint, Jupiter owned and operated a Secondary Aluminum Production Facility, as that term is defined in 40 C.F.R. § 63.1503, located at 1745 165th Street in Hammond, Indiana.

## STATUTORY AND REGULATORY BACKGROUND

7.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

8.      Pursuant to Section 112(b) of the Act, 42 U.S.C. § 7412(b), Congress has established a list of hazardous air pollutants, which includes, among others, hydrochloric acid ("HCl") and dioxin/furans ("D/F"). See 42 U.S.C. § 7412(b) (the chemical terms for dioxin being 2,3,7,8 tetrachloridebenzo-p-dioxin and furans being dibenzofurans).

9.      Section 112(c) of the Act, 42 U.S.C. § 7412 (c), authorizes the U.S. EPA Administrator to publish a list of all categories and subcategories of major sources and area sources of these hazardous air pollutants.

10.     In Section 112(d) of the Act, 42 U.S.C. § 7412(d), Congress required the U.S. EPA Administrator to prescribe emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants ("HAPs").  These emission standards are called the National Emission Standards for Hazardous Air Pollutants ("NESHAPs").  Numerous "source categories" are regulated under the NESHAPs, including, for example, coke oven batteries (40 C.F.R. Part 63, Subpart L), dry cleaning operations (40 C.F.R. Part 63, Subpart M), and the printing industry (40 C.F.R. Part 63, Subpart KK).  Each "source category" has a separate subpart under the NESHAP regulations (40 C.F.R. Part 63).  Secondary Aluminum Processing Facilities are regulated under Subpart RRR of Part 63 ("the Subpart RRR regulations" or "Subpart RRR").

11.     Sections 113(a)(3) and (b) of the Act, 42 U.S.C. § 7413(a)(3)(b), prohibit violations of any NESHAP regulation.   Thus, a violation of a NESHAP regulation is a violation of the Act.

12.     Subpart RRR applies to owners and operators of a Secondary Aluminum Production Facility, 40 C.F.R. § 63.1500(a), which is defined in Subpart RRR as "any

3

establishment using clean charge, aluminum scrap, or dross from aluminum production, as the

raw material for performing one or more of the following processes:  scrap shredding, scrap

drying/delacquering/decoating, thermal chip drying, furnace operations (*i.e.,* melting, holding,

sweating, refining, fluxing, or alloying), recovery of aluminum from dross, in-line fluxing, or

dross cooling." 40 C.F.R. § 63.1503.

13.     The NESHAPs apply to facilities that are "major sources" of HAPs, 40 C.F.R.

§ 63.1500(b), which are sources or groups of stationary sources located within a contiguous area

and under common control that emit or have the potential to emit ten tons per year or more of

any HAP, or twenty-five tons per year or more of any combination of HAPs, 40 C.F.R. § 63.2.

14.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28

U.S.C. § 2461 note: Pub. L. 101-40, enacted October 5, 1990; 104 Stat. 890), as amended by the

Debt Collection Improvements Act of 1996 (31 U.S.C. § 3701 note: Pub. L. 104-134, enacted

April 26, 1996; 110 Stat. 1321), U.S. EPA may seek civil penalties of up to $27,500 per day for

each violation occurring between January 31, 1997 and March 15, 2004.

15.     Further, pursuant to U.S. EPA's latest Civil Monetary Penalty Inflation

Adjustment Rule, effective March 15, 2004, the maximum civil penalty for violations of the

CAA Section 113(a) is $32,500 per day.  69 Fed. Reg. 7121 (Feb. 13, 2004).  Hence, any

violations occurring on or after March 15, 2004, may result in a civil penalty of not more than

$32,500 per day of violation.

## GENERAL ALLEGATIONS

16.     At all times relevant to this Complaint Defendant has owned a **"Secondary**

**Aluminum Production Facility"** (hereinafter "SAPF") within the meaning of 40 C.F.R. §

4

63.1503, located at 1745 165th Street, in Hammond, Indiana.  This SAPF is one part of

defendant's larger aluminum production facility at which it produces various aluminum products.

 Defendant operated this SAPF at all times relevant to this Complaint until November 26, 2006,

when a fire occurred at its larger aluminum production facility.

17.     At all times relevant to this Complaint, Defendant's SAPF has been  an "**affected

source**" and an "**existing source**" within the meaning of 40 C.F.R. § 63.2.

18.     At all times relevant to this Complaint, Defendant has been  a "**person**" within

the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

19.     At all times relevant to this Complaint, Defendant has been  a "**major source**" of

HAPs as defined in Section 112(a)(1) of the CAA, 42 U.S.C. § 7412(a)(1) and 40 C.F.R. § 63.2,

and/or an "**area source**" as defined in Section 112(a)(2) of CAA, 42 U.S.C. § 7412(a)(2) and 40

C.F.R. § 63.2.

20.     At all times relevant to this Complaint, Defendant  has been an "**owner or

operator**" within the meaning of  CAA Sections 111(a)(5) and 112(a)(9) of the CAA, and 40

C.F.R. §§ 60.2, 61.02.

21.     Under the Subpart RRR regulatory scheme, scrap aluminum falls into two broad

categories:  "clean charge" and other aluminum not fitting the definition of "clean charge"

(hereinafter "other than clean charge").  "Clean charge" is defined as furnace charge material

including molten aluminum, T-bar, sow, ingot, billet, pig, alloying elements, [and] *aluminum

scrap* known by the owner or operator to be entirely free of paints, coatings, and lubricants . . .

." 40 C.F.R. § 63.1503.

22.    At times relevant to this Complaint, Defendant's SAPF has contained (and/or continues to contain) four **"Group 1 furnaces"** as defined in 40 C.F.R. § 63.1503 that are identified as Furnaces 2, 3, 4, and 6, and some or all of the aluminum that Defendant  has charged into each of these furnaces is "other than clean charge."

23.    Furnace 1 is a holding furnace into which Defendant has placed molten aluminum from Group 1 furnaces.

24.    Furnaces 2 and 6 are **"sidewell"** furnaces as defined in 40 C.F.R. § 63.1503 which receive other than clean charge, more specifically, scrap aluminum including but not limited to painted aluminum siding, painted scrap from motor  vehicles, painted road signs,  painted or coated aluminum beverage cans, and aluminum coated with various oils, lubricants or other foreign materials.  The sidewells, which are adjacent to the actual furnaces, have hoods over them, that capture emissions which occur when the paints and coatings on the other than clean scrap volatilize when the metal melts.  Emissions caught by the hoods then travel through ductwork to separate "fabric filters" (or baghouses) where they are filtered before being emitted to the atmosphere.  The hoods, ductwork and baghouses connected to Furnaces 2 and 6 are **"add-on air pollution control devices"** as defined in 40 C.F.R. § 63.1503.  Each baghouse has a **"bag leak detection system"** as defined in 40 C.F.R. § 63.1503 on it.

25.    At times relevant to this Complaint, Jupiter has also used Furnaces 3 and 4 to melt "other than clean charge" from outside sources; however, unlike Furnaces 2 and 6, Furnaces 3 and 4 have not had "add-on pollution control devices" on them.  Emissions from these furnaces have vented directly to the air.

6

26.     At times relevant to this Complaint, Jupiter has performed **"reactive fluxing,"** as that term is defined at 40 C.F.R. § 63.1503, at one or more of its Group 1 furnaces.

27.     The "Group 1" furnaces at Jupiter's Hammond Facility (Furnaces 2, 3, 4 and 6) are a **"secondary aluminum processing unit"** as defined in 40 C.F.R. § 63.1503, and each of these furnaces has been considered a separate **"emission unit"** as defined in 40 C.F.R. § 63.1503.

28.     At times relevant to this Complaint, Jupiter has operated Furnaces 7 and 8 at its Hammond Facility as **"dross only furnaces,"** as defined in 40 C.F.R. § 63.1503.  At other earlier times relevant to this Complaint, Jupiter operated Furnaces 7 and 8 as "Group 1" furnaces and/or "Group 2" furnaces. "Dross" is the slag and skimmings from aluminum melting and refining operations. 40 C.F.R. § 63.1503.  Furnaces 7 and 8 currently share one "add on pollution control device" between them:  a fabric filter (a baghouse) with a "bag leak detection system," and associated ductwork.

29.     "Group 1 furnaces" at a SAPF emit and/or have the potential to emit **dioxin and furans ("D/F"), hydrochloric acid ("HCl"),** and **particulate matter ("PM")** as those terms are defined in 40 C.F.R. § 63.1503.  "Dross only furnaces" at a SAPF  emit and/or have the potential to emit **PM.**

30.     **Dioxins and furans** are hazardous air pollutants.  See 42 U.S.C. § 7412(b). There is scientific evidence that Dioxins and Furans are potential human carcinogens.

31.     **Hydrochloric acid** is a hazardous air pollutant.  See 42 U.S.C. § 7412(b).  HCl is corrosive to the eyes, skin and mucous membranes of humans.  Inhalation of HCl may cause

coughing, hoarseness, inflammation and ulceration of the respiratory tract, and chest pain.  Due to its corrosive nature, HCl is also damaging to personal property, as well as plants and animals.

32.     **Particulate Matter** from a SAPF contains hazardous metals, including, among others, arsenic, beryllium, cadmium, chromium, cobalt, mercury, nickel and selenium. 40 C.F.R. § 63.1503.  Measuring PM from a SAPF acts as a surrogate for measuring the individual HAP metals.  Id.  The Subpart RRR regulations limit these PM emissions.  See 40 C.F.R. § 63.1505(i)(2).

33.     On or around November 24, 2006, a fire occurred at the Defendant's larger aluminum production facility in Hammond, Indiana which resulted in the shut down of all of the furnaces at the SAPF.

34.     During the first six months of 2007, Defendant rebuilt its Hammond, Indiana facility, and on or around July 12, 2007, Defendant began heating up Furnaces 2 and 6 in anticipation of resuming normal recycling operations.

## FIRST CLAIM FOR RELIEF

**Failure to Design and Install an Air Pollution Control Device for Furnace 2 that Meets the Engineering Standards for Minimum Exhaust Rates in the American Conference of Governmental Industrial Hygienists Manual, in Violation of 40 C.F.R. § 63.1506(c)(1).**

35.     The allegations in Paragraphs 1 through 34 are hereby re-alleged and incorporated by reference, as if fully set forth herein.

36.     At times relevant to this Complaint, Defendant has operated a sidewell furnace know as Furnace 2 into which it places other than clean charge.  When other than clean charge melts, paints, lubricants, coatings and other foreign materials burn off, and these materials have

the potential to emit HAPs and other air pollutants into the atmosphere, including but not limited to D/F, HCl and PM. This PM may include hazardous metals such as, among others, arsenic, beryllium, cadmium, lead, mercury and nickel. See 57 Fed. Reg. 31576 (July 16, 1992).

37.     Furnace 2 is a "Group 1 furnace" and an "emission unit" within the meaning of 40 C.F.R. § 63.1503.

38.     At times relevant to this Complaint, Furnace 2 has had an "add on air pollution control device," within the meaning of 40 C.F.R. § 63.1503, connected to it, and in operation, but that device has been inadequate. This "add on air pollutant control device" consists of two exhaust hoods, one placed over the sidewell and the other placed over the furnace exhaust. These exhaust hoods connect to ductwork leading to a fabric filter (or baghouse).

39.     Subsection 63.1506(c)(1) of the Subpart RRR regulations requires the owner or operator of each "Group 1 furnace" or "emission unit" equipped with an "add-on pollution control device" to design and install a capture and collection system in compliance with the engineering standards for minimum exhaust rates as published by the American Conference of Governmental Industrial Hygienists in chapters 3 and 5 of "Industrial Ventilation: A Manual of Recommended Practices." (hereinafter **"the ACGIH Manual"**), 40 C.F.R. § 63.1506(c)(1).

40.     The capture and collection system that Defendant has used on Furnace 2 at times relevant to this Complaint was not designed to and did not meet the engineering standards for minimum exhaust rates as published by the ACGIH.

41.     The United States is entitled to injunctive relief requiring that Defendant's capture and control device for emissions from Furnace 2 comply with 40 C.F.R. § 63.1506(c)(1).

42.     As a result of this violation, Defendant is  liable for a civil penalty of up to $27,500 per day, from the date the requirement became effective on an "existing source" (March 24, 2003), through March 14, 2004, and of up to $32,500 per day, for each day on or after March 15, 2004 that this violation continued.

## SECOND CLAIM FOR RELIEF

### Failure to Design and Install an Air Pollution Control Device for Furnace 6 that Meets the Engineering Standards for Minimum Exhaust Rates in the ACGIH Manual, in Violation of 40 C.F.R. § 63.1506(c)(1).

43.     The allegations in Paragraphs 1 through 42 are hereby re-alleged and incorporated by reference, as if fully set forth herein.

44.     At times relevant to this Complaint, Defendant has operated a sidewell furnace know as Furnace 6 into which it places other than clean charge. When other than clean charge melts, paints, lubricants, coatings and other foreign materials burn off, and these materials have the potential to emit HAPs and other air pollutants into the atmosphere, including but not limited to D/F, HCl and PM.  This PM may include hazardous metals such as, among others, arsenic, beryllium, cadmium, lead, mercury and nickel.  See 57 Fed. Reg. 31576 (July 16, 1992).

45.     Furnace 6 is a "Group 1 furnace" and an "emission unit" within the meaning of 40 C.F.R. § 63.1503.

46.     At times relevant to this Complaint, Furnace 6 has had an "add on air pollution control device," within the meaning of 40 C.F.R. § 63.1503, connected to it, and in operation, but that device has been inadequate.  This "add on air pollutant control device" consists of  two

exhaust hoods, one placed over the sidewell and the other placed over the furnace exhaust. These exhaust hoods connect to ductwork leading to a fabric filter (or baghouse).

47.     Section 63.1506(c)(1) of the Subpart RRR regulations requires the owner or operator of each "Group 1 furnace" or "emission unit" equipped with an "add-on pollution control device" to design and install a capture and collection system in compliance with the engineering standards for minimum exhaust rates as published by the ACGIH Manual.  40 C.F.R. § 63.1506(c)(1).

48.     The capture and collection system that Defendant has used on Furnace 6 at times relevant to this Complaint was not designed to and did not meet the engineering standards for minimum exhaust rates as published by the ACGIH.

49.     The United States is entitled to injunctive relief requiring that Defendant's capture and control device for emissions from Furnace 6 comply with 40 C.F.R. § 63.1506(c)(1).

50.     As a result of this violation, Defendant is also liable for a civil penalty of up to $27,500 per day, from the date the requirement became effective on an "existing source" (March 24, 2003), through March 14, 2004, and of up to $32,500 per day, for each day on or after March 15, 2004 that this violation continued.

### THIRD CLAIM FOR RELIEF

**Failure Timely to Submit an Initial Notification to U.S. EPA that Subpart RRR of the NESHAP Regulations Applied to Defendant's Hammond Facility, in Violation of 40 C.F.R. § 63.9(b)(2)**

51.     The allegations in Paragraphs 1 through 50 are hereby re-alleged and incorporated by reference as if fully set forth herein.

52.     40 C.F.R. § 63.9(b)(2) of the NESHAP regulations requires each owner or operator of an "affected source" that had an initial startup before the effective date of a relevant NESHAP standard, to submit an "initial notification" in writing to the U.S. EPA Administrator that it is subject to the regulations, within 120 days of the standard's effective date.

53.     The effective date of the NESHAP standards for SAPFs is March 24, 2003, 40 C.F.R. § 63.1501(a), and the "initial notification" requirement in Section 63.9(b)(2) applies to such facilities.  See 40 C.F.R. Part 63, Subpart RRR, Appendix A.  As an owner and operator of an SAPFs that had an initial start up date before March 24, 2003, Defendant was required to submit an "initial notification" to U.S. EPA in accordance with Section 63.9(b)(2) by no later than July 23, 2003.

54.     By failing to submit an "initial notification" by July 23, 2003, Defendant violated 40 C.F.R. § 63.9(b)(2).  Defendant submitted an "initial notification" on August 19, 2004, more than a year after the deadline.

55.     As a result of its violation of the "initial notification requirement" in 40 C.F.R. § 63.9(b)(2), Defendant is liable for a civil penalty of up to $27,500 for each day prior to March 15, 2004,  and of up to $32,500 for each day on or after March 15, 2004, that this violation continued.

## FOURTH CLAIM FOR RELIEF

**Failure Timely to Conduct an Initial Performance Test on Furnace 2, and to Demonstrate that Furnace's Compliance with Subpart RRR, in Violation of 40 C.F.R. § 63.1511(b)**

56.     The allegations in Paragraphs 1 through 55 are hereby re-alleged and incorporated by reference as if fully set forth herein.

57.     40 C.F.R. § 63.1511(b) requires the owner or operator of a secondary aluminum production facility to conduct an initial performance test for each affected source and emission unit to demonstrate compliance with each applicable Subpart RRR emission standard, and report its compliance status in a "notification of compliance status report" as required in Subsection 63.1515(b), by no later than the compliance date (March 24, 2003) established in Subsection 63.1501(a).

58.     Defendant failed to conduct an initial performance test on Furnace 2 by March 24, 2003, in violation of 40 C.F.R. § 63.1501(a).  Defendant did not conduct a performance test on emissions from Furnace 2 until sometime between September 14-16, 2005, approximately two and a half years after the deadline for conducting such a test.

59.     Further, although Defendant did conduct a performance test in September 2004 on emissions from the baghouse serving Furnace 2, Defendant has failed to demonstrate compliance with each applicable Subpart RRR emission standard, as required by 40 C.F.R. § 63.1511(b), given inadequacies in the add on pollution control device for Furnace 2, as alleged in the First Claim for Relief.

60.     The United States is entitled to injunctive relief requiring Defendant to conduct a performance test on Furnace 2 to demonstrate compliance with all applicable emission standards of the Subpart RRR regulations after correcting deficiencies in the add-on pollution control device for Furnace 2.

13

61.    As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to $27,500 per day for each day from March 24, 2003 until March 15, 2004, and of up to $32,500 per day for each day on or after March 15, 2004 that it failed to conduct the test on Furnace 2 and adequately demonstrate compliance.

## FIFTH CLAIM FOR RELIEF

**Failure Timely to Conduct an Initial Performance Test on Furnace 3 in Violation of 40 C.F.R. § 63.1511(b)**

62.    The allegations in Paragraphs 1 through 61 are hereby re-alleged and incorporated by reference as if fully set forth herein.

63.    40 C.F.R. § 63.1511(b) requires the owner or operator of a secondary aluminum production facility to conduct an initial performance test for each affected source and emission unit to demonstrate compliance with each applicable Subpart RRR emission standard, and report its compliance status in a "notification of compliance status report" as required in Subsection 63.1515(b), by no later than the compliance date (March 24, 2003) established in Subsection 63.1501(a).

64.    Defendant failed to conduct an initial performance test on Furnace 3 by March 24, 2003, in violation of 40 C.F.R. § 63.1501(a).  Defendant did not conduct a performance test on Furnace 3 until sometime between October 26, 2004 and November 1, 2004, more than 19 months after the deadline for conducting the initial performance test.

65.    Defendant has removed Furnace 3, therefore conducting another performance test is unnecessary.

14

66.     As a result of this violation of the CAA, Defendant is liable for a civil penalty of

up to $27,500 per day for each day from March 24, 2003 until March 15, 2004, and of up to

$32,500 per day for each day on or after March 15, 2004 that it this violation continued.

### SIXTH CLAIM FOR RELIEF

**Failure Timely to Conduct an Initial Performance Test on Furnace 4, and to
Demonstrate that Furnace's Compliance with Subpart RRR, in Violation of
40 C.F.R. § 63.1511(b)**

67.     The allegations in Paragraphs 1 through 66 are hereby re-alleged and incorporated

by reference as if fully set forth herein.

68.     40 C.F.R. § 63.1511(b) requires the owner or operator of a secondary aluminum

production facility to conduct an initial performance test for each affected source and emission

unit to demonstrate compliance with each applicable Subpart RRR emission standard, and report

its compliance status in a "notification of compliance status report" as required in Subsection

63.1515(b), by no later than the compliance date established in Subsection 63.1501(a) (March 24,

2003).

69.     Defendant failed to conduct an initial performance test on Furnace 4 by March 24,

2003, in violation of 40 C.F.R. § 63.1501(a).  In fact, to this date, Defendant has not conducted a

performance test on Furnace 4 for compliance with all Subpart RRR emission standards

applicable to a Group 1 furnace such as Furnace 4.  Again, Furnace 4 has had no "add on

pollution control equipment" on it, within the meaning of that term in 40 C.F.R. § 63.1503.

70.     Further, between September 14-16, 2005, Defendant conducted a PM test on

Furnace 4, for purposes of determining compliance with other CAA regulations, and the results

of that test demonstrate that Furnace 4 does not meet the Subpart RRR emission standard for PM

(0.20 kg of PM per Mg or 0.40 lbs. of PM per ton of feed/charge for a Group 1 furnace, 40

C.F.R. § 63.1505(i)(1)), See Eleventh Claim for Relief, *infra.*

71.     The United States is entitled to injunctive relief requiring that Defendant either

install add on pollution control equipment on Furnace 4, and demonstrate compliance with all

applicable Subpart RRR regulations, or cease operating and dismantle Furnace 4.

72.     As a result of this violation of the CAA, Defendant is liable for a civil penalty of

up to $27,500 per day for each day from March 25, 2003 until March 15, 2004 and of up to

$32,500 per day for each day March 15, 2004 that this violation continued.

### SEVENTH CLAIM FOR RELIEF

**Failure Timely to Conduct an Initial Performance Test on Furnace 6, and to
Demonstrate that Furnace's Compliance with Subpart RRR, in Violation of
40 C.F.R. § 63.1511(b)**

73.     The allegations in Paragraphs 1 through 72 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

74.     40 C.F.R. § 63.1511(b) requires the owner or operator of a secondary aluminum

production facility to conduct an initial performance test for each affected source and emission

unit to demonstrate compliance with each applicable Subpart RRR emission standard, and report

its compliance status in a "notification of compliance status report" as required in Subsection

63.1515(b), by no later than the compliance date (March 24, 2003) established in Subsection

63.1501(a).

75.     Defendant failed to conduct an initial performance test on Furnace 6 by March 24, 2003, in violation of 40 C.F.R. § 63.1501(a).  Defendant did not conduct a performance test on emissions from Furnace 6 until sometime between October 28-29, 2004, more than 19 months after the deadline for conducting such a test.

76.     Further, although Defendant did conduct a performance test in October 2004 on emissions from the baghouse serving Furnace 6, Defendant has failed to demonstrate compliance with each applicable Subpart RRR emission standard, as required by 40 C.F.R. § 63.1511(b), given inadequacies in the add on pollution control device for Furnace 6, as alleged in the Second Claim for Relief.

77.     The United States is entitled to injunctive relief requiring Defendant to conduct a performance test on Furnace 6 to demonstrate compliance with all applicable Subpart RRR emission standards after correcting deficiencies in the add-on pollution control device for Furnace 6.

78.     As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to $27,500 per day for each day from March 24, 2003 until March 15, 2004, and of up to $32,500 per day for each day on or after March 15, 2004 that this violation continued.

## EIGHTH CLAIM FOR RELIEF

**Failure Timely to Conduct an Initial Performance Test on Furnace 7, and to Demonstrate that Furnace's Compliance with Subpart RRR, in Violation of 40 C.F.R. § 63.1511(b)**

79.     The allegations in Paragraphs 1 through 78 are hereby re-alleged and incorporated by reference as if fully set forth herein.

80.     40 C.F.R. § 63.1511(b) requires the owner or operator of a secondary aluminum production facility to perform an initial performance test for each affected source and emission unit to demonstrate compliance with each applicable Subpart RRR emission standard, and report its compliance status in a "notification of compliance status report" as required in Subsection 63.1515(b), by no later than the compliance date (March 24, 2003) established in Subsection 63.1501(a).

81.     Defendant failed to conduct an initial performance test on Furnace 7 by March 24, 2003, in violation of 40 C.F.R. § 63.1501(a).  Defendant has operated Furnace 7 as a "dross only" furnace.  Defendant did not conduct a performance test on Furnace 7 until sometime between September 14-16, 2005, approximately two and a half years after the deadline for conducting the initial performance test.

82.     Defendant should be enjoined to operate Furnace 7 as a "dross only" furnace if it resumes operation of Furnace 7, or if it decides to operate Furnace 7 as a Group 1 furnace, to conduct a performance test to demonstrate compliance in accordance with 40 C.F.R. § 63.1511(b).

83.     As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to $27,500 per day for each day from March 24, 2003 until March 14, 2004, and of up to $32,500 per day for each day on or after March 15, 2004 that this violation occurred.

## NINTH CLAIM FOR RELIEF

**Failure Timely to Conduct an Initial Performance Test on Furnace 8, and to Demonstrate that Furnace's Compliance with Subpart RRR, in Violation of 40 C.F.R. § 63.1511(b)**

84.    The allegations in Paragraphs 1 through 83 are hereby re-alleged and incorporated by reference as if fully set forth herein.

85.    40 C.F.R. § 63.1511(b) requires the owner or operator of a SAPF to conduct an initial performance test for new affected sources and emission units to demonstrate compliance with each applicable Subpart RRR emission standard, and report its compliance status in a "notification of compliance status report" as required in Subsection 63.1515(b), by no later than 90 days after the date of installation. See 40 C.F.R. § 63.1501(b).

86.    Furnace 8 is one of the newer furnaces at Defendant's Hammond Facility, and was, upon information and belief, installed sometime in early 2004.  Defendant initially intended to operate Furnace 8 as a Group 1 furnace.  Hammond Department of Environmental Management (HDEM) employees observed Furnace 8 in place in early March 2004.

87.    Defendant failed to conduct an initial performance test on Furnace 8 within 90 days of its installation, in violation of 40 C.F.R. § 63.1501(b).  Defendant conducted a performance test on Furnace 8 between October 26 and 27, 2004

88.    That performance test showed that Furnace 8 did not meet the HCl emission standard for Group 1 furnaces found in 40 C.F.R. § 63.1515(i)(4), and as further alleged in the Twelfth Claim for Relief, *infra.*

89.    Following the failed performance test for HCl, Defendant agreed to use Furnace 8 as a "dross only" furnace.  Defendant should be enjoined to operate Furnace 8 as a "dross only" furnace when it resumes operation of Furnace 8, or if Defendant desires to operate Furnace 8 as a Group 1 furnace, it should be enjoined to conduct an emissions test and demonstrate compliance with all applicable emission standards.

19

90.     As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to $32,500 per day for each day this violation continued.

## TENTH CLAIM FOR RELIEF

### Failure to Submit a Notification of Compliance Status Report, in Violation of 40 C.F.R. § 63.1515(b)

91.     The allegations in Paragraphs 1 through 90 are hereby re-alleged and incorporated by reference as if fully set forth herein.

92.     40 C.F.R. § 63.1515(b) requires each owner or operator of an existing affected source to submit a notification of compliance status report within 60 days after the compliance date established by Subsection 63.1501(a) (*i.e.* March 24, 2003).  The compliance status report must contain specific information, including but not limited to, performance test reports for each affected source, information on compliance operating parameter values established for each affected source, and design information for capture/collection systems.

93.     Although the deadline for submission of a notification of compliance status report was May 24, 2003, Defendant has never submitted a notification of compliance status report, in violation of 40 C.F.R. § 63.1515(b).

94.     Unless enjoined by order of this Court, Defendant will continue to violate 40 C.F.R. § 63.1515(b) when it resumes operation of its furnaces at its SAPF.

95.     As a result of this violation of this requirement, Defendant is liable for a civil penalty of up to $27,500 for each day prior to March 15, 2004, and of up to $32,500 for each day on or after March 15, 2004, that this violation continued.

## ELEVENTH CLAIM FOR RELIEF

### Failure to Meet the Particulate Matter ("PM") Emission Limit of

20

### 0.4 Pounds Per Ton of Feed/Charge on Furnace 4, in Violation of
### 40 C.F.R. § 63.1505(i)(1)

96.     The allegations in Paragraphs 1 through 95 are hereby re-alleged and incorporatedby reference as if fully set forth herein.

97.     Section 63.1505(i)(1) of the Subpart RRR regulations establishes an emission standard for Group 1 furnaces of 0.20 kg of PM per Mg (or 0.40 lb. of PM per ton) of feed/charge from a Group 1 furnace that is not a melting/holding furnace processing only clean charge at a SAPF  that is a major source.  40 C.F.R. § 63.1505(i)(1).  Defendant's Furnace 4 is a Group 1 furnace that processed other than clean scrap aluminum.

98.     In emissions tests run on Furnace 4 between September 14 and September 16, 2005, Furnace 4 emitted 0.759 pounds of PM per ton of feed/charge.

99.     Again, PM from secondary aluminum production contains HAP metals.  40 C.F.R. § 63.1503.  Measuring PM from secondary aluminum production acts as a surrogate for measuring the individual metal HAPs.  Id.

100.    Given that Furnace 4 failed to meet the Subpart RRR emission standard for PM, Defendant should be enjoined from operating Furnace 4 as a Group 1 furnace unless and until it installs pollution control equipment on it, and demonstrates that Furnace 4 complies with all applicable emission standards, including but not limited to the standard for PM set forth in 40 C.F.R. § 63.1505(i)(2).

101.    As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to $32,500 per day for each day this violation occurred.

### TWELFTH CLAIM FOR RELIEF

### Failure to Meet the Hydrochloric Acid (HCl) Emission Limit of 0.2 kg of

**HCl per Mg (0.40 lb of HCl per ton) of Feed/Charge on Furnace 8, in Violation of
40 C.F.R. § 63.1505(i)(4)**

102.    The allegations in Paragraphs 1 through 101 are hereby re-alleged and incorporated by reference as if fully set forth herein.

103.    Subsection 63.1505(i)(1) of the Subpart RRR regulations establishes an emission standard for Group 1 furnaces of 0.20 kg of HCl per Mg (or 0.40 lbs of HCl per ton) of feed/charge from a Group 1 furnace that is not a melting/holding furnace processing only clean charge at a SAPF that is a major source.  40 C.F.R. § 63.1505(i)(1).  At times relevant to this Complaint, Defendant operated Furnace 8 as a Group 1 Furnace.  In recent times, however, it has operated Furnace 8 as a "dross only" furnace.

104.    In emissions tests run on Furnace 8 between September 14 and September 16, 2005, at a time when it was being operated as a Group 1 furnace, Furnace 8 emitted 0.51 pounds of HCl per ton of feed/charge.  Sometime following this test result, Defendant began operating Furnace 8 as a "dross only" furnace.

105.    HCl is a hazardous air pollutant, See 42 U.S.C. § 7412(b).

106.    Defendant should be enjoined to operate Furnace 8 as a "dross only" furnace, or, if Defendant decides to operate Furnace 8 as a Group 1 furnace, it should be enjoined to conduct a performance test to demonstrate compliance with all applicable emission standards for Group 1 furnaces as a condition of its operation.

107.    As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to $32,500 per day for each day this violation occurred.

**THIRTEENTH CLAIM FOR RELIEF**

**Failure Timely to Prepare and Submit an Adequate Operation, Maintenance, and Monitoring Plan ("OM&M Plan") by March 24, 2003, in Violation of 40 C.F.R. § 63.1510(b)**

108.   The allegations in Paragraphs 1 through 107 are hereby re-alleged and incorporated by reference as if fully set forth herein.

109.   40 C.F.R. § 63.1510(b) requires the owner or operator of an existing affected source to prepare and submit an Operation, Maintenance and Monitoring Plan ("OM&M Plan") by the compliance date set forth in 40 C.F.R. § 63.1501(b)(*i.e.* March 24, 2003), which plan contains certain elements, as set forth in Subsections 63.1510(b)(1)-(8).

110.   Defendant failed to prepare and submit an OM & M Plan by the March 24, 2003 deadline.  Defendant submitted a draft OM&M Plan on August 19, 2004, which plan had deficiencies that Defendant was  requested to correct, including but not limited to the failure of Defendant to establish an adequate program for weighing the scrap aluminum fed to its furnaces so that emission limits set in "pounds per feed/charge" could be adequately tracked by Defendant and the governmental agencies that monitor its compliance with emission limits.  Failure of a pollution source adequately to track feed/charge or production on an emission unit-by-emission unit basis can make it difficult to determine compliance with production-based emission limits.

111.   Defendant should be enjoined to revise its OM&M Plan in accordance with the requirements of Subpart RRR, and once the Plan is approved, to fully implement the Plan.

112.   As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to $27,500 per day  between March 24, 2003, and March 14, 2004, and of up to $32,500 per day for each day on or after March 15, 2004 that this violation occurred.

## FOURTEENTH CLAIM FOR RELIEF

**Failure to Measure and Record the Weight of the Feed/Charge to, or Aluminum
Production from Each Emission Unit or Affected Source in Violation of
40 C.F.R. § 63.1510(e)**

113.    The allegations in Paragraphs 1 through 112 are hereby re-alleged and
incorporated by reference as if fully set forth herein.

114.    40 C.F.R. § 63.1510(e) requires the owner or operator of an affected source or
emission unit subject to an emission limit in kg/Mg (lb/ton) of feed/charge to install, calibrate,
operate and maintain a device to measure and record the total weight of feed/charge to, or
aluminum production from the affected source or emission unit over the same operating cycle or
time used in the performance test.  Section 63.1510(e) specifically states that feed/charge or
aluminum production must be measured and recorded on *an emission unit by emission unit basis.*

115.    At times relevant to the Complaint, Defendant has had several Group 1 furnaces
operating at its SAPF.  Defendant has placed the molten aluminum from these furnaces into one
common holding furnace (Furnace 1), and has measured the production from this common
holding furnace.

116.    Defendant has violated 40 C.F.R. § 63.1510(e) by failing to weigh the scrap being
charged into each Group 1 furnace, or by failing separately to weigh the production from each
Group 1 furnace.

117.    Defendant should be enjoined to comply with 40 C.F.R. § 63.1510(e).

118.    As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to
$27,500 per furnace for each day between March 23, 2003 and March 14, 2004, and up to

24

$32,500 per furnace for each day on or after March 15, 2004, that this violation occurred.

### FIFTHTEENTH CLAIM FOR RELIEF

**Failure to Operate the Capture and Collection Systems on Furnaces 2 and 6 in Accordance with an Approved OM&M Plan, in Violation of 40 C.F.R. § 63.1506(c)(3)**

119.    The allegations in Paragraphs 1 through 118 are hereby re-alleged and incorporated by reference as if fully set forth herein.

120.    40 C.F.R. § 63.1506(c)(3) provides that the owner or operator of each emission unit equipped with an add-on pollution control device must operate each capture/collection system on such control device in accordance with the procedures and requirements in an Operation, Maintenance and Monitoring Plan ("OM&M Plan"). For "existing sources" such as Defendant's Hammond Facility, this obligation commenced on the effective date of the Subpart RRR regulations- March 24, 2003. See 40 C.F.R. § 63.1501(a).

121.    At times relevant to this Complaint, although Defendant had capture/collection systems on Furnaces 2 and 6 it did not operate these capture/collection systems in accordance with an OM&M Plan. Defendant did not submit a draft OM&M Plan until August 19, 2004, and has yet to obtain approval of such plan.

122.    Defendant should be enjoined to operate its capture and collection systems on Furnaces 2 and/or 6 in accordance with an approved OM & M Plan, as required by 40 C.F.R. § 63.1506(c) (3).

123.    As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to $27,500 per day for each day between March 24, 2003 and March 14, 2004, and up to $32,500 per day for each day on or after March 15, 2004 that this violation continued.

## SIXTEENTH CLAIM FOR RELIEF

### Failure to Implement a Scrap Inspection Program for Furnaces 3 and 4 (Group 1 Furnaces without Add-on Pollution Control Devices), in Violation of 40 C.F.R. § 63.1510(p)

124.     The allegations in Paragraphs 1 through 123 are hereby re-alleged and incorporated by reference as if fully set forth herein.

125.     40 C.F.R. § 63.1510(a) requires owners or operators of existing emission units to monitor all processes in accordance with the provisions of Section 63.1510, commencing the date established in Section 63.1501 (March 24, 2003).  Subsection 63.1510(p) requires "group 1 furnaces without air pollution control devices" to develop and implement a "scrap inspection program" that, among other things, collects and measures the oils and coatings on other than clean scrap aluminum, performs periodic physical measurements of the oils and coatings on such scrap  and includes a system for assuring that only acceptable scrap is charged into the affected Group 1 furnace.

126.     Furnaces 3 and 4 at Defendant's Hammond Facility are/were "Group 1 furnaces" without add on pollution control devices.

127.     At times relevant to this Complaint, Defendant operated Furnaces 3 and 4 without the type of scrap inspection program required by Subsection 63.1510(p).

128.     Defendant should be enjoined from operating Furnace 4 without an approved scrap inspection program in place, in accordance with 40 C.F.R. § 63.1510(p). Since Defendant has permanently shut down Furnace 3, no injunctive relief is needed with regard to it.

129.     As a result of these violations of the CAA, Defendant is liable for a civil penalty of up to $27,500 per furnace for each day between March 23, 2003 and March 14, 2004, and of

up to $32,500 per furnace for each day on or after March 15, 2004 that these violations continued.

## SEVENTEENTH CLAIM FOR RELIEF

### Failure Timely to Install, Calibrate, Maintain and Continuously Operate Bag Leak Detection Systems on the Fabric Filters Serving Furnaces 2, 6, 7 and 8, in Violation of 40 C.F.R. § 63.1510(f).

130.    The allegations in Paragraphs 1 through 129 are hereby re-alleged and incorporated by reference as if fully set forth herein.

131.    40 C.F.R. § 63.1510(a) requires owners or operators of existing emission units to monitor all processes in accordance with the provisions of Section 63.1510, commencing the date established in Section 63.1501 (March 24, 2003).  Subsection 63.1510(f) requires the owner or operator of an emission unit using a fabric filter (*i.e.,* a baghouse) or lime-injected fabric filter to install, calibrate, maintain and continuously operate a bag leak detection system or a continuous opacity monitoring system.

132.    Defendant has four emission units (Furnaces 2, 6, 7 and 8) that use fabric filters to collect emissions, and Defendant installed bag leak detection systems on these fabric filters. Furnaces 2 and 6 each have their own fabric filter, and Furnaces 7 and 8 share a fabric filter. Thus, there are three fabric filters serving four furnaces at Defendant's SAPF.

133.    Defendant failed timely to install a bag leak detection system on its three fabric filters.  Although the requirement to operate a bag leak detection system became effective on March 24, 2003, Defendant did not begin operating such a system on its fabric filters until sometime in or after August 2004.

27

134.    After installing bag leak detection systems on its three fabric filters, Defendant failed properly to calibrate, maintain and continuously operate these systems in accordance with the requirements in 40 C.F.R. § 63.1510(f).  Among other problems, Defendant reports that the bag leak detection systems malfunction by frequently sounding false alarms.

135.    The United States is entitled to injunctive relief requiring that Defendant operate the bag leak detection systems for Furnaces 2, 6, 7 and 8 in compliance with the requirements of 40 C.F.R. § 64.1510(f).

136.    As a result of these violations of the CAA, Defendant is liable for a civil penalty of up to $27,500 per furnace for each day between March 24, 2003 and March 14, 2004, and of up to $32,500 per furnace for each day on or after March 15, 2004 that these violations continued.

## EIGHTEENTH CLAIM FOR RELIEF

**Failure to Keep Required Records for the Bag Leak Detection Systems on the Fabric Filters Serving Furnaces 2, 6, 7 and 8, in Violation of 40 C.F.R. § 63.1517(b)(1).**

137.    The allegations in Paragraphs 1 through 136 are hereby re-alleged and incorporated by reference as if fully set forth herein.

138.    40 C.F.R. § 63.1517(b)(1)(i) requires owners or operators of existing emission units that control emissions with a fabric filter (a baghouse) and that use a bag leak detection system to record:  1) the total number of hours of operation of the emission unit for each six month reporting period; 2) each alarm that occurs; 3) the time of each alarm; 4) the time

28

corrective action is initiated and completed; and 5) a brief description of the cause of the alarm and the corrective action taken.

139.    Defendant has four emission units (Furnaces 2, 6, 7 and 8) that use fabric filters to control emissions: Furnaces 2 and 6 each have their own fabric filter, and Furnaces 7 and 8 share a fabric filter.  At times relevant to the Complaint, there have been three fabric filters each with their own bag leak detection system at Defendant's SAPF.

140.    Defendant has failed to record the information for each of its three bag leak detection systems, as required by 40 C.F.R. § 63.1517(b)(1)(i).

141.    Defendant should be enjoined to comply fully with the recordkeeping requirements of 40 C.F.R. § 64.1517(b)(1)(i) when it resumes operation of Furnaces 2, 6, 7 and/or 8.

142.    As a result of these violations of the CAA, Defendant is liable for a civil penalty of up to $27,500 per furnace for each day between March 24, 2003 and March 15, 2004, and of up to $32,500 per furnace  for each day on or after March 15, 2004 that these violations continued.

**NINETEENTH CLAIM FOR RELIEF**

**Failure to Develop and Implement an Approved Startup, Shutdown and Malfunction Plan as Part of their Operation, Maintenance and Malfunction Plan, in Violation of 40 C.F.R. § 63.1516(a).**

143.    The allegations in Paragraphs 1 through 142 are hereby re-alleged and incorporated by reference as if fully set forth herein.

144.    40 C.F.R. § 63.1516(a) requires owners or operators of emission units to develop and implement a written startup, shutdown and malfunction plan ("SSM Plan") as described in

29

§ 63.6(e)(3), and a program of corrective action for malfunctioning process and air pollution control equipment used to comply with emission standards.  Subsection 63.1517(a) further requires owners or operators to keep records of each startup, shutdown and malfunction event, as required by 40 C.F.R. § 63.10(b), and record and report if an action taken during such a period is not consistent with the procedures in the plan.

145.    Defendant failed timely to comply with the requirement in 40 C.F.R. § 63.1516(a) to develop a written startup, shutdown and malfunction plan, and it has failed to implement such a plan in accordance with Subsection 63.1516(a).

146.    Defendant should be enjoined to operate each  emission unit at its SAPF in accordance with an approved  SSM Plan,  as required by 40 C.F.R. § 63.1516(a).

147.    As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to $27,500 per day for each day between March 24, 2003 and March 15, 2004, and of up to $32,500 per day for each day  on or after March 15, 2004 that this violation continued.

## TWENTIETH CLAIM FOR RELIEF

### Failure to Obtain Approval for a Lime Addition Monitoring Procedure to Conduct Intermittent Lime Addition, in Violation of 40 C.F.R. § 63.1510(i)(3).

148.    The allegations in Paragraphs 1 through 147 are hereby re-alleged and incorporated by reference as if fully set forth herein.

149.    Defendant has three fabric filters that receive emissions from Furnaces 2, 6, 7 and 8.  Lime is used to coat and protect the bags in the fabric filters that trap emissions.  Continuous lime injection systems are frequently used to add lime to fabric filters.  Defendant, however, has

30

not use a continuous lime injection system; rather, it intermittently dumped bags of lime into its fabric filters.

150.    40 C.F.R § 63.1510(i)(3) states that an owner or operator who intermittently adds lime to a fabric filter must obtain approval from the permitting authority for a lime addition monitoring procedure. Section 63.1510(i)(3) further states that the permitting authority will not approve a monitoring procedure unless data and information are submitted establishing that the procedure is adequate to ensure that relevant emission standards will be met on a continuous basis.

151.    Defendant failed timely to seek approval from the permitting authority to add lime on an intermittent basis to the three fabric filters at its SAPF, in violation of 40 C.F.R. § 63.1510(i)(3). Further, when Defendant sought approval for its intermittent lime addition procedure, it was denied approval because it could not demonstrate to the permitting authority that its proposed procedure would ensure consistent compliance with the relevant emission standards.

152.    Defendant should be enjoined either to install and operate a continuous lime injection system for each of its fabric filters, in compliance with 40 C.F.R. § 63.1510(i)(1), or, if it can make the required demonstration, to add lime on an intermittent basis in accordance with a procedure approved by the permitting authority, in accordance with 40 C.F.R. § 63.1510(i)(3).

153.    As a result of this violation of the CAA, Defendant is liable for a civil penalty of up to $27,500 per day for each day between March 24, 2003 and March 15, 2004, and of up to $32,500 per day for each day on or after March 15, 2004 that this violation continued.

## TWENTY-FIRST CLAIM FOR RELIEF

31

**Failure to Maintain Records of All Charge Materials Used in Defendant's
Dross Only Furnaces (Furnaces 7 and 8) in Violation of
40 C.F.R. § 63.1517(b)(9).**

154.    The allegations in Paragraphs 1 through 153 are hereby re-alleged and
incorporated by reference as if fully set forth herein.

155.    At times relevant to this Complaint, Defendant has operated Furnaces 7 and 8 at
its Hammond Facility as "dross only" furnaces, within the meaning of 40 C.F.R. § 63.1503.  40
C.F.R. § 63.1517(b)(9) requires the owners or operators of dross-only furnaces to record all
materials charged into  these furnaces.

156.    Defendant has violated 40 C.F.R. § 63.1517(b)(9) by failing to keep records on
the materials charged into Furnaces 7 and 8, during times when Defendant operated these
furnaces as "dross only" furnaces.

157.    Defendant should be enjoined to comply with the requirement to record the
materials charged into Furnaces 7 and 8, if an when it restarts operating these furnaces as "dross
only" furnaces, in accordance with 40 C.F.R. § 63.1517(b)(9).

158.    As a result of these violations of the CAA, Defendant is liable for a civil penalty
of up to $27,500 per day per furnace, for each day between March 24, 2003 and March 15, 2004,
and of up to $32,500 per day per furnace for each day  after March 15, 2004 that these violations
occurred.

**TWENTY-SECOND CLAIM FOR RELIEF**

**Failure to Maintain Records on the Reactive Flux Used in
Furnace 2 and 6's Operations, in Violation of
40 C.F.R. § 63.1510(j)(3).**

159.    The allegations in Paragraphs 1 through 158 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

160.    At times relevant to this Complaint, Defendant has operated Furnaces 2 and 6 as Group 1 furnaces.  Furnaces 2 and 6 are "sidewell furnaces," and Defendant has conducted "reactive fluxing," as that term is defined in 40 C.F.R. § 63.1503, in the sidewells for Furnaces 2 and 6.

161.    40 C.F.R. § 63.1510(j)(3) requires the owner or operator of a Group 1 furnace to record for each 15-minute block period during each operating cycle or time period used in the performance test during which reactive fluxing occurs the time, weight, and type of flux for each addition of a solid, gaseous or liquid reactive flux.

162.    Defendant has violated 40 C.F.R. § 63.1510(j)(3) by engaging in reactive fluxing in the sidewells for Furnaces 2 and 6 without keeping records on the time, weight and type of fluxing material used, in accordance with that subsection.

163.    Defendant should be enjoined to comply with the requirement to record the time, weight and type of fluxing material used in accordance with 40 C.F.R. § 63.1510(j)(3) whenever it used a reactive flux at Furnaces 2 and 6, or any other Group 1 furnace at the Hammond Facility.

164.    As a result of these violations of the CAA, Defendant is liable for a civil penalty of up to $27,500 per day per furnace, for each day between March 24, 2003 and March 15, 2004, and of up to $32,500 per day per furnace for each day on or after March 15, 2004, that these violations occurred.

### TWENTY-THIRD CLAIM FOR RELIEF

**Failure to Submit Semi-Annual Excess Emissions/Summary Reports for Each Emission Unit, within Sixty Day After the End of Each Six Month Period, in Violation of**

33

**40 C.F.R. § 63.1516(b).**

165.    The allegations in Paragraphs 1 through 164 are hereby re-alleged and incorporated by reference as if fully set forth herein.

166.    40 C.F.R. § 63.1516(b) requires the owner or operator of an emission unit to submit semi-annual excess emission/summary reports, within sixty days after the end of each six month period.  Each report must contain the information specified in Subsection 63.10(c), and even if no deviations of parameters occur, a report must be submitted stating that no excess emissions occurred during the reporting period.  Subsection 63.1516(b)(1) further sets forth required information, and Subsection 63.1516(b)(2) requires certain certifications to appear in each report, including but not limited to a *mandatory certification* for operators of sidewell Group 1 furnaces (such as Furnaces 2 and 6) with add-on air pollution control devices, and a *mandatory certification* for operators of dross only furnaces (such as Furnaces 7 and 8).

167.    Even if the owner or operator of a SAPF believes that it has had no excess emissions, it must still comply with this reporting obligation because Subsection 63.151(b) requires these reports even when no deviations of parameters have occurred.

168.    As with other Subpart RRR requirements, this requirement to submit excess emissions/summary reports semiannually commenced on March 24, 2003, for existing affected sources.  See 40 C.F.R. § 63.1501(a).  To date, Defendant has *never* submitted an excess emission/summary report for any of the six month periods that have occurred since this reporting requirement became effective, for any of the five emission units that have operated at its SAPF.

34

169. By failing to submit any semiannual excess emissions/summary reports Defendant has violated 40 C.F.R. § 63.1516(b) and has thereby avoided the requirement to supply certain compliance certifications and other information to the regulatory agencies.

170. Defendant should be enjoined to submit semi-annual excess emissions/summary reports for each emission unit in accordance with 40 C.F.R. § 63.1516(b) when it recommences furnace operations at its SAPF.

171. As a result of these violations of the CAA, Defendant is liable for a civil penalty of up to $27,500 per day per avoided report for each day between March 23, 2003 and March 15, 2004, and of up to $32,500 per day per avoid report for each day on or after March 15, 2004 that these violations occurred.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States respectfully requests that this Court:

(a) Issue an injunction requiring Defendant to remedy its past and current noncompliance with the Clean Air Act and the NESHAP requirements and to comply prospectively with all applicable requirements;

(b) Assess civil penalties of up to $27,500 per day for each violation occurring between March 24, 2003 and March 15, 2004, and of up to $32,500 per day for each violation occurring after March 15, 2004;

(c) Award the United States its costs and disbursements in this action; and

(d) Grant such other relief as the Court may deem appropriate.

Respectfully submitted,


RONALD J. TENPAS
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division


LISA A. CHERUP
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044-7611
Telephone: (202) 514-2802



DAVID CAPP
Acting United States Attorney for the Northern District of Indiana


By:
SHARON JOHNSON
Assistant United States Attorney

Hammond Division
5400 Federal Plaza
Hammond, IN 46320
Telephone: 219-937-5681

<u>Of Counsel</u>:
CATHLEEN R. MARTWICK
Associate Regional Counsel
U.S. EPA, Region 5
77 W. Jackson Blvd.
Chicago, Illinois  60604