**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| INDIANA DEPARTMENT OF | ) | |
| ENVIRONMENTAL MANAGEMENT, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | Civil Action No. 2:07 CV2 62 PS |
| | ) | |
| HAMMOND DEPARTMENT OF | ) | |
| ENVIRONMENTAL MANAGEMENT, | ) | |
| | ) | |
| v. | ) | |
| | ) | CONSENT DECREE |
| JUPITER ALUMINUM CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## TABLE OF CONTENTS

Page

I.    JURISDICTION AND VENUE ...................................................... 3

II.   APPLICABILITY .................................................................... 3-4

III.  OBJECTIVES ........................................................................ 4

IV.   DEFINITIONS ....................................................................... 4-7

V.    REMEDIAL MEASURES ........................................................ ........ 7-43

      **Article One- Furnaces 2 and 6 Capture and Control Requirements** ........... 8-19

      A.   "Hot Commissioning" and Initial "Clean Charge" Capture Efficiency
           Demonstration for Group 1 Furnaces 2 and 6

           1.   Hot Commissioning ...................................................... 8

           2.   Defendant's Duty to Submit Protocols and U.S. EPA and HDEM
                Approval Thereof ...................................................... 8-9

           3.   Initial "Clean Charge" Capture Demonstration ...................... 9

      B.   "Normal Operations Startup" and "Other Than Clean Charge" Capture
           Efficiency Demonstrations for Group 1 Furnaces 2 and 6

           1.   Initial "Other Than Clean Charge" Demonstrations .................. 9-10

           2.   Additional Protocol Requirements for the "Other Than Clean Charge"
                Capture Demonstration ................................................ 10

           3.   Two Week Period to Adjust Capture Equipment and/or Charge
                Rates Following an Unsuccessful Initial Demonstration . . . ......... 10-11

           4.   Subsequent "Other Than Clean Charge" Capture Efficiency
                Demonstrations ....................................................... 11-12

      C.   Defendant's Option in the Event of a Dispute over an Observation During
           an Initial "Other Than Clean Charge" Capture Efficiency Demonstration . . 12

      D.   Defendant's Duty to Maintain Operating Conditions Occurring at the
           Time of a Successful "Other Than Clean Charge" Demonstration .......... 12-13

      E.   Defendant's Duty to Perform a "Root Cause Analysis" and to Take

i

Corrective Actions in Response to Visible Fugitive Emissions after    Page
a Successful Initial "Other Than Clean Charge" Capture Efficiency
Demonstration ……………………………………………………………… 14-16

F.     Contents of the Root Cause Analysis Report ……………………………. 16-17

G.     Cessation of Furnace Operations and Modification of Capture Equipment
In Accordance with an Approved Plan ………………………………….. 17-18

H.     Control of Emissions from the Hearths of Furnaces 2 and 6, and Molten
Metal Levels ………………………………………………………………… 18-19

I.     Defendant's Duty to Achieve Compliance with Subpart RRR by Adequately
Controlling Emissions form All Emission Units ………………………….    19

**Article Two- Furnace 4 Capture and Control Requirements** ………………. 20

**Article Three- Performance Tests for Furnaces 2, 4, 6, 7 and 8** ………………. 21

A.     Schedule for Initial Performance Tests Following Resumption of
Furnace Operations …………………………………………………………. 21

     1.      Furnaces 2 and 6 …………………………………………………. 21

     2.      Furnace 4 ………………………………………………………… 21

     3.      Furnaces 7 and 8 ………………………………………………….. 21

B.     Annual Performance Tests for All Group 1 and Dross Only Furnaces …….. 21-22

C.     General Requirements for Performance Tests ……………………………….22-23

D.     Performance Test Results……………………………………………………….23-24

E.     General Provisions Applicable When a Furnace Fails a Performance Test …24-25

F.     Requirement to Submit a Notification of Compliance Status Report in
Accordance with 40 C.F.R. § 63.1515(b) …………………………………… 25

**Article Four- Weighing Feed/Charge Rates at Group 1 and Dross Only**
**Furnaces, Recording Charging Information and Calibrating Weighing**
**Devices** …………………………………………………………………………… 25-29

A.     General Requirements …………………………………………………………25-26

B.     Recordkeeping Requirements ……………………………………………….. 26

ii

Page

C.      Calibration Requirements ………………………………………….. 26

D.      Six Month Demonstration Period for Weigh Cell Devices for
        Front-End Loaders …………………………………………………… 26-28

E.      Alternative Weighing System in the Event that the Six-Month Demonstration
        Is Unsuccessful ……………………………………………………….28-29

**Article Five- Video Monitoring System for Charging, Weighing and Drossing
Operations at Group 1 Furnaces …………………………………………… 29-30**

**Article Six- Bag Leak Detection Systems for Fabric Filters ……………………… 30-32**

**Article Seven- Operation, Maintenance and Management Plan
("OM&M Plan") Approval ……………………………………………… 32-34**

**Article Eight- Independent Monitoring Contractor  ……………………………  34-39**

    A.      General Requirement …………………………………………….34-35

    B.      Hiring Process …………………………………………………...35-36

    C.      Duties of the Independent Monitoring Contractor …………………………. 36-38

    D.      Replacement Procedure …………………………………………….38

    E.      Quarterly Reports ……………………………………… …………... 38-39

F.      No Parties Bound Provision …………………………………………… 39

**Article Nine- General Provisions Relating to the Remedial Measures Program 39-43**

A.      General Provisions Applicable to All Demonstrations and Tests on
        Furnaces ………………………………………………..................................... 39

B.      Permits …………………………………………………………… 39-40

C.      Mechanism for Incorporation of Consent Decree Requirements into a
        Title V Permit ………………………………………………………….40-41

D.      Emission Credit Generation ……………………………………………41-42

E.      Approval of Deliverables by U.S. EPA, HDEM and/or IDEM …………….. 42-43

Page

VI.     CIVIL PENALTY …………………………………………………………...43-45

VII.    REPORTING REQUIREMENTS …………………………………………… 45-48

VIII.   STIPULATED PENALTIES ………………………………………………... 48-56

IX.     FORCE MAJEURE ………………………………………………………… 57-59

X.      DISPUTE RESOLUTION ………………………………………………….. 59-61

XI.     INFORMATION COLLECTION AND RETENTION ………………………… 61-63

XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ………………… 63-65

XIII.   COSTS …………………………………………………………………… 65

XIV.    NOTICES …………………………………………………………………… 65-67

XV.     EFFECTIVE DATE ………………………………………………………… 67

XVI.    RETENTION OF JURISDICTION ………………………………………….. 67

XVII.   MODIFICATION ………………………………………………………….. 67

XVIII.  TERMINATION ………………………………………………………….. ..68

XIX.    PUBLIC PARTICIPATION ………………………………………………… 68-69

XX.     SIGNATORIES/SERVICE ………………………………………………… 69

XXI.    INTEGRATION ……………………………………………………………70

XXII.   FINAL JUDGMENT ……………………………………………………….70

XXIII.  APPENDICES ……………………………………………………………...70

        Appendix A ……………………………………………………………78-79

        Appendix B ……………………………………………………………81

## CONSENT DECREE

WHEREAS, Plaintiff, the United States of America ("United States"), by the authority of the Attorney General of the United States and through its undersigned counsel, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("U.S. EPA"), filed a Complaint on August 9, 2007, seeking injunctive relief and civil penalties pursuant to Section 113(b) of the Clean Air Act ("the CAA" or "the Act"), 42 U.S.C. § 7413(b), naming as defendant Jupiter Aluminum Corporation;

WHEREAS, Plaintiff-Intervenors, the State of Indiana, on behalf of the Indiana Department of Environmental Management ("IDEM"), and the City of Hammond, on behalf of the Hammond Department of Environmental Management ("HDEM"), which are the State and local air pollution control agencies that monitor Defendant's compliance with the CAA and corresponding State and local statutes and regulations, filed Motions to Intervene and Complaints in Intervention on August 10, 2007, against Defendant;

WHEREAS, Defendant owns and operates a Secondary Aluminum Production Facility ("SAPF") which is part of Defendant's larger aluminum production facility located at 1745 165th Street, in Hammond, Indiana, and is subject to the National Emission Standards for Hazardous Air Pollutant ("NESHAP") for secondary aluminum processing, codified at 40 C.F.R. Part 63, Subpart RRR;

WHEREAS, on November 24, 2006, a fire occurred at Defendant's aluminum production facility in Hammond, Indiana which resulted in the shut down of the SAPF and other parts of the Defendant's larger facility;

WHEREAS, the United States has alleged in its Complaint that commencing in March 2003 and continuing through the date of the fire, Defendant consistently violated Section 112

1

the Act, and the applicable requirements of 40 C.F.R. Part 63, Subpart RRR including but not limited to requirements set forth in Subsections 63.9(b), 63.1505(i), 63.1506(c), 63.1510(b),(e),(f),(i),(j) and (p), 63.1511(b), 63.1516(a) & (b), and 63.1517(b) of 40 C.F.R.

WHEREAS, in a "Finding of Violation" and an Order issued by IDEM on May 4, 2007, involving the Defendant's Hammond, Indiana aluminum production facility (including but not limited to its SAPF), Defendant was found to have violated other State air pollution control regulations at its SAPF, and was ordered not to begin furnace operations at its SAPF until it demonstrates to U.S. EPA that it is in compliance with 40 C.F.R. Part 63, Subpart RRR;

WHEREAS, IDEM and HDEM have alleged in their Complaints in Intervention that Defendant has violated Section 112 of the Act, and the applicable requirements of 40 C.F.R. Part 63, Subpart RRR including but not limited to requirements set forth in Sections 63.9(b), 63.1505(i), 63.1506(c), 63.1510(b),(e),(f),(i),(j) and (p), 63.1511(b), 63.1516(a) & (b), and 63.1517(b) of 40 C.F.R., and the equivalent Indiana regulations;

WHEREAS, on August 10, 2007, the Court granted IDEM's and HDEM's Motions to Intervene, and they are now Plaintiffs in Intervention in the United States' case (Cause No. 2:07 CV 262 PS);

WHEREAS, the Parties agree, and the Court find, that settlement of the claims alleged in the Complaints without further litigation or trial of any issues is fair, reasonable and in the public interest, and that the entry of this Consent Decree is the most appropriate way of resolving the claims alleged in the Complaints; and

WHEREAS, Defendant Jupiter Aluminum does not admit any liability to the United States, the State of Indiana, and/or the City of Hammond;

NOW, THEREFORE, without any admission of any issue of fact or law, except as

2

provided in Section I, below, and with the consent of the Parties, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

I.    <u>JURISDICTION AND VENUE</u>

1.    This Court has jurisdiction over the subject matter of this action, pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, and 1355(a), and over the Parties.  Venue lies in this District pursuant to 42 U.S.C. § 7413(b) and 28 U.S.C. §§ 1391(b) and 1395 (a) because the violations alleged in the Complaints are alleged to have occurred in, and Defendant conducts business in, this judicial district.  For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree and any such action and over Defendant and consent to venue in this judicial district.

2.    For purposes of this Consent Decree, Defendant agrees that the Complaints state claims upon which relief may be granted pursuant to Section 113 of the CAA.

II.    <u>APPLICABILITY</u>

3.    The obligations of this Consent Decree apply to and are binding upon the United States and the State Parties, and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

4.    No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Decree are implemented.  At least 30 days prior to such transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer to U.S. EPA Region 5 and the State Parties, the United States Attorney for the Northern District of Indiana, Hammond Division, and the United States Department of Justice, in accordance with Section XIV of this Decree (Notices).  Any

3

attempt to transfer ownership or operation of Jupiter's Hammond, Indiana Facility without complying with this Paragraph constitutes a violation of this Decree.

5.      Defendant shall provide a copy of this Consent Decree to all officers, employees and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III.     OBJECTIVES

7.      The express purpose of the Parties in entering into this Consent Decree is to bring the Defendant into compliance with 40 C.F.R. Part 63, Subpart RRR, the National Emission Standards for Hazardous Air Pollutant (NESHAP) for secondary aluminum production facilities (hereinafter "Subpart RRR"), and to assist in Defendant's maintaining compliance with Subpart RRR.

### IV.     DEFINITIONS

8.      Terms used in this Consent Decree that are defined in the Act or Subpart RRR shall have the meanings assigned to them in the Act or Subpart RRR, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

> a.      "Article" shall mean a subsection of Section V (Remedial Measures) of
> this Consent Decree;

4

b.      "Complaint" shall mean the complaint filed by the United States, and the
Complaints in Intervention filed by the State Parties;

c.      "Consent Decree" or "Decree" shall mean this Decree and all appendices
attached hereto, but in the event of any conflict between the text of this Decree
and any Appendix, the text of this Decree shall control;

d.      "Date of Lodging" shall mean the date that the United States Department
of Justice files this Consent Decree with the Court, along with a Notice of
Lodging. The "Date of Lodging" occurs prior to the public notice and comment
period.

e.      "Date of Signature by Defendant" shall mean the date that Defendant
Jupiter Aluminum Corporation signs this Consent Decree;

f.      "Day" shall mean a calendar day. In computing any period of time under
this Consent Decree, where the last day would fall on a Saturday, Sunday, or
federal or State holiday, the period shall run until the close of business of the next
business day;

g.      "Defendant" shall mean Jupiter Aluminum Corporation;

h.      "Effective Date" shall mean the date upon which this Consent Decree is
entered by the Court.

i.      "Facility" (or "SAPF") shall mean Jupiter's secondary aluminum
processing plant located in Hammond, Indiana;

j.      "HDEM" shall mean the Hammond Department of Environmental
Management;

k.      "Hot Commissioning" (or "Clean Start Up") shall mean the period, prior to

5

"Normal Operations Start Up," during which Defendant charges "Clean Charge" within the meaning of 40 C.F.R. § 63.1503, to Furnaces 2 and 6, in an effort to fine tune the interaction between the various components of its hot production line, including the melting furnaces, the holding furnace, the degasser, the caster and the hot mill and ancillary equipment, but without using any fluxing agent.

l.    "IDEM" shall mean the Indiana Department of Environmental Management;

m.   "Malfunction" shall mean, consistent with 40 C.F.R. § 60.2, any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner, but shall not include failures that are caused in part by poor maintenance or careless operation;

n.    "Normal Operations Startup" shall mean the 24-hour period beginning when aluminum which is "Other Than Clean Charge" or dross is charged to a Group 1, Group 2, or a Dross Only Furnace, which shall not occur prior to the Effective Date of this Consent Decree;

o.    "Other Than Clean Charge" shall mean any scrap aluminum that does not meet the definition of "clean charge" in 40 C.F.R. § 63.1503.

p.    "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral in a Section of this Decree other than Section V (Remedial Measures);

q.    "Parties" shall mean the United States, the State of Indiana, the City of Hammond, Indiana, and Defendant;

r.    "Section" shall mean a portion of this Decree identified by a roman numeral;

s.    "Shutdown" shall mean the cessation of operation of a Group 1, Group 2 or

6

Dross Only Furnace, as defined in 40 C.F.R. § 63.1503, for any reason.
Shutdown begins at the time when charging of aluminum or dross to the furnace
ceases;

t.    "State Parties" shall mean the State of Indiana and the City of Hammond,
Indiana;

u.    "Title V Permit" shall mean the operating permit issued by IDEM to the
Defendant for its Hammond, Indiana Facility, numbered T089-5838-00201,
any subsequent modifications or reissuances thereto.

v.    "Ton" or "tons" shall mean short ton or tons;

w.    "United States" shall mean the United States of America, acting on behalf of
U.S. EPA.

x.    "U.S. EPA" shall mean the United States Environmental Protection Agency
and any of its successor departments or agencies;

y.    "Visible Emission" shall mean any particulate or gaseous matter escaping
from the furnace hoods, the furnace door or charge wells, that can be detected by
the human eye.

## V. REMEDIAL MEASURES

9.    Defendant shall take the following steps (as set forth in **Articles One** through
**Nine** of this Section ("Remedial Measures") of this Consent Decree) to bring itself into
compliance with 40 C.F.R. Part 63, Subpart RRR, and thereafter shall maintain compliance.

7

**Article One- Furnaces 2 and 6 Capture and Control Requirements**

    **A.**    **"Hot Commissioning" and Initial "Clean Charge" Capture Efficiency Demonstration for Group 1 Furnaces 2 and 6**

    1.    <u>Hot Commissioning</u>- Commencing on the Date of Signature by Defendant of this Consent Decree, and provided that Defendant has received written approval from U.S. EPA of its revised Operation, Maintenance and Management Plan ("OM&M Plan"), Defendant may begin "Hot Commissioning" of Furnaces 2 and 6 (*i.e.* may begin charging <u>only</u> "Clean Charge," without using any fluxing agent. Defendant shall notify each Plaintiff in accordance with Section XIV ("Notices") of the date that "Hot Commissioning" in fact began. During "Hot Commissioning" (as well as at all other times under this Consent Decree), Defendant shall keep charging records in accordance with the requirements of the approved OM&M Plan.

    2.    <u>Defendant's Duty to Submit Protocols and U.S. EPA, IDEM and HDEM Approval Thereof</u>-

    No later than one week after the commencement of "Hot Commissioning," Defendant shall submit to U.S. EPA, IDEM and HDEM protocols for conducting a "Clean Charge" <u>and</u> a "Other Than Clean Charge" capture demonstration, which shall include specifics on the maximum charge rates, types of aluminum to be charged during each demonstration, and flow rates to be achieved by the capture and collection devices. Both the "Clean Charge" and "Other Than Clean Charge" protocols shall specify that during the capture demonstrations Defendant shall take three measurements of the volumetric flow rate of gas at the charge well hood, in accordance with U.S. EPA Methods 1, 2 (40 C.F.R. Part 60, Appendix A), and shall obtain the average volumetric flow rate from those measurements, in accordance with 40 C.F.R. Part 60, Appendix A. (*See* Subpart B, below, for additional protocol requirements for the "Other Than Clean Charge" capture demonstration). Following receipt of the two protocols, U.S. EPA, IDEM

8

and HDEM shall have one week to comment on and/or approve them.  After receiving comments, if any, Defendant shall revise the protocol in accordance with the comments, and shall resubmit to U.S. EPA, IDEM and HDEM for approval.  U.S. EPA, IDEM and HDEM again shall have one week after receipt of any revised protocols to comment on and/or approve them.

      3.      <u>Initial "Clean Charge" Capture Demonstrations</u>-

When the "Hot Commissioning" is completed, Defendants shall promptly notify the Plaintiffs in accordance with Section XIV of this Consent Decree.  Following completion of "Hot Commissioning," and after receiving U.S. EPA, IDEM, and HDEM approval on both protocols, Defendant shall schedule with U.S. EPA, IDEM, and HDEM during normal business hours, a "Clean Charge" capture efficiency demonstration for Furnaces 2 and 6, and shall demonstrate 100% capture, over a complete operating cycle, including during charging and drossing, in accordance with the approved protocol for a "Clean Charge" demonstration.  During the capture demonstration, Defendant shall keep the dross door closed during charging and shall keep the dross door open during drossing. 100% capture efficiency shall mean that all U.S. EPA, IDEM and/or HDEM inspectors present during the demonstration observe no Visible Emissions escaping from the hood or emission source throughout a complete operating cycle.  Should Defendant fail to demonstrate 100% capture during the "Clean Charge" demonstration, it may have one additional opportunity, at a time agreed to by all Plaintiffs, to make another "Clean Charge" capture demonstration.

      **B.**      **"Normal Operations Startup" and "Other Than Clean Charge" Capture Efficiency Demonstrations  for Group 1 Furnaces 2 and 6.**

      1.      <u>Initial "Other Than Clean Charge" Demonstrations</u>- Following completion of a

9

successful "Clean Charge" capture efficiency demonstration for Furnace 2 and/or 6, but not, in any event, before the Effective Date of this Consent Decree, Defendant may begin "Normal Operations Startup" (*i.e.* may begin charging "Other Than Clean Charge") at the furnace(s) that completed the successful demonstration(s). No later than 24 hours after commencing "Normal Operations Startup" at Furnace 2 and/or 6, and during normal business hours, Defendant shall perform an "Other Than Clean Charge" capture efficiency demonstration, in accordance with the U.S. EPA, IDEM and HDEM-approved protocol, while inspectors from U.S. EPA, IDEM and/or HDEM are present, and shall demonstrate 100% capture efficiency, over a complete operating cycle, including during charging, fluxing and drossing operations. 100% capture efficiency shall mean that all U.S. EPA, IDEM and/or HDEM inspectors present during the demonstration observe no Visible Emissions escaping from the hood or emission source throughout a complete operating cycle. Capture demonstrations shall be conducted with the dross door closed during charging and fluxing, and with the dross door open during drossing.

2.   Additional Protocol Requirements for an"Other Than Clean Charge" Capture Demonstration

Under an "Other Than Clean Charge" protocol to be approved by U.S. EPA, IDEM and HDEM, Defendant shall charge Used Beverage Cans ("UBCs") and "Other Than Clean Scrap" at the maximum charge rates, and using the maximum amount of flux, as set forth in Defendant's then current, U.S. EPA-approved Operation, Maintenance and Management Plan ("OM&M Plan").

3.   Two Week Period to Adjust Capture and Collection Equipment and/or Charge Rates Following Unsuccessful Initial Demonstration

Following an unsuccessful initial "Other Than Clean Charge" demonstration at Furnace 2 and/or 6 (See **Article One, B.** 1 & 2, above), Defendant may make two additional attempts

10

during the two week period following the unsuccessful initial "Other Than Clean Charge"
demonstration to make a successful demonstration, by adjusting charging rates and/or capture
and collection equipment.  Prior to scheduling the second or third demonstration, Defendant shall
provide one week's prior notice to the U.S. EPA, IDEM and HDEM inspectors present during
the unsuccessful initial demonstration of the date for the second or third demonstration.  If
Defendant makes a successful capture demonstration during the second or third such attempt by
adjusting charging rates and/or capture and collection equipment, within one week after the
successful demonstration, it shall submit a revision to its OM&M Plan to U.S. EPA, IDEM, and
HDEM, which shall incorporate the adjusted charging rates, average volumetric flow rate, and/or
capture and collection equipment to ensure that Defendant shall operate the furnace(s) in
question in accordance therewith.

    4.      <u>Subsequent "Other Than Clean Charge" Capture Efficiency Demonstrations</u>

        Under **Article One, Subpart E** of the Remedial Measures Section (Section V) of this
Consent Decree, Defendant may be required to perform additional "Other Than Clean Charge"
capture efficiency demonstrations for Furnaces 2 and/or 6.  Such subsequent demonstrations
shall be scheduled no later than two weeks after receiving notice from U.S. EPA that such a
subsequent demonstration is required.  On each subsequent "Other Than Clean Charge" capture
efficiency demonstration, Defendant shall follow the same protocol that it used to perform the
first successful "Other Than Clean Charge" capture efficiency demonstration, unless a
modification to the protocol has been review and approved by U.S. EPA, after consultation with
HDEM.  Further, the Defendant shall provide U.S. EPA, HDEM and IDEM with, at a minimum,
48 hours advance notice of such subsequent demonstration so that an U.S. EPA, HDEM and/or
IDEM inspector(s) can be present during the demonstration, which shall be conducted during

regular business hours.  In contrast to the initial "Other Than Clean  Charge" capture

demonstration, Defendant shall not have an additional two attempts to demonstrate successful

capture following an unsuccessful subsequent "Other Than Clean Charge" capture

demonstration.

### C. Defendant's Option in the Event of a Dispute over an Observation During an Initial "Other Than Clean Charge" Capture Efficiency Demonstration

Should Defendant dispute a visual observation of a U.S. EPA, IDEM and/or an HDEM

inspector during an initial "Other Than Clean  Charge" capture efficiency demonstration,

Defendant may, at its own expense, install a long-path opacity monitor.  For testing of charging

and fluxing operations, the monitor shall be positioned immediately outside the opening on the

charge well hood.  For testing of drossing operations, the monitor shall be positioned

immediately outside of the drossing door.  Prior to any capture demonstration in which the

opacity monitor is used, Defendant shall demonstrate to the U.S. EPA, IDEM and/or HDEM

inspectors present during the inspection that the opacity monitor has been properly calibrated and

is in good working order, in accordance with manufacturer's specifications that shall be made

available to the inspectors for review at least one business day in advance of the demonstration.

A reading of 5% or less above background by the opacity monitor shall be considered acceptable

capture and collection.  This option is available only during the initial "Other Than Clean

Charge" capture efficiency demonstration, and not for subsequent "Other Than Clean Charge"

capture efficiency demonstrations.

### D. Defendant's Duty to Maintain Operating Conditions Occurring at the Time of a Successful  "Other Than Clean Charge" Demonstration.

Following any successful "Other Than Clean Charge" capture demonstration on Furnace

2 or 6 (whether the initial demonstration or a subsequent demonstration required by **Article One,**

12

**B. 4**), Defendant shall submit a revised OM&M Plan to U.S. EPA, IDEM and HDEM for review and approval, if necessary, to modify the Plan to be in accordance with the maximum charge rates and other operating conditions used during the successful demonstration. Thereafter, when Defendant adds " Other Than Clean Charge" to the furnace in question, it shall operate in accordance with the approved, revised OM&M Plan, including but not limited to never exceeding the maximum charge rate set forth in the revised OM&M, operating the capture and collection system at no less than 95% of the average volumetric flow rate taken during the last successful capture demonstration, and otherwise operating the furnace in question and its associated capture and collection system in accordance with the operating conditions set forth in the applicable Title V permit. Further, simultaneously with submitting a revised OM&M Plan, Defendant shall submit to U.S. EPA, IDEM and HDEM, in accordance with Section XIV (Notices), a certification signed by the same type of corporate official required to sign Quarterly Reports under Section VII (Reporting Requirements) of this Consent Decree (See Paragraph 18), which states:

> I certify under penalty of law that Jupiter Aluminum Corporation at no time shall exceed the maximum charge rates that occurred during the most recent successful capture demonstration(s) for Furnace 2 and/or Furnace 6 performed on _____ *(fill in the date)* under **Article One, B**, of the Consent Decree entered into with the United States in United States of America, et al. v. Jupiter Aluminum Corp., C.A. No.07-_____, and that it shall maintain, at a minimum, the capture and collection equipment consistent with the conditions that were present during the successful capture demonstration(s).

An exceedance of the maximum charge rate, and/or a failure to maintain capture and collection equipment in accordance with the approved, revised OM&M Plan required in this subsection, shall be subject to stipulated penalties under Section VIII of this Consent Decree, and/or may be the subject of a contempt motion.

E.    **Defendant's Duty to Perform a "Root Cause Analysis" and to Take Corrective Actions in Response to Visible Fugitive Emissions After a Successful Initial "Other Than Clean Charge" Demonstration**

Following a successful "Other Than Clean Charge" capture efficiency demonstration pursuant to **Article One, B,** if the Defendant observes (or if any of the Plaintiffs to this Consent Decree, or the Independent Monitoring Consultant employed under **Article Eight** of the Remedial Measures Section (Section V) of this Decree, observe and notify Defendant of an occurrence of) a Visible Emission escaping from the hood, charge well, dross door, or furnace door of any furnace or associated capture and collection system, Defendant shall accrue a stipulated penalty in accordance with Paragraph 26 of Section VIII (Stipulated Penalties). The Visible Emission observation mentioned above may be made either by the naked eye, or by observing a visual recording of emissions made by the video monitoring system required in **Article Five** of Section V ("Remedial Measures") of this Consent Decree. Additionally, regardless of whether a stipulated penalty has accrued for a Visible Emission under Paragraph 26, when a Visible Emission is observed by the human eye, Defendant shall take the following steps:

1.    immediately stop charging "Other Than Clean Charge" to the furnace in question, and, if observed by the Defendant or the Independent Monitoring Consultant ("the IMC"), notify U.S. EPA, IDEM and HDEM within 24 hours of the occurrence;

2.    promptly perform a "root cause analysis " in accordance with this **Article One, E,** and take corrective actions determined necessary to prevent such Visible Emissions from recurring;

3.    submit a root cause analysis report (in accordance with **Article One, F,** below)

14

for review to U.S. EPA, IDEM and HDEM within one week of the Visible Emission occurrence (or, being notified of the Visible Emission occurrence, if observed by a Plaintiff by video);

4.    Defendant may recommence charging "Other Than Clean Charge" at the furnace where the Visible Emission was observed, only after the Defendant has done each of the following, and subject to Subsection 5, below:

    a.    identified the "root cause(s)" of the Visible Emission, and has made a contemporaneous record of the cause(s), when determined, (which record shall be made available to U.S. EPA, HDEM and IDEM, upon request);

    b.    taken corrective actions required to prevent the recurrence of such Visible Emission;

    c.    completed the operating cycle in which the Visible Emission occurred, using only "Clean Charge," and with, at a minimum, a company employee present who is qualified to make Visible Emission evaluations pursuant to U.S. EPA Method 22;

    d.    completed another full operating cycle using only "Clean Charge," during which a Visible Emission observer from the Defendant is consistently present, and during which no further Visible Emissions have been observed; and

    e.    following the Visible Emission observation, Defendant shall check to ensure that the camera that is recording the emissions from the furnace in question is operating and recording and the lense is clean.

15

However, if the Visible Emission observation is made through a video recording, Defendant must perform only requirements 2 and 3, above, within two weeks of receiving notice (either in oral or in writing) of the observation;

5.      After U.S. EPA learns of the Visible Emission (whether by receipt of the root cause analysis report, or otherwise) U.S. EPA, after consultation with HDEM and IDEM, may require another capture demonstration for the furnace in question, pursuant to **Article One, B, 4** or may require the submission of a Plan consistent with **Appendix A**, to modify the capture and collection system for the furnace in question, in accordance with **Article One, G**, if it believes that the corrective actions that Defendant has taken are not adequate to address the Visible Emissions that have occurred. U.S. EPA's decision to require a subsequent capture demonstration under this Subpart 5 of **Article One, E,** shall not be subject to dispute resolution.

**F.     Contents of the Root Cause Analysis Report-**

Any time Defendant observes (or a Plaintiff or the IMC observes and notifies Defendant of) a Visible Emission from a furnace, charge well, dross door or hood, Defendant shall perform a "root cause analysis" and submit a report, which includes the following:

1.      the date, start time, and end time, that the Visible Emissions were observed;

2.      the name and title of the person(s) who made the observation(s);

3.      the exact location(s) from which the emission originated;

4.      the step(s) taken, if any, that Defendant took to limit the duration and/or the quantity of the Visible Emission;

5.      a detailed analysis of the "root cause" or "root causes," of the occurrence, to the

extent determinable; if the "root cause(s)" cannot be determined, an explanation shall be provided of what steps Defendant took to identify the "root cause(s)" ;

6. an analysis of the measures, if any, that are available to reduce the likelihood of a recurrence of another Visible Emission from the same or a similar "root cause" or "root causes." This analysis shall discuss the alternatives, if any, that are available, the probable effectiveness and cost of the alternatives, and whether an outside consultant should be retained to assist in the analysis. Possible design, operational, and maintenance changes shall be evaluated; and

7. Defendant's recommendation on what corrective action(s) should be taken, and a schedule for completion of such corrective action(s).

## G. Cessation of Furnace Operations and Modification of Capture and Collection Equipment in Accordance with an Approved Plan

### 1. Cessation in the Event of a Failed Initial Capture Demonstration

If Defendant does not complete a successful initial " Other Than Clean Charge" capture demonstration on Furnace 2 and/or 6 in accordance with **Article One, B**, Defendant shall submit a plan within 14 days to U.S. EPA, HDEM and IDEM, a plan to modify its capture and control system(s) in accordance with Appendix A, to achieve 100% capture. U.S. EPA, IDEM and HDEM shall have 30 days from receipt of the plan to review and comment on the plan, and Defendant shall have 14 days after receipt of comments to modify the plan in accordance with the comments. Once the plan is approved by U.S. EPA, IDEM and HDEM, Defendant shall then implement the approved plan in accordance with the approved construction schedule, which plan and schedule shall be incorporated by reference and shall be enforceable under this Consent Decree. When the modifications have been completed, Defendant shall notify U.S. EPA, IDEM

17

and HDEM in writing, and shall schedule with them another "Other Than Clean Charge" capture efficiency demonstration.

Pending submission and approval of the plan for modification of the capture and control system, Defendant may continue to charge the furnace(s) in question with "Clean Charge" until the furnace(s) need to be shut down to make the approved modifications.

2.   Cessation in the Event of a Failed Subsequent Capture Demonstration

If Defendant completes a successful initial "Other Than Clean Charge" capture efficiency demonstration on Furnace 2 and/or 6 under **Article One, B 1-3,** but thereafter fails a subsequent capture demonstration required under **Article One, B. 4,** Defendant shall submit a plan within 14 days to U.S. EPA, IDEM and HDEM, a plan to modify its capture and control system(s) in accordance with Appendix A, to achieve 100% capture.  U.S. EPA, IDEM and HDEM shall have 14 days to review and comment on the plan, and Defendant shall have 14 days after receipt of comments to modify the plan in accordance with the comments.  Once the plan is approved by U.S. EPA, IDEM and HDEM, Defendant shall then implement the approved plan in accordance with the approved construction schedule, which plan and schedule shall be incorporated by reference and shall be enforceable under this Consent Decree.  When the modifications have been completed, Defendant shall notify U.S. EPA, IDEM and HDEM, in writing, and shall schedule with them another "Other Than Clean Charge" capture efficiency demonstration.

Pending submission and approval of the plan for modification of the capture and control system, Defendant may continue to charge the furnace(s) in question with "Clean Charge."

**H.   Control of Emissions from the Hearths of Furnaces 2 and 6, and Molten Metal Levels**

1.   Unless and until Defendant makes a successful demonstration of 100% capture at

18

the Furnace 2 hearth and/or Furnace 6 hearth, Defendant shall be prohibited from charging "Other Than Clean Charge" to the Furnace 2 hearth and/or the Furnace 6 hearth.  Should Defendant desire to make such a compliance demonstration at the Furnace 2 hearth and/or the Furnace 6 hearth, it shall so notify U.S. EPA, IDEM and HDEM, and the same process as set forth in **Article One, B** shall be followed.

2.  Further, if the level of molten metal falls below the top of the passage between the sidewell and the hearth, Defendant shall immediately notify U.S. EPA, IDEM and HDEM of this fact, and shall be required to demonstrate 100% capture efficiency at the furnace door and furnace flue hood while charging scrap to hearths at the maximum rate.

3.  If Defendant fails to demonstrate 100% capture at the Furnace 2 and/or Furnace 6 hearth, and Defendant still desires to charge "Other Than Clean Charge" to such hearths, Defendant may propose a modification to its capture and collection system (such as hood extensions over the hearth door) and following receipt of U.S. EPA, IDEM and HDEM approval (and appropriate modifications to its OM&M Plan and approvals thereof) may implement such a plan and retest at the hearth.  Should Defendant successfully demonstrate 100% capture efficiency following such modification, it shall be allowed to charge "Other Than Clean Charge" to the hearth(s) in question.

**I.  Defendant's Duty to Achieve Compliance with Subpart RRR by Adequately Controlling Emissions from All Emission Units.**

Any redesign of the capture and control system for Furnaces 2 and/or 6 required under Section V (Remedial Measure) of this Consent Decree shall meet or exceed the design standards set forth in Appendix A.  It remains, at all times, Defendant's responsibility to achieve and maintain compliance with the requirements of Subpart RRR.

19

**Article Two- Furnace 4 Capture and Control Requirements**

A.    Defendant shall either dismantle Furnace 4 and permanently remove it from service within 180 days from the Effective Date, or shall install and operate the following capture and control equipment prior to Normal Operations Startup:

1.    The Defendant shall design and install a system to capture and control emissions from the Furnace 4 flue and door which meets the engineering standards for minimum exhaust rates as published in chapters 3 and 5 of "Industrial Ventilation: A Manual of Recommended Practice," 23rd edition as published by the American Conference of Governmental Industrial Hygienists. The Defendant shall also vent captured emissions through a closed system, except that dilution air may be added to emission streams for the purpose of controlling temperature at the inlet to a fabric filter;

2.    Install an appropriately sized and designed fabric filter baghouse and bag leak detection system capable of meeting the emission standards for D/F, HCl and PM set forth in Subpart RRR;

3.    Once the baghouse and leak detection system are installed, Defendant shall notify U.S. EPA, IDEM and HDEM, and shall thereafter conduct a Performance Test on the system, in accordance with **Article Three, A. 2,** below, and

4.    Defendant, within one week of completing construction on the Furnace 4 capture system, shall propose and submit to U.S. EPA, IDEM and HDEM a modification to its OM&M Plan to address the new capture and collection system for Furnace 4, and shall operate the new capture and collection systems in accordance with the approved modification to the OM&M Plan.

20

**Article Three- Performance Tests for Furnaces 2, 4, 6, 7 and 8**

    A.   Schedule for Initial Performance Tests Following Resumption
        of Furnace Operations

1.    Furnaces 2 and 6- Defendant shall conduct performance tests on Furnaces 2 and 6 within three months of successfully demonstrating 100% capture as described in **Article One, B, above** and shall demonstrate compliance with the emission standards for Group 1 furnaces for Dioxin/Furans, Hydrochloric Acid and Particulate Matter set forth in 40 C.F.R. § 65.1505(i). Defendant shall also perform one three-hour performance test run using only "clean charge" to demonstrate compliance with the emission standards in 40 C.F.R. § 65.1505(i), while using "clean charge."

2.    Furnace 4- Defendant shall either dismantle Furnace 4 and permanently remove it from operation within 180 days from the Effective Date, or, if Defendant decides to install pollution control equipment on it and resume operation of Furnace 4, in accordance with **Article Two**, above, Defendant shall have three months following the date it notifies U.S. EPA, IDEM and HDEM in writing that it has commenced such operation, to conduct a performance test on Furnace 4, and demonstrate compliance with the emission limits for Group 1 furnaces found at 40 C.F.R. § 63.1505(i).

3.    Furnaces 7 and 8- Within three months of the Date of Lodging, Defendant shall conduct performance tests on Furnaces 7 and 8 (the "dross only furnaces"), and shall demonstrate compliance with the emission limit for "dross only" furnaces found at 40 C.F.R. § 63.1505(g).

B.    Annual Performance Tests for All Group 1 and Dross Only Furnaces
Following the year in which the "initial performance tests" are conducted pursuant to

**Article Three, A,** above, by the end of each subsequent calendar year, and until this Consent Decree terminates, Defendant shall conduct annual performance tests for Furnaces 2, 6, 7, 8, and 4 (if still in operation).

      C.      General Requirements for Performance Tests

            1.      Defendant shall conduct performance tests in accordance with 40 C.F.R. § 63.1511 and 63.1512, except that 40 C.F.R. § 63.1511(f) shall not apply. Defendant shall set the sensitivity of the baghouses alarms on the actual results of the PM stack tests to be performed on each baghouse stack under this Article of Section V (Remedial Measures).

            2.      Defendant shall conduct performance tests for each pollutant for which an emission standard has been established in 40 C.F.R. § 63.1505.

            3.      During the performance test Defendant shall obtain three measurements of the volumetric flow rate of the gas at the charge well hood in accordance with U.S. EPA Methods 1 and 2 (40 C.F.R. Part 60, Appendix A), and shall calculate the average of the three measurements. For Furnaces 2 and 6, the average gas volumetric flow rate measured during the performance test must be greater than or equal to the average volumetric flow rate measured during the capture demonstration required pursuant to **Article One.**

            4.      Defendant shall submit to U.S. EPA and HDEM for review and approval a test protocol at least 60 days in advance of the test, and in accordance with Subpart RRR. Defendant shall not conduct any performance test until and unless it receives from U.S. EPA and IDEM approval of the test protocol. The protocol shall include, among other things, a lime addition procedure.

22

5.      Further, within 45 days of completing each test, Defendant shall submit to U.S. EPA, IDEM and HDEM a test report containing the emissions measured during the test. The test report, among other things, shall verify that the lime addition procedure used during the test was, in fact, conducted in the protocol. Further, no later than 30 days after receiving comments from U.S. EPA and/or HDEM on deficiencies in the test report, Defendant shall revise the test report in accordance with the comments, and/or shall retest, if necessary, to address the deficiencies raised.   Defendant shall supply to U.S. EPA, IDEM and HDEM any data, measurements and/or calculations requested, relating to the performance test report. U.S. EPA, after consultation with IDEM and HDEM, shall notify Jupiter in writing when it accepts Defendant's Performance Test Report (or revised Performance Test Report).

D.      Performance Test Results

1.      For Furnaces 2, 6, and 4 (if still in operation), measured emissions shall not exceed the emission standards contained in 40 C.F.R. §  63.1505(i).

2.      Should the measured **Hydrochloric Acid (HCl)** emission rate exceed the limitations contained in 40 C.F.R. §  63.1505(i) for that pollutant, the Defendant shall cease operating the furnace in question until such time that a system for continuously feeding lime to the furnace's baghouse has been installed and the Defendant has demonstrated through another performance test that the HCl emission rate set forth in 40 C.F.R. §  63.1505(i) can be repeated.

3.      Should the measured **Dioxin/Furan (D/F)** emission rate exceed the limitations contained in 40 C.F.R. §  63.1505(i), the Defendant shall cease

23

charging "Other Than Clean Scrap," to the furnace, and shall submit a plan to U.S. EPA and HDEM for their review and approval, to ensure that the furnace can achieve and maintain compliance with the limitation that was exceeded. After the plan is approved and implemented, Defendant shall not resume charging "Other Than Clean Scrap" until another Performance Test confirms that the D/F and/or the PM limitation has been met.

4.     Should the measured **Particulate Matter (PM) emission rate** exceed the limitation contained in 40 C.F.R. § 63.1505(i) ), the Defendant shall cease charging "Other Than Clean Scrap," to the furnace, and shall submit a plan to U.S. EPA and HDEM for their review and approval, to ensure that the furnace can achieve and maintain compliance with the PM limitation. After the plan is approved and implemented, Defendant shall not resume charging "Other Than Clean Scrap" until another Performance Test confirms that the PM limitation has been met.

5.     For Furnaces 7 and 8, emissions shall not exceed the emission standards contained in 40 C.F.R. §  63.1505(g). Should the measured PM emission rate exceed the limitation contained in 40 C.F.R. §  63.1505(g), the Defendant shall cease operation of the offending furnace until such time as the furnace's baghouse has been repaired or replaced and a new performance test can be performed.

E.     General Provisions Applicable When a Furnace Fails a Performance Test

Should any furnace fail to demonstrate compliance with an emission standard during a Performance Test, and a modification of the control system is required by this Decree, the Defendant shall repeat the performance test on the furnace in question within two weeks of

returning the furnace to operation. Should the furnace in question fail the second performance test, the Defendant shall cease operation of the furnace in question upon receipt of the test results, or shall utilize "clean charge" only in the furnace that failed the test provided that Defendant has demonstrated compliance with the capture requirements and performance test while using "clean charge." Defendant may submit a plan to bring the furnace in question into compliance with the emission standard, however, no further operation of the furnace may occur until: (i) U.S. EPA and HDEM have approved the plan; and (ii) the Defendant has implemented the plan and demonstrated compliance.

F.      Requirement to Submit a Notification of Compliance Status
        Report in Accordance with 40 C.F.R. § 63.1515(b).

No later than 30 days after receiving U.S. EPA's notice of acceptance of a Performance Test Report (or a revised Performance Test Report) for a particular furnace, Defendant shall submit to U.S. EPA, IDEM and HDEM, in accordance with Section XIV (Notices) of this Decree, a "Notification of Compliance Status Report," in accordance with 40 C.F.R. § 63.1515(b). U.S. EPA, after consultation with IDEM and HDEM, shall approve, approve with comments, or disapprove the Notification of Compliance Status Report.

**Article Four- Weighing the Feed/Charge Rates at Group 1 and Dross Only Furnaces, Recording Charging Information, and Calibrating the Weighing Devices**

A.      General Requirements- Commencing on the Date of Signature by Defendant of this Consent Decree, prior to charging any load of scrap to Furnaces 2 or 6, or any load of dross to Furnaces 7 or 8, Defendant shall, on a furnace by furnace basis, weigh the scrap [or dross] with a weighing device that is accurate to within plus or minus one percent, as required by 40 C.F.R. § 63.1510(e). For Group 1 furnaces, Defendant shall weigh all scrap prior to charging it, and shall separately weigh flux, prior to charging it. For dross only furnaces, the dross and flux

25

may be weighed separately or together, prior to charging. Defendant shall use a scale to weigh the dross charged to Furnaces 7 and/or 8, and shall use weigh cells on front end loaders to weigh the scrap charges to Furnaces 2 and 6. However, the weighing mechanism used for Furnaces 2 and 6 (*i.e.* the weigh cells on the front end loaders) are subject to an initial "six month demonstration period," and if they do not prove reliable and sufficiently accurate ($\pm$ 1%), Defendant shall replace them with another weighing device, in accordance with Subpart D, below. Defendant shall supply the previous calibrations and manufacturer's specifications on the existing dross scales(s) to U.S. EPA, IDEM and HDEM to demonstrate that these are within $\pm$ 1% accuracy.

B.   <u>Recordkeeping Requirements</u> - For each load of scrap, dross, or flux that Defendant charges to a Group 1 or dross only furnace, Defendant shall record the following information:  the date, time, weight, the furnace to which the material was charged, whether the material was charged to the furnace hearth or the side well, and whether the material is scrap, dross, or flux. If the material being charged is scrap, Defendant shall also specify the type of scrap (Clean Charge, UBCs, Other Than Clean Charge, etc.).

C.   <u>Calibration Requirements</u>- The weighing device shall be calibrated, at a minimum once per month, or more frequently, if recommended by the manufacturer.

D.   <u>Six Month Demonstration Period for the Weigh Cell Devices for Front-End Loaders</u>

Defendant has proposed to weigh scrap aluminum being charged into Furnaces 2 and 6 through the use of weigh cells installed in the bucket of each front end loader that it used to load scrap aluminum in these furnaces. Because the Plaintiffs have concerns regarding the reliability and accuracy of such a weighing mechanism, the Parties have agreed to an initial six month demonstration period for these weigh cells.

26

As part of this six month demonstration, Defendant shall purchase and install on each front end loader that it shall use to load scrap into Furnaces 2 and 6, a weigh cell mechanism. Each front end loader shall also have a light or audible beep that signals to the operator when the bucket has lifted the material to the proper level for accurate weighing to occur. In operating the front end loaders, Defendant shall consistently lift the material in the loader to the required level, and shall obtain an accurate measurement of the weight of each load, prior to dumping the load into the charge well.

Defendant has represented that this weigh cell mechanism is, according to the manufacturer, accurate to within plus or minus one percent. Defendant shall have a six month demonstration period, commencing on the Date of Lodging of this Consent Decree, to demonstrate to the Plaintiffs that this weighing system is accurate and reliable, and that it adequately enables Defendant and Plaintiffs to monitor compliance with 40 C.F.R. § 63.1510(e).

During this six month demonstration period and within one week of the Date of Lodging, Defendant, after providing at least two business day's notice to HDEM, shall have an independent contractor experienced in testing weighing equipment for accuracy, conduct an initial "blind weight test" for each front-end loader that is used to load scrap into Furnace 2 or Furnace 6. Defendant shall arrange to have the independent contractor deliver to its furnace building, at a minimum, four blocks of varying weights, which have been pre-weighed on a properly calibrated and accurate truck scale. The weights of each block shall not be known by Defendant (or by HDEM) in advance of the "blind test." With an HDEM inspector(s) present, during this initial demonstration, each of Defendant's employees who operate the weighing system on the front end loader shall weigh each pre-weighed block with each front-end loader, and shall record the weight of each block independently of each other during the blind test. Each

front end loader operator shall conduct the weighing test under the same operating conditions

that he/she uses when charging furnaces, including but not limited to weighing the test blocks in

the same timeframe as he/she would take to weigh a single charge, and shall provide the results

of the test to the independent contractor. Following the test, the operators who have completed

the test shall not disclose to the other operators the weights that they measured. At the end of the

"blind test," the independent contractor shall immediately provide to HDEM and the Defendant

the results of the "blind test," and shall only at that time reveal the weights of the blocks, as

measure prior to the "blind test."

This "blind test" shall be repeated during the third and sixth month of the six month

demonstration period, and shall be scheduled so that the same operators are not performing the

demonstration each time. HDEM and U.S. EPA shall receive at least one week's prior notice of

the scheduling of the third month and sixth month demonstration.

If the independent contractor, after reviewing the protocol for the "blind test" set forth

above, determines that the protocol should be modified, it may suggest modifications and such

modifications shall be made if all parties agree thereon, and such modifications shall be

considered a "minor modification" to this Consent Decree that do not require the Parties to

modify this Decree pursuant to Section XVII (Modification) of the Decree.

While using the "weigh cell" technology for the front end loaders, Defendant shall follow

all manufacturer's recommendations for maintenance, calibration and repairs.

E.    Alternative Weighing System in the Event that the Six Month
      Demonstration is Unsuccessful

If following the six month demonstration period for the weigh cell system U.S. EPA,

after consultation with HDEM and IDEM, determines that the system is not reliable and accurate

within plus or minus one percent, then U.S. EPA may require Defendant to install either an in-

28

ground truck scale or a feed hopper weighing system in lieu of the weigh cell weighing system in the front end loaders. Within one month of receiving such notice from U.S. EPA, Defendant shall propose a plan and schedule to install, as promptly as feasible, the alternative weighing system, and shall submit it to U.S. EPA and IDEM, for review and approval. After receiving approval of such plan, Defendant shall install the approved alternative weighing system on the approved schedule, shall notify the Plaintiffs when construction is completed, and shall perform one blind weighing test, with, at a minimum, HDEM present. If the alternative weighing device passes the blind test, it shall be used thereafter to weigh all scrap and dross charged into all Group 1 and dross only furnaces at Defendant's SAPF. If the alternative weighing device does not pass the blind test, the Parties shall meet and confer on what additional steps, if any, should be taken, and on whether the Consent Decree should be modified.

## Article Five- Video Monitoring System for Furnaces 2 and 6 Charging and Weighing Operations

Pursuant to Section VI (Civil Penalty) of this Consent Decree, HDEM shall obtain a 50% share of the Civil Penalty and shall use a portion of the penalty received from Defendant to reimburse itself for the purchase and installation of: 1) a video monitoring system to provide a visual record of the weighing and charging of scrap that occurs at Furnaces 2; and 2) a wireless "LED display system" that shall remotely display weight of loads of scrap, as measured by the weigh cell in the front end loader, or an truck scale. While HDEM shall be responsible for purchasing, installing and testing the video monitoring system and the LED display system, Defendant shall provide to HDEM (or its contractor(s)) reasonable access to its furnace building and front end loaders, for proper installation and testing of the video monitoring system and the LED display, which installation may occur no earlier than the Date of Lodging of the Decree.

29

Defendant shall also supply the electrical power necessary to operate the video monitoring system and the LED display.

It shall be the obligation of HDEM to maintain the video monitoring system and the LED display in good working order, and Defendant shall provide reasonable access to HDEM and/or HDEM's contractors to ensure that the video system and LED display are operating properly.

However, under this Article of the Remedial Measures Section, Defendant shall be required to clean the lense on the video monitoring devices, as requested by HDEM (but no more frequently than once per week), and to ensure that the line of vision between the video equipment and Furnaces 2 and 6 (and their charge wells) is not obstructed, other than obstructions caused by normal business operations.

**Article Six- Bag Leak Detection Systems for Fabric Filters**

A.      Defendant shall operate a bag leak detection system, capable of detecting PM emissions at concentrations of 10 milligrams per actual cubic meter or less, for each exhaust stack of a fabric filter. Defendant shall also operate each bag leak detection system in accordance with the manufacturer's written specifications and recommendations, a copy of which it shall supply to U.S. EPA, IDEM and HDEM within thirty days from the ~~Effective Date~~ Date of Lodging of the Consent Decree.

B.      Prior to Normal Operations Startup, the manufacturer shall inspect and verify that the bag leak detection systems are installed and calibrated to ensure accuracy of operational parameters. Subsequently every six months, the manufacturer shall reinspect and shall verify that each bag leak detection system remains accurate. In the event that the manufacturer determines that the system is inaccurate, Defendant shall promptly take corrective action to return the system to proper operation. Defendant shall provide a copy of these verifications as

30

part of the Quarterly Report under Section VII (Reporting Requirements) of the Decree. Defendant's personnel who perform installation, maintenance and/or adjustment of the bag leak detection system shall obtain all available training from the manufacturer.

C.     For each bag leak detection system, Defendant shall install and operate a device that automatically records the following information at no greater than 10 second intervals: date, time, baghouse number, furnace number, relative or absolute PM loading, alarm setpoint, alarm delay, alarm sensitivity, alarm status, and current alarm duration.

D.     For each bag leak detection system, Defendant shall maintain a log sheet with the following information: date and time of each alarm, the cause of each alarm, the corrective action undertaken for each alarm, and the date and time when corrective action was initiated and completed. The Defendant shall also record any dates and times when the bag leak detection system was not in service or believed to be malfunctioning. Defendant shall also record dates and times when the bag leak detection system was calibrated, repaired or adjusted in any manner. For each record on the log sheet, Defendant shall record the full name and title of the person entering the information on the sheet.

E.     Defendant shall move visual and audible bag leak alarms to a location that is permanently staffed, on a 24 hour basis, and shall maintain such alarms at that location. Defendant shall make the staff at this location responsible for initiating corrective action each alarm on each baghouse within one hour or less from the time the alarm began, and shall record all responses/corrective actions taken.

F.     Defendant shall operate each baghouse servicing Furnaces 2, 6, 7, 8, and 4 (if still in operations) such that the bag leak detection system alarm does not sound more than 5 percent of the operating time during a calendar month.

31

G.    The total downtime for each bag leak detection system during each calendar month shall be no more than five percent of the corresponding furnace's operating hours.

H.    When the bag leak detection system is not in operation, Defendant shall have a certified Visible Emissions evaluator take Visible Emissions readings once per daylight shift on the baghouse stack on which the detection system is not operating. The readings shall be taken in accordance with 40 C.F.R. 60, Method 9.  Records shall be maintained of the Visible Emissions readings and available to agency personnel upon request.  The readings shall be taken while the furnace and baghouse are in operation, and records shall be maintained regarding the operating conditions in effect during the readings.  If a furnace does not operate during daylight hours on any day, the Visible Emissions evaluator can note this fact in lieu of taking the readings.  The Defendant shall report any Method 9 readings at or over 20% to U.S. EPA, IDEM and HDEM in the Quarterly Report required by Section VII (Reporting Requirements) of this Consent Decree. Each Method 9 opacity reading at or over 20% shall be considered a violation of the PM standard, and shall be subject to a stipulated penalty under Paragraph 30 of the Decree.  In reporting such readings, Defendant shall provide the stack in question, the percentage opacity observed, the date and the time of the observation.

**Article Seven- Operation, Maintenance and Management Plan ("OM&M Plan") Approval**

Within thirty days after the Date of Lodging of this Consent Decree, Defendant shall submit an OM&M Plan revision to U.S. EPA, IDEM and HDEM for review and approval.  All OM&M Plan revisions or amendments submitted after the Date of Lodging of this Consent Decree shall contain, at a minimum, the following information:

A.    A certification from the Defendant that Defendant shall operate Furnaces 7 and 8 as "dross only" furnaces;

32

B.     A certification from the Defendant that Defendant shall charge only "clean charge," as defined in 40 C.F.R. § 63.1501, to Furnace 1;

C.     A startup, shutdown, and malfunction plan meeting the requirements of 40 C.F.R. § 63.1516(a);

D.     A lime addition monitoring procedure for each baghouse to which intermittent lime addition will take place;

E.     A timetable for demolition for any furnace which will no longer be operated;

F.     For any furnace which will remain in operation, establish maximum feed/charge rates in tons per charge and tons per hour for the furnace hearth and side well (if so equipped) of the following materials: flux, dross, total aluminum scrap, UBCs, Clean Charge, and Other Than Clean Charge excluding UBCs;

G.     A description of the method that Defendant shall use to ensure that the molten metal level in Furnaces 2 and 6 (as measured during fluxing), does not fall below the arch of the furnace;

H.     Maximum feed/charge rates shall not exceed the rates established during the capture demonstration conducted pursuant to **Article One**, or the performance test conducted pursuant to **Article Three**, whichever is lower;

I.     A procedure to take weekly measurements of the volumetric flow rate of gas at the Furnace 2 and Furnace 6 charge well hoods in accordance with U.S. EPA Methods 1 and 2 (40 C.F.R. Part 60, Appendix A). For Furnaces 2 and 6 charge well hoods, the gas volumetric flow rate measured during the monthly checks must be at least 95 percent of the average volumetric flow rate measured during the successful **Article One** capture demonstration. If the measured flow rate is less than 95 percent of the average volumetric flow rate measured during

33

the successful **Article One** capture demonstration, Defendant shall modify or repair the capture and collection equipment to achieve the required flow rate within one month from the date such measurement is taken, or shall cease charging the furnace in question. Defendant shall notify U.S. EPA, IDEM and HDEM, within two days, of the date when the flow rate was measured at less than 95 percent of the average volumetric flow rate measured during the successful **Article One** capture demonstration, and

J.      Designation of supervisor(s) who shall be responsible for ensuring compliance with this Consent Decree, Subpart RRR and the approved OM&M Plan in the following areas:

      1.      training personnel on the operation of the furnaces and the capture and collection system (including but not limited to the bag leak detection system, scrap charging techniques and scrap weighing equipment);

      2.      training personnel on the recordkeeping requirements;  and

      3.      on a weekly basis, reviewing records pertaining to the bag leak detection system and the scrap weighing to ensure that:  the equipment is functioning and recordkeeping, corrective actions are occurring and observing operator's charging techniques.

**Article Eight- Independent Monitoring Contractor**

A.      General Requirement-  In accordance with the procedure in the following Subsection B, Defendant shall hire an Independent Monitoring Contractor ("IMC") to perform the duties in the following Subsection C.  Defendant's contract with the IMC shall require the IMC to perform all the duties in Subsection C, to provide quarterly reports to U.S. EPA, IDEM and HDEM pursuant to Subsection D, and to be fully available to consult with U.S. EPA, IDEM and HDEM upon request within a reasonable time and upon reasonable notice.  Defendant shall

34

bear all costs associated with the IMC, cooperate fully with the IMC, and provide the IMC with unfettered access to the Defendant's Hammond facility, including all records and documents required pursuant to this Decree and 40 C.F.R. 63, Subpart RRR. The obligation to maintain a contract with the IMC shall continue until this Consent Decree terminates in accordance with Section XVIII (Termination).

  B. Hiring Process- Within 15 days of the Date of Lodging, Defendant shall submit to U.S. EPA a list of three or more proposed consultants to serve as the IMC along with their qualifications and descriptions of any previous work or contracts with the Defendant. Each proposed consultant must employ two or more registered professional engineers and one or more qualified environmental professionals ("QEPs") with a specialization in air quality:

   1. experienced in the operation of fabric filter baghouses;

   2. familiar with the operation of metal melting furnaces; and

   3. certified to make Visible Emissions evaluations pursuant to U.S. EPA Method 9.

  The proposed consultants shall not be present employees or contractors of the Defendant, or present employees of any contractor of the Defendant. Within 15 days of receiving the list of proposed consultants, U.S. EPA, after consultation with IDEM and HDEM, shall approve or disapprove each member of the list, which approval shall not be unreasonably withheld. Should U.S. EPA approve none of the proposed consultants on Defendant's initial list, Defendant shall be provided with one opportunity to revise and resubmit the list. Should U.S. EPA, after consultation with IDEM and HDEM, not approve any of the consultants on the revised list, U.S. EPA shall identify additional candidates, and shall notify Defendant of the names of the candidates. Within 15 days after receipt of U.S. EPA's approval, Defendant shall select one

contractor from those contractors approved by U.S. EPA and shall enter into the contract described in **Article Eight, A**. In the event that any of the contractor(s) approved by U.S. EPA is no longer available or willing to accept the work described in Subsection C when notified of their selection by Defendant, the Defendant shall select another contractor approved by U.S. EPA, after consultation with IDEM and HDEM, and shall enter into the contract described in **Article Eight, A,** within 15 days. If U.S. EPA disapproves of all of the proposed consultants on Defendant's list, the Defendant shall submit another list of proposed contractors to U.S. EPA within 15 days of receipt of U.S. EPA's written notice disapproving of the contractors on the previous list. If after Defendant has submitted a third list of contractors, which must be submitted within 15 days of receipt of written notice disapproving of all of the contractors on Defendant's second list, the parties are unable to agree on an IMC, the parties agree to resolve the selection of the IMC through the dispute resolution process in Section X (Dispute Resolution).

C.   Duties of the Independent Monitoring Contractor- Defendant's contract with the Independent Monitoring Contractor shall provide that the IMC shall perform the following duties:

> 1.   monitor operation of Defendant's furnaces, at a minimum, for forty hours per week, to determine compliance with 40 C.F.R. Part 63, Subpart RRR, this Decree, and Defendant's OM&M plan;
>
> 2.   monitor Defendant's response to bag leak detection alarms;
>
> 3.   monitor Defendant's weighing, characterization, and charging of scrap to the furnaces (including, but not limited to, monitoring to ensure that maximum charge rates are not exceeded);

36

4.   review records relating to scrap weighing, bag leak detection alarms, and baghouse maintenance;

5.   review, in advance of submission, reports submitted by the Defendant to U.S. EPA, IDEM and/or HDEM relating to 40 C.F.R. Part 63 Subpart RRR requirements or requirements of this Decree;

6.   determine whether Furnaces 2 and/or 6 are operating with the level of molten metal between the hearth and the charge well below the arch;

7.   on a weekly basis, periodically monitor for fugitive emissions from the Furnace 2 and Furnace 6 per U.S. EPA Method 22 charge well hoods, and from the Furnace 2 and Furnace 6 hearth door, and flue hoods;

8.   once every month observe the charge wells of Furnaces 2 and 6 (per Method 22), over an entire operating cycle (including during charging, fluxing and drossing operations) to determine whether any fugitive emissions occur;

9.   once every day in which the IMC is present at the Facility during daylight hours, make and properly document Visible Emission evaluations of the baghouse stacks in accordance with U.S. EPA Method 9; and

10.   submit quarterly reports to U.S. EPA and HDEM regarding items 1 through 9, above, and Defendant's compliance with the requirements of this Decree and 40 C.F.R. Part 63, Subpart RRR and the plans required therein.

Regarding hours of monitoring, the IMC shall be given access to Jupiter's SAPF at all times of the day and night, and the IMC shall monitor compliance, on an unannounced, rotating

basis, during all shifts the furnaces are in operation.

      D.    <u>Replacement Procedure</u>- If the IMC becomes unable or unwilling to perform or complete the duties described in **Article Eight, C**, or for other good cause, Defendant and U.S. EPA shall confer in good faith regarding whether or not Defendant and U.S. EPA need to select a replacement IMC. If Defendant and U.S. EPA agree on the need to select a replacement IMC, Defendant and U.S. EPA shall select the replacement IMC in accordance with the selection procedures in **Article Eight, B**, above. If Defendant and U.S. EPA do not agree on the need to select a replacement IMC, either Defendant or U.S. EPA may invoke the dispute resolution procedures in Section X (Dispute Resolution) of the Decree.

      E.    <u>Quarterly Reports</u>- Once Defendant has retained the IMC pursuant to **Article Eight, B**, the IMC shall provide certified Quarterly Reports to U.S. EPA, IDEM and HDEM in accordance with the requirements of this Paragraph. The first Quarterly Report shall be due within 90 days of the close of the calendar year quarter after U.S. EPA has approved the IMC pursuant to **Article Eight, B**, of this Decree with subsequent reports due within 90 days of the close of each calendar year quarter thereafter. Each Quarterly Report shall include:

    1.    copies of any Visible Emissions evaluations for which a six-minute average opacity exceeded 20 percent for a stack emission or 10 percent for a building emission;

    2.    copies of any Visible Emission evaluations made of fugitive emissions;

    3.    dates and times when Defendant failed to initiate corrective action within 1-hour of a bag leak detection alarm or failed to complete the corrective action procedures in accordance with the approved OM&M Plan;

    4.    dates, times, and descriptions of deviations when Defendant operated the

38

furnaces or baghouses in a manner inconsistent with the approved OM&M plan;

5.      dates, times, and descriptions of any other deviations from the requirements of this Decree or 40 C.F.R. Part 63, Subpart RRR; and

6.      description of any errors noted in the reports, required pursuant to this Decree or 40 C.F.R. Part 63, Subpart RRR, submitted by the Defendant to the U.S. EPA or HDEM.

F.      No Parties Bound Provision- None of the Parties shall be bound by the statements, conclusions or opinions of the IMC. However, if Defendant violates any requirement of the Decree, Defendant shall be liable for stipulated penalties, unless excused by *force majeure*, pursuant to Section IX, regardless of the statements, conclusions or opinions of the IMC.

**Article Nine- General Provisions Relating to the Remedial Measures Program**

A.      General Provisions Applicable to Demonstrations and Tests of Furnaces

Until such time as Defendant successfully demonstrates 100% capture at Furnaces 2, 6 and 4 (if not dismantled and taken out of operation), Defendant shall notify the U.S. EPA, IDEM and HDEM, in writing, at least one week in advance as to its intended Normal Operations Startup or demonstration dates. Normal Operations Startup and capture demonstrations shall be restricted to normal business hours, unless U.S. EPA, IDEM and HDEM agree otherwise, and express such agreement to Defendant in writing.

B.      Permits- Where any compliance obligation (including installation or construction of pollution control technology or equipment) under this Section V (Remedial Measures) requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit

39

timely and complete applications and take all other actions necessary to obtain all such permits
or approvals. Defendant may seek relief under the provisions of Section IX (Force Majeure) of
this Consent Decree for any delay in the performance of any such obligation resulting from a
failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such
obligation, including, but not limited to, any necessary air, water and hazardous waste
construction and operating permits, if Defendant has submitted timely and complete applications
and has taken all other actions necessary to obtain all such permits or approvals, including
without limitation, submitting to the federal, state and/or local permitting authority all relevant
and available information requested by such agency after its receipt of the permit application.
Any failure by Defendant to submit timely permit applications shall bar any use of Section IX
(Force Majeure] of this Consent Decree, where a force majeure claim is based on permitting
delays. U.S. EPA Region 5 and the State Parties shall use best efforts to review expeditiously all
permit applications submitted to meet the requirements of this Consent Decree.

C.   Mechanism for Incorporation of Consent Decree Requirements
     into a Title V Permit

The Parties agree that the incorporation of the requirements of this Consent Decree into a
Title V permit shall be in accordance with the State of Indiana's Title V rules, including
applicable administrative amendment provisions of such rules. Defendant shall provide U.S.
EPA and the State Parties a copy of each application for a federally enforceable permit necessary
to implement the requirements of this Consent Decree, as well as a copy of any permit proposed
as a result of such application, to allow for timely participation in any public comment
opportunity.

Within twelve months of the Date of Lodging of this Consent Decree, Defendant shall

40

also submit a proposal to the Chief, Air Enforcement and Compliance Assurance Branch, U.S.

EPA Region 5, requesting an alternative approach to establishing capture and collection system

operating requirements for Furnaces 2 and 6. Defendant's proposal shall include all data

or information justifying the request, including but not limited to, volumetric flow measurements

and charging rates, as well as all information required by **Article 4, B** of Section V (Remedial

Measures), and Section VII (Reporting Requirements) of this Consent Decree. Within 14 days

of receipt of U.S. EPA's approval of the above-referenced alternative approach Defendant shall

include the terms of such approach in an application for modification to its Title V permit as

applicable requirements established under Subpart RRR.

> D.   Emission Credit Generation

Defendant will neither generate nor use any emission reductions resulting from any

projects required pursuant to this Consent Decree for the purpose of obtaining netting credits or

offsets in any application for approval for construction under the Prevention of Significant

Deterioration (PSD) part of the Clean Air Act, major non-attainment (meaning the non-

attainment area New Source Review (NSR) program within the meaning of Part D of Subchapter

I of the Act, 42 U.S.C. §§ 7510-7515, 40 C.F.R. Part 51), and/or minor NSR permit or permit

proceeding; provided, however, that notwithstanding any other provision herein, (a) nothing in

this Paragraph shall be construed to limit the generation and use of emissions credits or offsets

respecting emission reductions that are either more stringent than the emissions limits established

under the Consent Decree or achieved from sources not covered under the Consent Decree, as

well as reductions of any other pollutant at any source; and (b) this Consent Decree is not

intended to prohibit Defendant or the States in which the Facilities are located from using

emission reductions from the installation of controls required by this Consent Decree in

41

determining whether a project that includes both the installation of controls under this Consent Decree and other construction or modification (whether or not such construction or modification affects the Facility's production capacity), and is permitted as a single or phased construction project, triggers PSD and/or NSR requirements.

      E.     Approval of Deliverables- After review of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, U.S. EPA, after consultation with the State Parties, shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

      1.     If the submission is approved, Defendant shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.

      2.     If the submission is conditionally approved or approved only in part, Defendant shall, upon written direction from U.S. EPA, after consultation with the State Parties, take all actions required by the approved plan, report, or other item that U.S. EPA after consultation with the State Parties determines are technically severable from any disapproved portions, subject to Defendant's right to dispute only the specified conditions or the disapproved portions, under Section X. of this Decree (Dispute Resolution).

      3.     Any stipulated penalties applicable to the original submission, as provided in Section VIII (Stipulated Penalties) of this Decree, shall accrue during the 30 Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this

Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

4.      If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, U.S. EPA after consultation with the State Parties, may again require Defendant to correct any deficiencies, in accordance with the preceding subsections, subject to Defendant's right to invoke Dispute Resolution and the right of U.S. EPA to seek stipulated penalties as provided in this Consent Decree.

## VI.    CIVIL PENALTY

10.      Defendant shall pay $2,000,000 dollars (two million dollars), as a civil penalty, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961. 50% of the civil penalty ($1,000,000) shall be paid to the United States and 50% ($1,000,000) to the City of Hammond, over a two year period, in five equal installment payments, with the first payment to the United States ($200,000) and the first payment to the City of Hammond ($200,000) occurring thirty days from the Effective Date of this Decree. Following the first payment, the remaining four installment payments shall be made on or before December 31, 2007, June 30, 2008, December 31, 2008, and the final payment on or before June 30, 2009. The payments to the United States shall be made by FedWire Electronic Funds Transfer (EFT) to the U.S. Department of Justice in accordance with instructions to be provided to Defendant, following lodging of the Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the Northern District of Indiana, Hammond Division. At the time of payment, Defendant shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United

43

States, et al. v. Jupiter Aluminum Corp., and shall reference the civil action number (C.A. No.

07-___ ) and DOJ case number DOJ case number 90-5-2-1-08734 to the United States in

accordance with Section XIV of this Decree (Notices); by email to

acctsreceivable.CINWD@epa.gov; and by mail to:

> U.S. EPA Cincinnati Finance Office
> 36 Martin Luther King Drive
> Cincinnati, Ohio 45268

11.     Defendant shall not deduct any penalties paid under this Decree pursuant to this

Section or Section VIII (Stipulated Penalties) in calculating its federal, state and/or local income

tax.

12.     Within 30 days after the Effective Date of this Consent Decree, Defendant shall

pay the first of five equal installment payments to the City of Hammond. Following the first

payment, the remaining four payments should be made on or before December 31, 2007, June 30,

2008, December 31, 2008, and the final payment on June 30, 2009.  Civil and stipulated

penalties owed to the City of Hammond are payable by check to the Hammond City Controller.

Checks shall include the Case Number of this Action and shall be mailed to Hammond

Department of Environmental Management, 5925 Calumet Avenue, Room 304, Hammond, IN

46320.  In accordance with **Article Ten** of the Remedial Measures Section (Section V) of this

Consent Decree, HDEM shall spend a portion of its share of the Civil Penalty (not to exceed

$100,000) on an environmentally beneficial project, namely, the purchase, installation and

maintenance of video monitoring equipment for charging and drossing, and an LED display for

the scrap weighing system.  Following the Date of Lodging, HDEM may use its own funds to

purchase and install the video monitoring equipment and LED display, and may then reimburse

itself from the initial Civil Penalty installment payment made by Defendant to HDEM.  When

this Consent Decree terminates under Section XVIII (Termination), Defendant shall allow
HDEM to remove the video monitoring equipment from its SAPF, or if Defendant and HDEM
agree, arrangements can be made to maintain the equipment in place, at the SAPF.

## VII.   REPORTING REQUIREMENTS

13.   The Defendant shall submit weekly furnace charging data and bag leak detection
data to HDEM up until the time the IMC has been hired and trained on his/her responsibilities.
This information shall be submitted in either paper or electronic form. The information shall be
submitted each Tuesday for the previous week's information.

14.   Within 30 days after the end of each quarter calendar year (*i.e.,* by January 30th,
April 30th, July 30th, October 30th) after the Effective Date, until termination of this Decree
pursuant to Section XVIII (Termination), Defendant shall submit a quarterly report for the
preceding three months that shall include:

a.   The status of any construction or compliance measures necessary to correct any
problems encountered or anticipated, together with implemented or proposed solutions;

b.   Problems encountered or anticipated, together with implemented or proposed
solutions;

c.   Status of permit applications;

d.   A summary of Defendant's compliance status with emission limitations;

e.   A report of any excess emissions observed during the quarter, including but not
limited to Method 9 observations made of stacks and observations made of fugitive
emissions from Group 1, Group 2 and/or dross only furnaces. In making Method 9
observations Defendant's certified reader must use Appendix B (Hammond Department
of Environmental Management, Air Pollution Control Division's "Visible Emission

45

Evaluation Form");

f. For the fugitive emissions observed, a table or summary of the total number of Visible Emission Observations that occurred per furnace, the total number of such observations that were in excess of 30 seconds; the dates, start times and ending times, the "root cause(s)" identified, the corrective actions taken, if any, for each such observation, and for those observations for which corrective actions are ongoing, a date in which completion of the corrective action is anticipated;

g. Information on whether the bag leak detection system manufacturer has inspected the bag leak detection systems during the quarter, and if so, whether any problems were discovered, what corrective actions were taken, and whether the manufacturer verified the accuracy of each bag leak detection system used by Defendant on its baghouses; and

h. Records on the lime addition and salt flux rates in pounds per ton of feed charge.

The first quarterly report shall be submitted by the end of the month following the end of the first calendar quarter after the Effective Date, and must contain a verification of the capture and control system, including any capture demonstration and the charging rate during the demonstration, along with any exceedances of the maximum charge rate set forth in the OM&M Plan.

15. If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree or any applicable permits, Defendant shall notify United States and the applicable State Party of such violation and its duration or anticipated likely duration, in writing, within 30 days of the day Defendant first becomes aware of the violation or potential violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the

46

time the report is due, Defendant shall so state in the report. Defendant shall investigate the

cause of the violation and shall then submit an amendment to the report, including a full

explanation of the cause of the violation, within 30 days of the day Defendant becomes aware of

the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves

Defendant of its obligation to provide the notice required by Section IX of this Consent Decree

("Force Majeure").

16.     Whenever any violation of this Consent Decree or any applicable permits or any

other event affecting Defendant's performance under this Decree, or the performance of its

secondary aluminum production facility, may pose an immediate threat to the public health or

welfare or the environment, Defendant shall notify U.S. EPA, IDEM and HDEM orally or by

electronic or facsimile transmission as soon as possible, but no later than 24 hours after

Defendant first knew of, or should have known of, the violation or event. This procedure is in

addition to the requirements set forth in the preceding Paragraph.

17.     All reports shall be submitted to the persons designated in Section XIV of this

Consent Decree (Notices).

18.     Each report submitted by Defendant under this Section shall be signed by a plant

manager, a corporate official responsible for environmental management and compliance, or

a corporate official responsible for plant management of the Defendant, and shall include the

following certification:

> I certify under penalty of law that this document
> and all attachments were prepared under my direction
> or supervision in accordance with a system designed
> to assure that qualified personnel properly gather
> and evaluate the information submitted. Based on my
> inquiry of the person or persons who manage the
> system, or those persons directly responsible for
> gathering the information, the information submitted

47

USDC IN/ND case 2:07-cv-00262-PPS-APR document 10-2 filed 08/10/07 page 53 of 87

>is, to the best of my knowledge and belief, true,
>accurate, and complete. I am aware that there are
>significant penalties for submitting false
>information, including the possibility of fine
>and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

19. The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

20. Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VIII. STIPULATED PENALTIES

21. If Defendant fails to pay the civil penalty required to be paid under Section VI of this Decree (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $2,000 per day for the first 30 days that the payment is late to each Plaintiff (the United States and/or the City of Hammond), and $5,000 per day to each Plaintiff (the United States and/or the City of Hammond), for each day thereafter that the payment is late to that Plaintiff. Late payment of the civil penalty shall be made in accordance with Section VI, Paragraphs 10 through 12, above. Each stipulated penalty due under this Paragraph shall be paid exclusively to the Party to whom Defendant failed to make timely payment of the civil penalty.

22. Stipulated Penalties shall be paid in accordance with Section VIII, Paragraph 41, below. All transmittal correspondence shall state that any such payment is for late payment of the civil penalty due under this Decree, or for Stipulated Penalties for late payment, as

48

applicable, and shall include the identifying information set forth in Section VI, Paragraphs 10 and 12, above.

23.     Defendant shall be liable for Stipulated Penalties to the United States and HDEM for violations of this Consent Decree as specified below, unless excused under Section IX (Force Majeure).

24.     Operation of a Furnace at a Time Not Permitted Under this Consent Decree

Should Defendant operate any furnace at its Hammond SAPF at a time not permitted under the Remedial Measures Section (Section V) of this Consent Decree, or should it operate any furnace with "Other Than Clean Charge" at a time not permitted under the Remedial Measures Section, the following stipulated penalties shall accrue:

| Penalty Per Violating Furnace | Period of Noncompliance |
|---|---|
| $10,000 | First day of operation |
| $20,000 | Second day of operation |
| $30,000 | Third day of operation |
| $40,000 | Fourth day of operation |
| $50,000 | Fifth, and each subsequent day of operation. |

If Defendant is subject to a stipulated penalty under this Paragraph for operating a furnace at a time not permitted under this Consent Decree, it shall not be subject to a stipulated penalty under Paragraph 25 or 26 for capture and control or capture efficiency excursions occurring on the same days for which it is subject to the stipulated penalty for operating on days not permitted. However, it there are Visible Emissions of a length (the second or third 30 second Visible Emission within 24 hours, or the fourth 30 second Visible Emission in a seven day period) that otherwise would have trigger a stipulated penalty under Paragraph 26, Defendant

49

shall, in any event, be required repeat the capture demonstration and other requirements as set forth in Article One.

25.   Capture and Control Requirements: The following Stipulated Penalties shall accrue per day for each violation of a requirement identified in **Articles One** or **Two** of Section V (Remedial Measures):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st day through 14th day |
| $4,000 | 15th day through 30th day |
| $6,000 | 31st day and beyond |

26.   Capture Efficiency Excursions: Stipulated penalties shall accrue in the event that Visible Emissions are observed coming from Defendant's furnaces or associated capture and collection devices, above:

Penalty Per Visible Emission Occurrence

$2,000                                    For any second or third occurrence of 30 seconds or more in a 24 hour period;

$4,000                                    For any fourth occurrence of 30 seconds or more in a seven day period.

Additionally, without any demand for a stipulated penalty, following either of the violations above, Defendants shall repeat the capture demonstration and other requirements, as set forth in **Article One.** However, if a stipulated penalty is assessed for a Visible Emission under Paragraph 26, a stipulated penalty shall not be assessed for the same Visible Emission under Paragraph 25.

27.   Feed/Charge Weight: The following stipulated penalties shall accrue per violation per day for each violation of the feed/charge weight requirements identified in **Article Four,** of

50

Section V, with the exception of the requirement to perform "blind weighing tests," which requirement is governed by Paragraph 35, *infra*.

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st day through 14th day |
| $4,000 | 15th day through 30th day |
| $6,000 | 31st day and beyond |

28.    Performance Tests: The following stipulated penalties shall accrue per day, per furnace, for each violation of the performance testing requirements identified in **Article Three,** of Section V, except violation of the emission limitations contain in **Article Three, D,** of Section V:

| Penalty Per Furnace Per Day | Period of Noncompliance |
|---|---|
| $2,500 | 1st through 14th day |
| $5,000 | 15th through 30th day |
| $7,500 | 31st day and beyond |

29.    The following stipulated penalties shall accrue for each violation of an emission standard set for a pollutant under Subpart RRR, and as stated in **Article Three, D,** of Section V:

| Penalty Per Furnace Per Pollutant | Percentage above Limitation |
|---|---|
| $10,000 | 0.01 – 10% |
| $25,000 | 10.01 – 50% |
| $50,000 | 50.01 – 100% |
| $100,000 | > 100% |

30.    Bag Leak Detection System: The following stipulated penalties shall accrue per day for each violation of the bag leak detection system requirements identified in **Article Six,** of

Section V, with the exception of the requirement not to exceed 20% opacity from a baghouse stack.

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st day through 14th day |
| $4,000 | 15th day through 30th day |
| $6,000 | 31st day and beyond. |

If Defendant exceeds 20% opacity as measured during a Method 9 reading by a certified Method 9 reader, of any baghouse stack, Defendant shall pay the following stipulated penalty for each such excess opacity observation:

| Penalty Per Violation | Percent Opacity |
|---|---|
| $10,000 | 20-40% opacity |
| $15,000 | 41-60% opacity |
| $25,000 | 61-80% opacity |
| $30,000 | 81-100% opacity. |

31.     OM&M Plan: The following stipulated penalties shall accrue per day for each violation of each OM&M plan requirements, identified in **Article Seven,** of Section V:

| Penalty Per Day for Each Requirement Omitted | Period of Noncompliance |
|---|---|
| $2,000 | 1st day through 14th day |
| $4,000 | 15th day through 30th day |
| $6,000 | 31st day and beyond |

32.     Permitting Requirements: The following Stipulated Penalties shall accrue per day for each violation of the permitting requirements identified in **Article Nine, B,** of Section V:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|

| | |
|---|---|
| $2,000 | 1st day through 14th day |
| $4,000 | 15th day through 30th day |
| $6,000 | 31st day and beyond |

33.     Reporting Requirements: The following Stipulated Penalties shall accrue per day

for each violation of any reporting and/or notification requirement set out in Section V

(Remedial Measures), and Section VII (Reporting Requirements) of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $1,500 | 31st day and beyond |

34.     Independent Monitoring Contractor:   The following stipulated penalties shall

accrue per day for each violation of the requirement set forth in **Article Eight** of Section V

(Remedial Measures), to hire, employ and/or find a replacement for the Independent Monitoring

Contractor who shall assist in implementing the requirements of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st through 14th day |
| $4,000 | 15th through 30th day |
| $8,000 | 31st day and beyond. |

35.     Weighing System Requirements-

The following stipulated penalties shall accrue for Defendant's failure to conduct one of

the monthly "blind weighing tests" under **Article Four** of the Remedial Measures Section:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $2,000 | 1st through 14th day |

53

| | |
|---|---|
| $4,000 | 15th through 30th day |
| $8,000 | 31st day and beyond. |

Further, the following stipulated penalties shall accrue for Defendant's failure to timely propose an alternative weighing system plan or to timely install an approved alternative weighing system in accordance with the requirements of **Article Four** of the Remedial Measures Section:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $4,000 | 1st through 14th day |
| $8,000 | 15th through 30th day |
| $12,000 | 31st day and beyond. |

36.     The following Stipulated Penalties shall accrue per violation per day for Defendant's failure to comply with any requirement of this Consent Decree not specifically referenced in Paragraphs 21-35 above, including, but not limited to, failing to perform any obligation required by any work plan or schedule approved under this Decree, within the specified time schedules established by or approved under this Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $1,500 | 31st day and beyond. |

37.     Stipulated Penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated Penalties shall accrue simultaneously for separate violations of this Consent Decree. Defendant

54

shall pay any Stipulated Penalty within 30 days of receiving the United States' written demand. The United States shall consult with HDEM prior to making a demand for stipulated penalties. Any stipulated penalties paid under this Section shall be paid 50 percent to the United States and 50 percent to HDEM.

38.     The United States, after consultation with HDEM, may, in the unreviewable exercise of its discretion, reduce or waive Stipulated Penalties otherwise due that sovereign under this Consent Decree.

39.     Obligations Prior to the Effective Date-   Upon the Effective Date of this Consent Decree, the stipulated penalty provisions of this Decree shall be retroactively enforceable with regard to any and all violations of obligations under Section V (Remedial Measures) of this Decree that occurred prior to the Effective Date of the Decree, provided that stipulated penalties that may have accrued prior to the Effective Date may not be collected unless and until this Decree is entered by the Court. Defendant waives any argument that the United States should not be permitted to seek stipulated penalties for violations of Consent Decree requirements that occurred between the Date of Signature by Defendant and the Effective Date of this Decree.

40.     Stipulated Penalties shall continue to accrue as provided in Paragraph 37, above, during any Dispute Resolution, but need not be paid until the following:

a.      If the dispute is resolved by agreement or by a decision of U.S. EPA, after consultation with the State Parties, that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, at the rate specified in 28 U.S.C.§ 1961, to the United States and/or HDEM within 30 days of the effective date of the agreement or the receipt of U.S. EPA's decision or order.

b.      If the dispute is appealed to the Court and the United States prevails in

55

whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, at the rate specified in 28 U.S.C. § 1961, within 60 days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

   c.  If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest at the rate specified in 28 U.S.C. § 1961, no later than 30 days after the administrative decision or judicial order, judgment or decree resolving the dispute becomes final and not subject to any further appeal.

  41.  Defendant shall pay stipulated penalties owing to the United States in accordance with Section VI of this Decree, or by certified or cashier's check in the amount due, payable to the "U.S. Department of Justice," referencing DOJ No. 90-5-2-1-08734 and United States Attorney's Office file number _____, and delivered to the office of the United States Attorney, Northern District of Indiana, Hammond Division, 5400 Federal Plaza, Hammond, Indiana 46320, (219) 937-5500. Defendant shall pay Stipulated Penalties owing to HDEM in accordance with Section VI of this Decree.

  42.  No amount of the Stipulated Penalties to be paid by Defendant shall be used to reduce its federal or state tax obligations.

  43.  Defendant shall be liable for interest at the rate specified in 28 U.S.C. § 1961, accruing as of the date payment became due.

  44.  Subject to the provisions of Section XII of this Consent Decree (Effect of Settlement/Reservation of Rights), the Stipulated Penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States, IDEM or HDEM for Defendant's violation of this Consent Decree or applicable law

## IX.  FORCE MAJEURE

45.     "Force majeure," for purposes of this Consent Decree, is defined as any event beyond the control of Defendant, of any entity controlled by Defendant, or Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible. "Force majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

46.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice orally or by electronic or facsimile transmission to U.S. EPA, IDEM and HDEM within 48 hours of when Defendant first knew that the event might cause a delay.  Within seven days thereafter, Defendant shall provide in writing to U.S. EPA, IDEM and HDEM an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing the delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to any endangerment to public health, welfare or the environment. Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting

any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

47.     If U.S. EPA, after consultation with the State Parties, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligation(s) under this Consent Decree that is (are) affected by the force majeure event will be extended by U.S. EPA, after consultation with the State Parties, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. U.S. EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

48.     If U.S. EPA, after consultation with the State Parties, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, U.S. EPA will notify Defendant in writing of its decision.

49.     If Defendant elects to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution), it shall do so no later than 15 days after receipt of U.S. EPA's notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 45-46, above. If Defendant carries the burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected

58

obligation of this Consent Decree identified to U.S. EPA and the Court.

## X.  DISPUTE RESOLUTION

50.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

51.     Informal Dispute Resolution. Any dispute subject to Dispute resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States, after consultation with the State Parties, shall be considered binding unless, within 20 days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

52.     Formal Dispute Resolution. Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

53.     The United States shall serve its Statement of Position within 45 Days of receipt of Defendant's Statement of Position. The United States' Statement of Position shall include,

59

but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

54.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIV of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within 10 Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

55.     The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court. Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

56.     Standard of Review

        a.      Disputes Concerning Matters Accorded Record Review.

Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 52 48 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by U.S. EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the

60

administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

      b.    Other Disputes.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 52, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

      57.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 57.  If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## XI.  INFORMATION COLLECTION AND RETENTION

      58.    The United States, the State Parties, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into the Facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

      a.    monitor the progress of activities required under this Consent Decree;

      b.    verify any data or information submitted to the United States or a State Party in accordance with the terms of this Consent Decree;

      c.    obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

      d.    obtain documentary evidence, including photographs and similar data; and

61

assess Defendant's compliance with this Consent Decree.

59.    Until five years after the termination of this Consent Decree Defendant shall
retain and shall instruct its contractors and agents to preserve, all non-identical copies of all
documents, records, or other information (including documents, records, or other information in
electronic form) in its or its contractors' or agents' possession or control, or that come into its or
its contractors' or agents' possession or control, and that relate in any manner to Defendant's
performance of its obligations under this Consent Decree. This information-retention
requirement shall apply regardless of any contrary corporate or institutional policies or
procedures. At any time during this information-retention period, upon request by the United
States or a State Party, Defendant shall provide copies of any documents, records, or other
information required to be maintained under this Paragraph.

60.    At the conclusion of the information-retention period provided in the preceding
Paragraph, Defendant shall notify the United States and the State Parties at least 90 Days prior to
the destruction of any documents, records, or other information subject to the requirements of the
preceding Paragraph and, upon request by the United States or a State Party, Defendant shall
deliver any such documents, records or other information to U.S. EPA or one of the State Parties.
Defendant may assert that certain documents, records, or other information is privileged under
the attorney-client privileged or any other privilege recognized by federal law. If Defendant
asserts such a privilege, it shall provide the following: (1) the title of the document, record, or
information; (2) the date of the document, record, or information; (3) the name and title of each
author of the document, record, or information; (4) the name and title of each addressee and
recipient; (5) a description of the subject of the document, record, or information; and (6) the
privilege asserted by Defendant. However, no documents, records, or other information created

62

or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

61.     Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information (CBI) under 40 C.F.R. Part 2. As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

62.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Parties pursuant to applicable federal, or state or local laws, regulations, ordinances, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal, state or local laws, regulations, ordinances or permits.

## XII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

63.     This Consent Decree resolves all the civil claims of the United States and the State Parties for the violations alleged in the Complaint, and in the Complaints in Intervention filed in this action through the Date of Lodging.

64.     The United States and the State Parties reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 63, above. This Consent Decree shall not be construed to limit the rights of the United States or the State Parties to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal, state or local laws, regulations, ordinances, or permit conditions, except as expressly specified in Paragraph 63. The United States and the State Parties further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed

63

by, Defendant's Facility, whether related to the violations addressed in this Consent Decree or otherwise.

65.     In any subsequent administrative or judicial proceeding initiated by the United States or a State Party for injunctive relief, civil penalties, other appropriate relief relating to the Facility, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or a State Party in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 63 of this Section.

66.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits. Except as otherwise provided in this Consent Decree, the United States and the State Parties do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, or with any other provisions of federal, State, or local laws, regulations, or permits. The Parties agree that this Consent Decree represents diligent prosecution of the claims alleged in the Complaint.

67.     This Consent Decree does not limit or affect the rights of Defendant or of the United States or the State Parties against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant,

64

except as otherwise provided by law.

      68.    This Consent Decree shall not be construed to create rights in, or grant any cause

of action to, any third party not party to this Consent Decree.

## XIII. COSTS

      69.    The Parties shall bear their own costs of this action, including attorneys' fees,

except that the United States and the State Parties shall be entitled to collect the costs (including

attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any

Stipulated Penalties due but not paid by Defendant.

## XIV. NOTICES

      70.    Unless otherwise specified herein, whenever notifications, submissions, or

communications are required by this Consent Decree, they shall be made in writing and

addressed to the United States Department of Justice, U.S. EPA Headquarters, and the U.S. EPA

Region and the State Parties as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C. 20044-7611
Re: DOJ No. 90-5-2-1-08734

and

To U.S. EPA:

Sara Dauk
U.S. Environmental Protection Agency
Region 5
Mail Code AE-17J
77 West Jackson. Blvd.
Chicago, Il 60604
dauk.sara@U.S. EPA.gov

65

Cathleen Martwick
U.S. Environmental Protection Agency
Region 5
Mail Code C-14J
77 West Jackson Blvd.
Chicago, Il 60604
martwick.cathleen@U.S. EPA.gov

Office of Enforcement and Compliance Assurance, Air
U.S. Environmental Protection Agency Headquarters
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mailcode 2242A
Washington D.C. 20460

To IDEM:

Lynne Sullivan
Office of Enforcement/Air Section – Mail Code 60-02
Indiana Department of Environmental Management
100 N. Senate Avenue
Indianapolis, IN 46204-2251

To HDEM:

Thomas Nyhan
Hammond Department of Environmental Management
Hammond City Hall, Room 304
5925 Calumet Avenue
Hammond, IN 46320
nyhant@gohammond.com

To Defendant:

Jupiter Aluminum Corp.
Mark Volkmann
EHS Coordinator
1745—165th Street
Hammond, IN 46320
MVolkmann@jupiteraluminum.com

71.     Any Party may, by written notice to the other Parties, change its designated notice

66

recipient or notice address provided above.

72.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XV. EFFECTIVE DATE

73.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket, provided, however, that Defendant hereby agrees that it shall be bound to perform duties scheduled under this Consent Decree to occur prior to the Effective Date. In the event that the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to comply with requirements of this Consent Decree prior to the Effective Date shall terminate.

## XVI. RETENTION OF JURISDICTION

74.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections X and XVII, or effectuating or enforcing compliance with the terms of this Decree.

## XVII. MODIFICATION

75.     The terms of this Consent Decree, including an attached appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to any term of this Decree, it shall be effective only upon approval by the Court.

67

## XVIII.   TERMINATION

76.     After Defendant has completed the requirements of Section V (Remedial

Measures) of this Consent Decree, has thereafter maintained continuous compliance with 40

C.F.R. Part 63, Subpart RRR and this Consent Decree for a period of twelve consecutive months,

and has complied with all other requirements of this Consent Decree, including but not limited to

paying the civil penalty and any accrued stipulated penalties as required by this Consent Decree,

Defendant may serve upon the United States and the State Parties a Request for Termination,

stating that Defendant has satisfied those requirements, together with all necessary supporting

documentation.

77.     Following receipt by the United States and the State Parties of Defendant's

Request for Termination, the Parties shall confer informally concerning the Request and any

disagreement that the Parties may have as to whether Defendant has satisfactorily complied with

the requirements for termination of this Consent Decree.

78.     If the United States, after consultation with the State Parties, agrees that the

Decree may be terminated, the United States and the Defendant shall submit, for the Court's

approval, a joint stipulation terminating the Decree.

79.     If the United States, after consultation with the State Parties, does not agree that

the Decree may be terminated, Defendant may invoke Dispute Resolution under Section X of

this Decree.  However, Defendant shall not seek Dispute Resolution of any dispute regarding

termination, under Paragraphs 52 and 54 of Section X, until 90 days after service of its Request

for Termination.

## XIX.   PUBLIC PARTICIPATION

80.     This Consent Decree shall be lodged with the Court for a period of not less than

68

30 days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.

## XX.   SIGNATORIES/SERVICE

81.     Each undersigned representative of Defendant and other parties to the Decree and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

82.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

83.     Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Further, the Defendant shall not need to answer the United States' Complaint or the State Parties' Complaint in Intervention unless and until the United States withdraws its consent to this Decree, or the Court declines to enter it, in which case Defendant shall have an additional twenty days from that date to answer.

## XXI.   INTEGRATION

84.     This Consent Decree and its Appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than the Appendices, which are attached to and incorporated in this Decree, and deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXIV.   FINAL JUDGMENT

85.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court in this action as to the United States, the State Parties, and Defendant. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXV.     APPENDICES

86.     The following appendices are attached to and incorporated into this Consent Decree:

"Appendix A" is Recommendations for Improvements to the Capture and Collection Systems for Furnaces 2 and 6.

70

"Appendix B" is Hammond Department of Environmental Management Air

Pollution Control Division "Visible Emissions Evaluation" Form.

Dated and entered this ___ day of _____, 2007.

_____
UNITED STATES DISTRICT JUDGE
Northern District of Indiana

71

FOR PLAINTIFF UNITED STATES OF AMERICA:

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of United States v. Jupiter Aluminum Corp., (N.D. Ind.), relating to alleged violations of the Clean Air Act:

FOR PLAINTIFF UNITED STATES OF AMERICA:

RONALD  J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources
 Division
United States Department of Justice

LISA A. CHERUP
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources
 Division
United States Department of Justice
Post Office Box 7611
Washington, D.C. 20044
(202) 514-2802
(202) 616-6584 (FAX)

DAVID CAPP
Acting United States Attorney for the
Northern District of Indiana

By: _____

SHARON J. JOHNSON
Assistant United States Attorney
5400 Federal Plaza, Suite 1500
Hammond, IN 46320
Telephone: 219-937-5500
Facsimile:  219-852-2770

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of <u>United States v. Jupiter Aluminum Corp.</u>, (N.D. Ind.), relating to alleged violations of the Clean Air Act:

ROBERT A. KAPLAN
Acting Regional Counsel
U.S. Environmental Protection Agency
Region 5

74

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of <u>United States v. Jupiter Aluminum Corp.,</u> (ND. Ind.), relating to alleged violations of the Clean Air Act.


GRANTA Y. NAKAYAMA
Assistant Administrator
Office of Enforcement and Compliance
Assurance


ADAM M. KUSHNER
Director, Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance
Assurance

75

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of <u>United States v. Jupiter Aluminum Corp.</u>, (N.D. Ind.), relating to alleged violations of the Clean Air Act:

RONALD L. NOVAK
Director
Department of Environmental Management
City of Hammond, Indiana

76

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of <u>United States v. Jupiter Aluminum Corp.</u>, (N.D. Ind.), relating to alleged violations of the Clean Air Act:


SCOTT NALLY
Assistant Commissioner
Indiana Department of Environmental
  Management
Indianapolis, Indiana


CHARLES J. TODD
Chief Operating Officer
Office of the Indiana Attorney General

77

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of <u>United States v. Jupiter Aluminum Corp.</u>, (N.D. Ind.), relating to alleged violations of the Clean Air Act:

FOR DEFENDANT JUPITER
ALUMINUM CORP.:

DIETRICH GROSS
President, Jupiter Aluminum
Corp.

The following is the name and address of Settling Defendant's counsel and agent for service. Counsel shall act as agent for service.

Agent for Service and Attorney

Anthony C. Sullivan
Barnes & Thornburg, LLP
11 South Meridian Street
Indianapolis, IN 46204-3535
(317) 231-7472
tony.sullivan@btlaw.com

78

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of <u>United States v. Jupiter Aluminum Corp.</u>, (N.D. Ind.), relating to alleged violations of the Clean Air Act:

> FOR DEFENDANT JUPITER
> ALUMINUM CORP.:
>
>
>
> _____
> DIETRICH GROSS
> President, Jupiter Aluminum
> Corp.

The following is the name and address of Settling Defendant's counsel and agent for service. Counsel shall act as agent for service.

Agent for Service and Attorney

Anthony C. Sullivan
Barnes & Thornburg, LLP
11 South Meridian Street
Indianapolis, IN  46204-3535
(317) 231-7472
tony.sullivan@btlaw.com

78

## APPENDIX A

The following upgrades to Jupiter's capture and collection systems are recommended to comply with the requirements of Subpart RRR:

1. Increase the hood size at the Furnace 2 and 6 charge wells from 13.88 x 9 ft. to 13.88 x 17.7 ft. with dross door and charge opening as described in Jupiter's 114 response dated 4/27/07.

2. Install an additional hood at dross door to capture emissions from door and dross pot which occur during drossing operations. The dross door hood shall be designed in accordance with chapters 3 and 5 of "Industrial Ventilation: A Manual of Recommended Practice," 23rd edition as published by the American Conference of Governmental Industrial Hygienists.

3. If Other Than Clean Charge is added to the furnace hearth or the level of molten metal falls below the top of the passage between the sidewell and the hearth, install a hood at the furnace hearth door. The furnace hearth door hood shall be designed in accordance with chapters 3 and 5 of "Industrial Ventilation: A Manual of Recommended Practice," 23rd edition as published by the American Conference of Governmental Industrial Hygienists.

4. Increase volumetric flow rate at the Furnace 2 and 6 charge well hoods from 43,900 actual cubic feet per minute (acfm) to 70,746 acfm or greater.

5. Increase volumetric flow rate at the Furnace 2 and 6 flue hoods to a level where no emissions are visibly escaping the hood. Install necessary lighting and observation platforms needed to make observations.

6. Obtain or modify control equipment so that a total volumetric flow rate of 70,746 acfm can be achieved at the Furnace 2 & 6 charge wells (plus required flows at the furnace dross door hood, furnace flue hood and furnace hearth door hood, if applicable) at a minimum air to cloth ratio of 4.73 to 1.

7. Restrict charge rates of UBCs and Other Than Clean scrap to a level where no emissions are visibly escaping the charge well capture hoods.

**APPENDIX B**

**HAMMOND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT**
**Air Pollution Control Division**

**VISIBLE EMISSIONS EVALUATION**

TIME START: _____
END: _____

DATE: _____
OBSERVER: _____
CERTIFICATION DATE: _____

SOURCE: _____
ADDRESS: _____
UNIT OBSERVED: _____
FUEL: _____

**STACK INFORMATION**
DISTANCE FROM: _____
DIRECTION: _____
HEIGHT: _____

**READING CONDITIONS**
WIND SPEED: _____
WIND DIRECTION: _____
TEMPERATURE: _____
SKY CONDITION: _____
HUMIDITY: _____
BACKGROUND: _____
COLOR OF EMISSION: _____

**SOURCE REPRESENTATIVE(s) PRESENT:**

| # | 0 | 15 | 30 | 45 |
|---|---|----|----|----|
| 0 | | | | |
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |
| 29 | | | | |



Stack with Plume
Sun
Wind

SOURCE LAYOUT        Draw North

X

140°

Sun Location Line

NUMBER OF READINGS TAKEN:     0
AVERAGE OPACITY: _____ %

REMARKS: _____

OBSERVER'S SIGNATURE: _____