IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| THE STATE OF INDIANA, AND | ) | Civil Action No. 2:07CV262PS |
| THE CITY OF HAMMOND, | ) | |
| | ) | Judge Phillip P. Simon |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JUPITER ALUMINUM CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES OF AMERICA'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR ENTRY OF CONSENT DECREE**

Plaintiff, the United States of America, on behalf of the United States Environmental

Protection Agency ("U.S. EPA"), respectfully submits this Memorandum of Law in Support of

its Motion for Entry of Consent Decree.  Plaintiff-Intervenors, the State of Indiana, on behalf of

the Indiana Department of Environmental Management ("IDEM") and the City of Hammond, on

behalf of the Hammond Department of Environmental Management ("HDEM") and the

Defendant, Jupiter Aluminum Corporation, also support entry.

On August 9, 2007, the United States filed a Complaint against Defendant Jupiter

Aluminum Corporation alleging violations of the Clean Air Act, and on the same date the State

of Indiana and the City of Hammond, Indiana also filed motions to intervene and complaints in

intervention, also alleging violations of the Clean Air Act, and corresponding State and local

laws and regulations.  Following this Court's Order of August 10, 2007, granting the unopposed

1

motions to intervene, the United States lodged a proposed Consent Decree with this Court, which Consent Decree, if approved and entered, would resolve all claims against Jupiter Aluminum alleged in all three complaints.

Following publication of a notice of lodging of the Jupiter Consent Decree in the Federal Register, the United States received two sets of comments on the Decree, one from the Aluminum Association, and the other from Aleris Corporation, which is one of Jupiter's competitors that is also in the business of producing products from recycled aluminum.   In essence, the commenters complain that the Decree is too stringent.

All parties to this action support entry of the Consent Decree.  For the reasons set forth below, the proposed Consent Decree is fair, reasonable and consistent with the goals of the Clean Air Act.  As discussed below, the United States also has determined that the issues raised by the two sets of comments do not justify withdrawl or necessitate modification of the proposed settlement.  Accordingly, the United States respectfully requests that this Court approve the settlement by executing the Consent Decree and directing the Clerk to enter it as a final judgment in this action.  Because the decree requires Jupiter to limit its operations until the decree is entered, the United States respectfully requests that the decree be approved without delay.

Section I of this Memorandum provides background information on Jupiter's Hammond facility.  Section II summarizes the applicable Clean Air Act requirements and the violations alleged in the complaints.  Section III briefly summarizes the terms of the proposed decree. Section IV demonstrates that the decree is fair, reasonable and consistent with the applicable, law, notwithstanding the comments submitted.

## I.        STATEMENT OF FACTS

## A.        The Jupiter Aluminum Hammond Facility

Jupiter Aluminum Corporation operates an aluminum recycling facility in Hammond, Indiana, which supplies aluminum coils and other products to a variety of customers for use in manufacturing products for building, construction, irrigation, cookware, signs and license plates. Jupiter is a closely-held, private corporation, incorporated under the laws of the State of Illinois, but which conducts its principal business in Hammond, Indiana.

Jupiter's Hammond facility, located at 1745 165th Street, occupies approximately 25 acres and has more than 600,000 square feet of production space in several manufacturing buildings. Jupiter employs approximately 200 employees at its Hammond facility.  Since it began operations at its Hammond facility in the early 1990s, Jupiter has used four scrap melting furnaces (Furnaces 2, 3, 4 and 6) and two "dross-only"[1] furnaces (Furnaces 7 and 8) to produce recycled aluminum.   Furnaces 2 and 6 are "sidewell furnaces," which means that the furnaces where the scrap is melted are adjacent to the "sidewell" where the scrap aluminum is loaded.  As the scrap melts in the "sidewell," it flows into the furnace, where it is heated further. The sidewell furnaces (Furnaces 2 and 6) have hoods over the sidewells that capture hazardous air pollutant emissions which occur when the paints and coatings on "other than clean scrap" volatilize as the metal melts.  There is a distance (a gap) of approximately seven feet between the top of the sidewell and the capture hood.  Examples of the type of "other than clean scrap" aluminum used by Jupiter in its recycling operations are painted automobile and truck body parts, painted aluminum siding, painted road signs, and used beverage cans.  As discussed below, an array of Clean Air Act regulations applies to the recycling of "other than clean scrap" because hazardous air pollutants ("HAPs") are emitted to the air when such scrap is melted.  When "clean scrap" aluminum melts in a sidewell, HAPs are not emitted.

---

[1]  "Dross" is the slag and skimmings from the aluminum melting process.

The hoods over the sidewells on both Furnaces 2 and 6 have ductwork that carries the emissions to separate "fabric filters" (or "baghouses") where the particulate emissions are filtered before being emitted to the atmosphere.  The hoods, ductwork and baghouses connected to Furnaces 2 and 6 are considered "add-on air pollution control devices," under EPA regulations, and each baghouse has a separate "bag leak detection system," to ensure that emissions do not escape the baghouses, before being filtered.

During the scrap melting process, Jupiter periodically adds "flux" (salt compounds) to the molten aluminum to improve its characteristics, and it "drosses" the molten aluminum (removing skimming or impurities).  After the aluminum is sufficiently heated, the molten aluminum is sent to a holding furnace, and from that furnace the aluminum is cast into various shapes and further processed.

**B.     Pollutants of Concern**

When coatings on "other than clean charge" aluminum melt, they can emit hazardous air pollutants, including dioxin/furans (D/F), hydrochloric acid (HCl) and particulate matter (PM), containing hazardous metals, such as arsenic, beryllium, cadmium, chromium, mercury, nickel and selenium.   There is scientific evidence that dioxin and furans are potential human carcinogens.  HCl is corrosive to the eyes, skin and mucous membranes of humans.  Inhalation of HCl may cause coughing, hoarseness, inflammation and ulceration of the respiratory tract, and chest pain.  Due to its corrosive nature, HCl can also damages personal property, as well as plants and animals.  Measuring and regulating the PM from a secondary aluminum production facility, such as Jupiter's facility, is a surrogate for measuring and regulating the individual hazardous metals (such as arsenic, beryllium, cadmium, mercury, etc.) that are known to be emitted from such facilities.

Jupiter's Hammond facility, while located in an industrialized area of Hammond, is within one mile of two public schools (Maywood Elementary and Thomas Jefferson Elementary), several shopping centers, and several residential areas.

## II.     APPLICABLE LAW, AND VIOLATIONS ALLEGED IN THE COMPLAINTS

**A.     The NESHAP Regulations for Secondary Aluminum Production Facilities ("Subpart RRR of the NESHAPs")**

In Section 112(b) of the Clean Air Act, 42 U.S.C. § 7412(b), Congress established a list of HAPs emitted by manufacturing operations and other commercial establishments in the United States, which have been targeted for reduction.  Included in the Clean Air Act's list of HAPs are HCl and D/F, and various metals such as arsenic, beryllium, cadmium and mercury compounds. In Section 112(c) of the Act, 42 U.S.C. § 7412(c), Congress authorized U.S. EPA to publish a list of categories of sources of HAPs, and in Section 112(d), 42 U.S.C. § 7412(d), Congress further required U.S. EPA to set emission standards for each category of sources of HAPs.  These emission standards for source categories of HAPs are known as the "National Emission Standards for Hazardous Air Pollutants" (or the "NESHAPs").  Many "source categories" are regulated under the NESHAPs, including, for example, dry cleaning operations (40 C.F.R. Part 63, Subpart M) and the printing industry (40 C.F.R. Part 63, Subpart KK).  Each "source category" has a separate subpart under 40 C.F.R. Part 63 (the NESHAPs).

Secondary aluminum production facilities (such as Jupiter's Hammond facility) are regulated under 40 C.F.R. Part 63, Subpart RRR.  Jupiter's Hammond facility fits the definition of a "major source" of HAPs, 40 C.F.R. § 63.1500(b).  The Subpart RRR regulations generally became effective to "existing" secondary aluminum production facilities (such as Jupiter's) on March 24, 2003.

**B.**     **Violations Alleged in the Complaints[2]**

U.S. EPA, IDEM and HDEM believe that Jupiter was in significant, wide-ranging non-compliance with the Subpart RRR regulations for several years following their March 24, 2003 effective date.  Of course none of these alleged violations has been proven, and Jupiter does not concede any non-compliance in the Consent Decree.  There are twenty-three counts in the United States' complaint.  Only the more critical counts will be discussed here, to provide background for the decree's injunctive provisions

1.     First and Second Claims for Relief

Subpart RRR requires owners and operators of "emission units" equipped with "add-on pollution control devices" (such as Jupiter's Furnaces 2 and 6) to design and install a capture and collection system in compliance with the engineering standards for minimum exhaust rates established by the American Conference of Governmental Industrial Hygienists in chapters 3 and 5 of its "Industrial Ventilation: A Manual of Recommended Practices."  ("the ACGIH Manual"). 40 C.F.R. § 63.1506(c)(1).  In the first and second claims for relief , the United States alleges that Jupiter failed to design and install the "add on pollution control devices" on Furnaces 2 and 6 in compliance with this requirement.  U.S. EPA, HDEM and IDEM inspectors have witnessed heavy fugitive emissions escaping from the pollution control devices on Furnaces 2 and 6.

2.     Fourth through Ninth Claims for Relief

Subpart RRR required that owners and operators of secondary aluminum production facilities to conduct initial performance tests on each "emission unit" to demonstrate compliance with the Subpart RRR emission limits for D/F, HCl and PM by March 24, 2003. 40 C.F.R. § 63.1511(b).  In the Fourth through Ninth claims for relief, the United States alleges that of the six

---

[2]   References will be to the United States' complaint.

furnaces that should have been tested and for which compliance should have been demonstrated

by March 24, 2003, Jupiter never conducted a perform test on one, conducted tests on three in

October 2004, and conducted tests on two in September 2005.  The United States further alleges

that when the tests were belatedly conducted, they failed to demonstrate compliance with the

emission standards.

   3.   Twelfth Claim for Relief

Under Subpart RRR, furnaces that melt coated or painted scrap aluminum must emit no more

than 0.40 pounds of HCl per ton of scrap charged.  40 C.F.R. § 63.1505(i)(4).  In its Twelfth

Claim for Relief the United States alleges that during an emission test conducted in October

2004, Jupiter measured HCl emissions from Furnace 8 in excess of 0.40 lbs/per ton charged.

   4.   Fourteenth Claim for Relief

Subpart RRR requires owners and operators of "emission units" subject to a throughput-

based pounds per ton (lbs/ton) emission standards to install, calibrate and begin to operate, by

March 24, 2003, a weighing device that is accurate to within $\pm$ 1%, and to record the weight of

feed charge to, or production from each emission unit. 40 C.F.R. § 63.1510(e).  In its Fourteenth

Claim for Relief, the United States alleges that Jupiter failed to install, calibrate and operate a

weighing device on an emission unit by emission unit basis, and failed properly to record the

amount scrap charged into each furnace, which made it difficult to determine compliance with

the Subpart RRR lbs/ton emission standards for D/F, HCl and PM.

   5.   Fifteenth Claim for Relief

Subpart RRR requires owners and operators of "emission units" equipped with "add on

pollution control devices" to begin operating them in compliance with an Operation,

Maintenance and Monitoring Plan ("OM&M Plan") beginning on March 24, 2003.  40 C.F.R.

§ 63.1506(c)(3).  In its Fifteenth Claim for Relief, the United States alleges that Jupiter violated

this requirement, by failing timely to develop an OM&M Plan, and failing to operate in

accordance with a proper OM&M Plan.

      6.    Seventeenth Claim for Relief

Subpart RRR requires owners and operators of an emission unit which uses a baghouse to

install, calibrate, maintain and continuously operate, by March 24, 2003, a "bag leak detection

system," or a "continuous opacity monitoring system," to ensure  proper emissions capture. 40

C.F.R. § 63.1510(f).   In its Seventeenth Claim for Relief the United States alleges that Jupiter

failed to install "bag leak detection systems" (or a continuous opacity monitoring system) on any

of its three baghouses until August 2004, and then failed to operate them properly because,

among other things, the system's alarm system chronically malfunctioned.

      7.    Eighteenth Claim for Relief

Subpart RRR requires owners and operators who use baghouses to record the hours of

operation, time alarms sound, and corrective actions taken in responding to alarms, starting on

March 24, 2003. 40 C.F.R. § 63.1517(b)(1).  In its Eighteenth Claim for Relief, the United States

alleges that Jupiter chronically failed to keep the records required by § 63.1517(b)(1).

      8.    Twenty-Third Claim for Relief

Subpart RRR requires the owner or operator of an emission unit to submit "semi-annual

excess emission/summary reports," commencing March 24, 2003.   40 C.F.R. § 63.1516(b).

Operators of "sidewell furnaces" and "dross only furnaces" must make certain certifications in

these reports.  Even if the operator believes that no "excess emissions" have occurred, the report

must still be submitted, and the certifications made.  In its Twenty-Third Claim for Relief, the

United States alleges that Jupiter never submitted semi-annual reports for any of its six furnaces.

### III.    THE PROPOSED CONSENT DECREE

**A.    <u>Introduction</u>**

Given the breadth of Jupiter's alleged noncompliance with Subpart RRR, the injunctive relief contained in the "Remedial Measures Section" (Section V, pages 7- 43) of the Consent Decree is likewise broad.  There are nine separate "articles" in the Remedial Measures Section, each addressing a different aspect of the injunctive relief that is necessary to address Jupiter's extensive non-compliance.

**B.    Remedial Measures Obtained in the Consent Decree**

1.    <u>Article One- Furnaces 2 and 6 Capture and Control Requirements</u>

When this Consent Decree was negotiated in early to mid 2007, Jupiter's Hammond facility was shut down, and none of its furnaces had been in operation since November 24, 2006, the date that an extensive fire occurred at the facility.  During the shut down period, Jupiter relined the refractory on Furnaces 2 and 6 (its main melting furnaces), and made some modifications to the add-on pollution control systems on those furnaces, namely, it increased the size of the hoods over the sidewells, and increased the size of some of the ductwork leading from the hoods to the baghouses.  Additionally, Jupiter partially closed off one side between the top of the sidewell and the bottom of the hood, by installing a "dross door" on that side.  Jupiter did not, however, increase the filtering capacity of its baghouses, nor did it increase the size of the fans that move emissions from the hood, through the ductwork, and into the baghouses.

The Plaintiffs and Jupiter disagreed on the scope of modifications necessary to bring Furnaces 2 and 6's pollution control equipment into compliance with 40 C.F.R. § 63.1506(c)(1).  Rather than litigating that highly technical question and delaying resolution of the dispute, the parties agreed, as a compromise, to an alternative approach to demonstrating compliance (a

"demonstration approach").  Subpart RRR allows such alternative approaches, on a case-by-case basis.  See 40 C.F.R. § 63.1510(w)(6) ("The Administrator may decide at any time, on a case-by-case basis, that additional or alternative operating limits, or alternative approaches to establishing operating limits, are necessary to demonstrate compliance with the emission standards of this subpart").

In Article One, the parties established a process for Jupiter to resume operations ("hot commission") its cold furnaces that had been idle since the fire.  Jupiter is first to perform an "initial capture demonstration" on both Furnaces 2 and 6, using "clean charge" (i.e. clean scrap aluminum), and then later, to perform a "capture demonstration" using "other than clean charge" (i.e. coated or painted scrap aluminum). The purpose of the "clean charge" demonstration is to ensure that the operation of the furnace and pollution control equipment alone is not creating emissions (given that clean aluminum does not create emissions when melted).  After the decree was lodged with this Court, Jupiter conducted "clean charge" demonstrations on Furnaces 2 and 6, and has passed those demonstrations.

Following the Date of Entry of the decree, Jupiter will perform the initial "other than clean charge" capture demonstrations on Furnaces 2 or 6.  Until such capture demonstrations are performed, the parties agreed that Jupiter would charge only "clean charge."  Should Jupiter fail the first "other than clean charge" capture demonstration for either Furnace 2 or Furnace 6, the Parties agreed that Jupiter will be given two more opportunities, within two weeks after the unsuccessful initial demonstration, to pass the "other than clean charge" capture demonstration. If Jupiter can pass a capture demonstration by reducing production rates and/or adjusting settings on its pollution control equipment, the Decree requires Jupiter to maintain these adjusted operating conditions thereafter to ensure compliance.

If, after three attempts over two weeks, Jupiter fails to pass an "other than clean charge" capture demonstration on either Furnace 2 or Furnace 6, Jupiter must modify the capture and control system for the furnace that failed the demonstration, in accordance with Appendix A. Appendix A represents the consensus view of the Plaintiffs on what additional measures Jupiter should take to ensure compliance with the emission standards in Subpart RRR.

Article One further explains what steps Jupiter must take if, following a successful "initial other than clean charge capture demonstration," visible emissions are observed coming from the furnaces or sidewells.  These steps include temporarily switching to "clean charge," performing a "root cause analysis," taking corrective action, and submitting a "root cause analysis report" to the Plaintiffs.

      2.      <u>Article Two- Furnace 4 Capture and Control Requirements</u>

Under Article Two, Jupiter has committed to either dismantling Furnace 4 or installing a Subpart RRR-compliant capture and control system on it, within 180 days from the Date of Entry of the Decree.  Jupiter intends to dismantle Furnace 4.

      3.      <u>Article Three- Performance Tests for Furnaces 2, 4, 6, 7 and 8</u>

Under Article Three, within three months after Jupiter completes a successful "initial other than clean charge" capture demonstration on Furnaces 2 and 6, Jupiter shall conduct "performance tests" on these furnaces, to demonstrate compliance with the Subpart RRR emission standards for the D/F, HCl and PM standards applicable to Furnaces 2 and 6.  If Jupiter fails to meet one or more emission standards during a performance test, it must submit a plan to make modifications to its capture and collection system to meet the limitations, and then retest.

Under Article Three, Jupiter has three months from the Date of Lodging to conduct a performance test on Furnaces 7 and 8.  Furnaces 7 and 8 are "dross only" furnaces, and only the

Subpart RRR emission standard for PM applies to "dross only" furnaces.  Additionally, under

Article Three, after conducting initial performance tests, Jupiter will conduct annual performance

tests on each of its operating furnaces, to demonstrate continued compliance with Subpart RRR's

emission standards.

    4.    <u>Article Four- Weighing Scrap Charged to Furnaces, Recording</u>
<u>Charging Information, and Calibrating Weighing Devices</u>

Because Subpart RRR establishes emission limits based on throughput, or pounds of

emissions per ton of feed charge, it is critical that owners and operators of aluminum scrap

melting furnaces accurately weigh and record the scrap they charge into a furnace.  The weighing

must be done on an "emission unit by emission unit" (*i.e.* furnace by furnace) basis, and the

weighing device must be accurate to $\pm$ 1%.  40 C.F.R. § 63.1510(e).  In Article Four, the parties

fashioned a six-month demonstration period during which Jupiter must show the Plaintiffs that

recently purchased "weigh cell" devices that Jupiter installed on four front end loaders that it

uses to charge scrap  will meet that regulatory requirement.  A truck scale and/or feed hopper

will be installed if the weigh cells prove unreliable or inaccurate.

Article Four also requires Jupiter to properly calibrate its weighing devices and properly

to record the time, weight and type of material charged into each furnace, in accordance with the

recordkeeping requirements of Subpart RRR.

    5.    <u>Article Five- Video Monitoring System for Furnaces 2 and 6</u>
<u>Charging and Weighing Operations</u>

As a result of allegations that Jupiter was overcharging its furnaces and having excessive

emissions during evening hours when agency inspectors were off-duty, the parties agreed in

Article Five that HDEM could use a portion of the 50% share of the civil penalty that it will

receive under the Decree to purchase a video monitoring system that would record the charging

operations at Furnaces 2 and 6, Jupiter's main melting furnaces.  The Decree also requires

Jupiter to install a L.E.D. screen so that the weight of the scrap being loaded into the furnaces

will be displayed, and can be seen easily.

 6. Article Six- Bag Leak Detection Systems for Fabric Filters

 The purpose of a bag leak detection system is to notify the owner or operator of an

emission source when a baghouse is not operating properly, and when emissions are escaping the

baghouse with inadequate treatment.  Jupiter historically has had problems with operating the

bag leak detection systems on the three baghouses for Furnaces 2, 6, 7 and 8, and with properly

maintaining records on its bag leak detection systems in accordance with Subpart RRR.  In

particular, Jupiter had chronic problems with false alarms on all three baghouses, so much so that

its workers routinely ignored the baghouse alarms when they sounded.  Further, Jupiter failed to

keep required maintenance records on the baghouses, and records of when alarms sounded, and

how it responded to alarms.

 Jupiter believes that it has corrected the problems with the alarm systems on its existing

bag leak detection systems, and that replacement of the bag leak detection systems is

unnecessary. Under Article Six, Jupiter and the manufacturer of the bag leak detection systems

must keep the systems in good operating condition.  Further, Jupiter must promptly respond to

baghouse alarms when they sound, and keep records on corrective actions taken.

 7. Article Seven-  Operation, Maintenance and Monitoring Plan

 Article Seven requires Jupiter to submit a modification to its Operation, Maintenance and

Monitoring Plan ("OM&M Plan") within thirty days from the Date of Lodging, to make it

consistent with the Consent Decree. Article Seven also requires Jupiter periodically to modify

the OM & M Plan, if operating conditions or production limits necessary to maintain compliance change over time.

        8.      Article Eight-  Independent Monitoring Contractor

In an effort to improve communications and trust between the Plaintiffs and Jupiter, Article Eight requires Jupiter to employ an "independent monitoring contractor" ("IMC") during the life of the Consent Decree.  The "IMC" will work a 40 hour week, and will be selected by Jupiter, with the approval of EPA, IDEM and HDEM.  The IMC's duties include, among others: 1) monitoring compliance with Subpart RRR, Jupiter's OM&M Plan and the Consent Decree, 2) monitoring Jupiter's weighing, characterization and charging of scrap aluminum; 3) monitoring Jupiter's maintenance of its bag leak detection systems; 4) monitoring fugitive emissions from the furnaces; 5) making visible emission observations of the baghouse stacks; and 6) submitting quarterly reports to EPA, IDEM and HDEM.  Article Eight makes clear that no parties are bound by the statements, conclusions or opinions of the IMC.

        9.      Article Nine- General Provisions Relating to the Remedial
                        Measures Program

Article Nine contains general provisions commonly found in Clean Air Act consent decrees which: 1) make clear that Jupiter remains responsible for obtaining all necessary permits to conduct work under the Decree; 2) explain how the terms of the Consent Decree will be incorporated into a future modification to Jupiter's Clean Air Act Title V operating permit; 3) explain that Jupiter may not get any "emission credits" for projects performed under the Decree; and 4) explain the process for EPA, HDEM and IDEM's approval of deliverables.

**C.**    **Stipulated Penalties**

Under the Stipulated Penalties Section of the Decree (Section VIII), Jupiter is liable for stipulated penalties for violations of certain provisions of the Remedial Measures Section

(Section V) of the Decree, including, among others:  1) operating a furnace at a time not permitted under the Decree; 2) violating a provision relating to the "capture demonstrations" that must be performed under Article One; 3) capture efficiency excursions (*i.e.* fugitive emissions observations); 4) violating the requirements relating to weighing and recording the scrap and dross charged to furnaces; 5) failing to conduct "performance tests" to measure the level of emissions of D/F, HCl and PM from furnaces; 6) failing a "performance test"; 6) failing properly to maintain and record information relating to the bag leak detection systems; 7) having emissions from the baghouse stacks that exceed the 20 % opacity standard that applies to Lake County, Indiana; 8) violating the requirements of the OM&M Plan; 9) violating reporting or notification requirements; and 10) failing to comply with the IMC requirements.

**D.      Other "Boilerplate" Sections of the Consent Decree**

Other Sections of the Consent Decree (Reporting Requirements, Force Majeure, Dispute Resolution, Effect of Settlement/Reservation of Rights, Modification, Termination, etc.) are standard provisions commonly found in environmental consent decree entered into by the United States, on behalf of U.S. EPA.

**E.      The Civil Penalty**

Under the Decree Jupiter will pay a civil penalty of $2,000,000 over the course of two years, which will be split 50%-50% between the United States and HDEM.   The civil penalty payment will resolve all twenty-three claims for relief alleged by the United States and the intervening plaintiffs in their respective complaints.

### III.   GROUNDS FOR ENTRY OF CONSENT DECREE

**A.   Standard of Review**

Another Court in this district aptly summarized the standards governing judicial review

and approval of a settlement like this in another recent Clean Air Act case:

> This Court must review a consent decree to assure that it is fair, reasonable, adequate, and consistent with applicable law. *[citations omitted].*  The underlying purpose of this review is to determine whether the decree adequately protects and is consistent with the public interest. *[citation omitted].*  . . . In other words, a consent decree will not be approved where the agreement is illegal, a product of collusion, inequitable, or contrary to the public good. *[citation omitted].*  In reviewing a consent decree, this Court need not inquire into the precise legal rights of the parties, nor reach and resolve the merits of the parties' claims. *[citation omitted].*  Rather, it is ordinarily sufficient if this Court determine whether the consent decree is appropriate under the particular facts of the case.

*       *       *       *

> In its review the Court must keep in mind <u>the strong policy favoring voluntary settlement of litigation.</u> *[citations omitted, emphasis added].* This presumption is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal agency, like the Environmental Protection Agency ("EPA"), which enjoys substantial expertise in the environmental field. *[citation omitted].*  Although this Court should pay deference to the judgment of the government agency which has negotiated and submitted a proposed decree, this Court must avoid any rubberstamp approval in favor of an independent evaluation. *[citations omitted].*  However, this Court must not substitute its judgment for that of the parties nor conduct the type of detailed investigation required if the parties were actually trying the case. *[citations omitted].*  The test is not whether this Court would have fashioned the same remedy nor whether it is the best possible settlement. *[citations omitted].*

> *United States v. BP Exploration & Oil Co.*, 167 F. Supp 2d 1045, 1049-1050 (N.D. Ind. 2001)(Lozano, J).

As the First Circuit stated in another leading case, *United States v. Cannons*

*Engineering Corp.*, 899 F.2d 79 (1st Cir. 1990):

> Respect for the agency's role [in negotiating an environmental consent decree] is heightened in a situation where the cards have been dealt face up and a  crew of sophisticated players, with sharply conflicting interests, sit at the table.  That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance. *[citation omitted].*

16

899 F.2d at 84.

We believe that Congress intended, first, that the judiciary take a broad view of proposed settlements, leaving highly technical issues and relatively petty   inequities to the discourse between parties; and second, that the district courts treat each case on its own merits, recognizing the wide range of potential problems and possible solutions.

*Id.* at 86.

**B.     The Consent Decree is Fair, Reasonable, Adequate and Consistent with the Objectives of the Clean Air Act.**

1.     <u>Procedural and Substantive Fairness</u>

A consent decree must be both procedurally and substantively fair.  *BP Exploration & Oil,* 167 F. Supp 2d at 1052 (quoting *Cannons Engineering*, 899 F.2d at 86).  Procedural fairness concerns the negotiation process, i.e. whether it was open and at arms-length.  *Id.* The Consent Decree with Jupiter was negotiated at "arms length" and it is the product of a carefully-wrought compromise among "sharply conflicting interests." *Cannons Engineering,* 899 F. 2d at 84. Negotiations over the Jupiter Consent Decree took several months to complete, during which many representatives of the various parties (Jupiter, U.S. EPA, IDEM and HDEM) participated in intense face-to-face negotiations spanning multiple days, and many conference calls.  Jupiter was ably represented by three attorneys during these negotiations, including Jupiter's general counsel, and two partners from the law firm of Barnes & Thornburg who specialize in environmental law and governmental regulation.  Also present for Jupiter during negotiations were Jupiter's Environment, Health and Safety Coordinator, who is responsible for environmental compliance, and a Vice President of Operations.  Jupiter's counsel and other representatives aggressively advocated Jupiter's position during negotiations.

In assessing substantive fairness, courts consider concepts of corrective justice and accountability. *Cannons Engineering,* 899 F.2d at 87, *BP Oil & Exploration,* 167 F. Supp. 2d at

1052.  This Consent Decree includes detailed injunctive relief crafted to remedy the extensive problems at Jupiter's Hammond facility, and to ensure future compliance with Subpart RRR. Litigation of this case would have been time-consuming and complex for all parties.  The decree also requires Jupiter to pay a significant civil penalty-- $2,000,000-- over two years, for its past noncompliance.  Taken together, the injunctive relief and civil penalty promote the environmental protection and compliance assurance goals of the Clean Air Act.

> 2.   Reasonableness

In assessing the reasonableness of an environmental consent decree, courts consider, among other things, the nature and extent of potential hazards, the availability of alternatives to the decree, and the extent to which a court's approval is in the public interest.  *BP Exploration & Oil Co.,* 167 F. Supp. 2d at 1053.  Clearly, approval of the Jupiter Consent Decree is in the interest of the residents of Hammond, in that it should reduce the level of HAPs emitted from the Jupiter facility.  These reductions should result promptly under the decree, rather than awaiting a lengthy litigation process.

> 3.   Adequacy and Consistency with Applicable Law

As stated in *BP Exploration & Oil Co.,* 167 F. Supp. 2d at 1054, a consent decree may not contravene the statute upon which the claims are based, and must comport with the goals of Congress in enacting the statute.  Significantly, no one has objected to the Jupiter Consent Decree as failing adequately to protect the public from the HAPs that may be emitted from Jupiter's Hammond facility.  Clearly, this decree furthers a critical goal of the Clean Air Act: reducing the emission of HAPs from aluminum recycling facilities.

4.      Comments Submitted on the Consent Decree

Two sets of comments were submitted on the decree:  one by Aleris International, Inc., (another aluminum recycler that is one of Jupiter's competitors), and the other by the Aluminum Association (a trade association comprise of members of the aluminum industry).  These comments do not provide a basis for rejecting the settlement under the governing standard of review, discussed above.  Distilled to their essence, these comments argue that the settlement is too stringent, and may go beyond the requirements imposed by Subpart RRR.  The United States agrees that the decree is stringent, given the extensive noncompliance present in this situation.  A few of the decree's requirements may even exceed the minimum requirements under the Subpart RRR regulations.  But consent decree requirements are remedial in nature and they can go beyond requiring formulaic compliance with a regulatory scheme.  As another district court recently observed in approving another complex Clean Air Act consent decree negotiated by the United States:

> A consent decree need only 'come within the general scope of the case made by the pleadings' and a federal court is 'not necessarily barred from entering a consent decree merely because the consent decree provides broader relief than the court could have awarded after a trial.' *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525(1986) . . . *see also Sierra Club v. Electronic Controls Design,* 909 F.2d 1350, 1355 (9th Cir. 1990)(holding that the court had the power to enter a consent decree as long as the decree 'further[ed] the broad objectives upon which the complaint was based and does not violate the Clean Water Act').

> *United States v. Chevron U.S.A., Inc.,* 380 F.Supp.2d 1104, 1110 (N.D. Cal. 2005).

Indeed, under the Clean Air Act a court may assess civil penalties, restrain violations of the Act, and "may award any other appropriate relief." *See* 42 U.S.C. § 7413(b).

The two commenters appear to be concerned that the United States may expect similarly-strict injunctive relief requirements as a remedy for violations at other aluminum recycling

facilities.  Each case must be evaluated based on the facts specific to that case.  Any target of a future Subpart RRR enforcement action may choose to settle or to litigate its own case, so the concern that the Jupiter consent decree is too stringent for other aluminum recyclers, is not a basis for disapproving this negotiated settlement.

The two sets of comments to the Consent Decree are attached as **Attachments 1 and 2** to this Memorandum, and the United States has provided detailed responses to the specific issues raised by the comments in **Attachment 3** to this Memorandum.

### IV.   CONCLUSION

In light of the "strong policy favoring voluntary settlement of litigation," and the deference that should be paid to the U.S. EPA on technical issues concerning environmental protection and the appropriateness of a settlement, *See Cannons Engineering,* 899 F.2d at 84, *BP Exploration & Oil Co.,* 167 F. Supp. 2d at 1050, the United States respectfully recommends that this Court approve and sign the attached proposed Consent Decree.

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Lisa A. Cherup*
LISA A. CHERUP
Trial Attorney
PA Bar 47737
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C.  20044-7611
Telephone:     (202) 514-2802
Facsimile:     (202) 616-6584

DAVID A. CAPP
Acting United States Attorney
Northern District of Indiana

*/s/ Sharon J. Johnson*
SHARON J. JOHNSON
Assistant United States Attorney
5400 Federal Plaza, Suite 1500
Hammond, Indiana  46320
Telephone:     (219) 937-5500
Facsimile:     (219) 852-2770

OF COUNSEL:

CATHERINE MARTWICK
Assistant Regional Counsel
U.S. EPA Region 5
77 West Jackson Blvd.
Chicago, IL 60640