Kenneth J. Willings
Vice President, Health, Safety and Environmental
Telephone: 216.910.3507
Facsimile: 216.910.3652
Cell Phone: 216.233.8320
Email: ken.willings@aleris.com



September 14, 2007

**_By E-mail (pubcomment-ees.enrd@usdoj.gov)_**

Assistant Attorney General
Environmental and Natural Resources Division
P.O Box 7611
U.S. Department of Justice
Washington DC 20044-7611

RE:   *United States, Indiana and Hammond v. Jupiter Aluminum Corp.*, D.J. Ref. 90-5-2-1-08734

To Assistant Attorney General:

I am writing this letter on behalf of Aleris International, Inc. and each of its subsidiaries (collectively "Aleris") to timely submit comments to the United States Department of Justice's ("DOJ") notice published in the Federal Register on August 21, 2007 entitled, *"Notice of Lodging of Consent Decree Under the Clean Air Act"* ("Notice") related to the proposed consent decree filed on August 10, 2007 in *United States, the State of Indiana, and the City of Hammond, Indiana v. Jupiter Aluminum Corporation*, Civil Action No. 2:07 CV 262 PS, with the United States District Court for the Northern District of Indiana, Hammond Division ("Proposed Consent Decree").

Aleris contends that the DOJ should withdraw, withhold consent for, or reasonably revise the Proposed Consent Decree, in accordance with 28 CFR §50.7, based on the below-described comments, views and allegations concerning the Proposed Consent Decree that disclose facts or considerations which indicate that the Proposed Consent Decree is inappropriate, improper or inadequate. In sum, we contend that the DOJ should take such necessary and justified measures because certain elements of the Proposed Consent Decree, as discussed below, can foreseeably be (a) misinterpreted as regulatory obligations by sources other than Jupiter Aluminum Corporation ("Jupiter" or "Defendant") subject to 40 CFR Part 63, Subpart RRR ("Subpart RRR") or (b) misapplied as rules, policy or official interpretations of compliance with, or demonstrating compliance with, Subpart RRR, by federal, state or local government entities (collectively "Government") authorized or delegated to implement and enforce Subpart RRR.

Attachment 1

September 14, 2007

In providing comments to this Notice, we begin by briefly describing Aleris and how its operations relate to, and are immediately and directly impacted by, the subject matter of the Notice. We then provide a detailed discussion of the specific reasons why the DOJ should withdraw, withhold consent for, or reasonably revise the Proposed Consent Decree.

## BACKGROUND

Aleris was formed as a result of the December 2004 merger of two companies, IMCO Recycling, Inc. and Commonwealth Industries, Inc. Based on that initial merger, as well as subsequent acquisitions since then, Aleris consists of a disparate group of much smaller corporate entities that currently own and operate twenty-one separate and independent secondary aluminum manufacturing operations throughout the United States ("Plants").[1] Due to the nature and type of operations, each of the Plants is subject to Subpart RRR as either an area (i.e., minor) source or major source of hazardous air pollutants ("HAP"). Thus, changes to Subpart RRR, as well as any government policies and interpretations about compliance and demonstrating compliance with Subpart RRR, immediately and directly affect Aleris' day-to-day operations, compliance obligations and compliance costs. Notably, such changes immediately and directly impact all companies subject to, or potentially subject to, Subpart RRR ("Subpart RRR Sources"), which was previously projected by the United States Environmental Protection Agency ("EPA") to be at least 135 facilities nationwide based on responses to directed information requests.[2] However, according to the EPA, the true number of facilities subject to Subpart RRR could easily be in excess of 400.[3]

## DISCUSSION

The Proposed Consent Decree includes many compliance obligations that have no regulatory basis, far exceed the regulatory requirements of Subpart RRR, unreasonably restrict the Defendant's ability to utilize inherent operational flexibility afforded by Subpart RRR, or inexplicably impose test methods that have no applicable technical or regulatory basis. Because the "express purpose" of the Proposed Consent Decree is supposed "to bring the Defendant into compliance with [Subpart RRR]" and "to assist in Defendant's maintaining compliance with Subpart RRR,"[4] the inclusion of such compliance obligations strongly suggests to Subpart RRR Sources, other than Jupiter, that the obligations in the Proposed Consent Decree are not limited to Jupiter's operations. Instead, the inclusion of such obligations in the Proposed Consent Decree seem to describe minimum expectations by the Government for compliance or demonstrating compliance with Subpart RRR for all Subpart RRR

---

[1] Of Aleris' twenty-one Plants, nine are located in Region 5, where the complaint was filed, and three are located in Indiana, where Jupiter is located.

[2] *64 Fed. Reg. 6946, 6991, and 6994-6995 (February 11, 1999); 65 Fed. Reg. 15690, 15708 (March 23, 2000).*

[3] *64 Fed. Reg. at 6994-6995; see also "Facilities Potentially Subject to Secondary Aluminum NESHAP"* - (www.epa.gov/ttn/atw/alum2nd/plantlist.pdf).

[4] *See Section III.Paragraph 7 and Section V.Paragraph 9 of the Proposed Consent Decree.*

● Page 2

September 14, 2007

Sources. The existence of those compliance obligations in the Proposed Consent Decree, coupled with the DOJ's prefatory language about compliance, also seems to advance that the Government can implement and enforce compliance obligations against Subpart RRR Sources even though those obligations clearly have no regulatory basis. Thus, the existence and filing of the Proposed Consent Decree, as written, raises serious and legitimate concerns by Subpart RRR Sources.

Furthermore, the Proposed Consent Decree represents the first complaint and settlement to be filed in federal court "to enforce NESHAP regulations applicable to the secondary aluminum production facilities."[5] As such, it is reasonable to assume that the ultimate consent decree will be, or foreseeably could be, identified by Subpart RRR Sources or the Government as establishing some potentially weighty precedent for complying with Subpart RRR, demonstrating compliance with Subpart RRR or settling Subpart RRR enforcement matters in the future. Additionally, the Proposed Consent Decree includes certain compliance obligations that, if not strictly met, seem to clearly suggest that a "violation" of Subpart RRR has occurred, even when such obligations have no regulatory basis. Because of the dearth of regulatory guidance regarding Subpart RRR,[6] it is reasonable to assume that the ultimate consent decree will be, or foreseeably could be, identified by Subpart RRR Sources or the Government as a legitimate resource for Government-sanctioned guidance about what is required to comply with Subpart RRR or to demonstrate compliance with Subpart RRR. Consequently, in any final consent decree to resolve the Jupiter enforcement matter in federal court, it is extremely important, at a minimum, to distinguish between what is required for complying with Subpart RRR (or demonstrating compliance with Subpart RRR) and what is punitively being imposed upon Jupiter by the Government for its prior and future non-compliance. Such distinctions do not currently exist in the Proposed Consent Decree and therefore purposefully or inadvertently confuse the regulated community.

Set forth below are descriptions of those specific terms of the Proposed Consent Decree that have no regulatory basis, exceed the regulatory requirements of Subpart RRR, unreasonably restrict the Defendant's ability to utilize inherent operational flexibility afforded by Subpart RRR, or impose test methods that have no applicable technical or regulatory basis. Aleris contends that such terms of the Proposed Consent Decree are inappropriate, improper or inadequate and could, in essence, constitute rulemaking outside of the appropriate administrative process.

---

[5] *Press Release, U.S. Department of Justice, Joint Settlement Will Ensure Reduction of Hazardous Pollutants from Hammond, Indiana Plant, August 13, 2007.*

[6] As of September 12, 2007, there were only twenty-one Subpart RRR-related applicability determinations posted on the EPA's Applicability Determination website (http://cfpub.epa.gov/adi/). None of those determinations are more recent than June 14, 2005.

September 14, 2007

<u>Visible Emissions</u>

The definition of "Visible Emission" and all of the compliance obligations related to "Visible Emissions" found in the Proposed Consent Decree[7] have no regulatory basis, exceed the requirements of Subpart RRR and impose test methods that have no applicable technical or regulatory basis. As such, the DOJ should delete those compliance obligations from the Proposed Consent Decree or, alternatively, clarify that those obligations are not required by Subpart RRR in any final consent decree.

- *Subpart RRR does not include "Visible Emission" limits, as defined by the Proposed Consent Decree*

There are no specific visible emission limitations on sidewell reverberatory furnaces in Subpart RRR, despite the inclusion of such obligations in the Proposed Consent Decree. According to the Proposed Consent Decree, "any particulate or gaseous matter escaping from the furnace hoods, the furnace door or charge wells, that can be detected by the human eye"[8] or a "video monitoring system"[9] for thirty (30) seconds or more[10] would constitute a "Visible Emission." Such a Visible Emission would purportedly be out of compliance with Subpart RRR under the Proposed Consent Decree and could trigger stipulated penalties[11] for either of Jupiter's sidewell reverberatory furnaces (i.e., Furnaces 2 and 6) equipped with add-on air pollution control devices and located inside a building.

Such definitions and obligations related to Visible Emissions from furnaces do not expressly exist in Subpart RRR, nor are they identified or included in the administrative record as MACT floor obligations under Subpart RRR.[12] In fact, "visible emission" is already defined in Subpart RRR as "the observation of an emission of opacity or optical density above the threshold of vision."[13] Moreover, visible emission requirements in Subpart RRR are expressly limited to emissions **<u>from</u>** add-on air pollution control devices or exhaust stacks.[14] As such, the only "visible emissions" expressly regulated by Subpart RRR are point source emissions, not indoor fugitive emissions.[15]

---

[7] Relevant provisions include *Section IV.Paragraph 8.y, Article One.A.3., Article One.B.1, Article One.B.3, Article One.B.4., Article One.C., Article One.E., Article One.F., Article One.G., Article One.H., Article Three.A.1. Article Five, Article Seven.I., Article Eight.E.1.-2., Article Nine.A., Section VI.Paragraph 12, Section VII.Paragraph 14.f., and Section VIII.Paragarph 24., and Appendix A.(5) of the Proposed Consent Decree.*
[8] *Section IV.Paragraph 8.y. of the Proposed Consent Decree.*
[9] *See also Article One.E. of the Proposed Consent Decree.*
[10] *Section VIII.Paragraphs 25-26 of the Proposed Consent Decree.*
[11] *Id.*
[12] *See, generally, 40 CFR Part 63, Subpart RRR; 64 Fed. Reg. at 6960; 65 Fed. Reg. at 15698.*
[13] *40 CFR Part 63, Subpart RRR, Appendix A; 40 CFR §63.2.*
[14] *See 40 CFR §63.1505(b)(2)(scrap shredder); 40 CFR §§63.1505(d)(2) and (e)(2)(scrap dryer/delacquering kiln/decoating kiln); 40 CFR §63.1505(g)(2)(dross-only furnace); 40 CFR*

● Page 4

September 14, 2007

- *Subpart RRR does not require 100% emission capture efficiency*

The Government's suggestion in the Proposed Consent Decree that 100% emission capture efficiency is required to comply with Subpart RRR is baseless. Specifically, the Proposed Consent Decree includes performance test requirements for "Clean Charge" and "Other Than Clean Charge" capture efficiency that require Jupiter to demonstrate 100% capture of emissions, over a complete operating cycle, including charging, drossing and/or fluxing, in accordance with Government-approved performance test protocols.[16] "100% capture efficiency," for purposes of the Proposed Consent Decree compliance obligation, subjectively means that "all U.S. EPA, IDEM and/or HDEM inspectors present during the demonstration observe no Visible Emissions escaping from the hood or emission source throughout a complete operating cycle."[17] More than one failure by Jupiter to initially demonstrate 100% capture during the "Clean Charge" performance test demonstration or otherwise operate with 100% capture during "Clean Charge" seems to constitute a "violation" of Subpart RRR that could subject Jupiter to reporting obligations, restrictions on materials charged to the furnace(s), and stipulated penalties.[18] More than three failures by Jupiter to initially demonstrate 100% capture during the "Other Than Clean Charge" performance test demonstration seems to constitute a "violation" of Subpart RRR that could subject Jupiter to reporting obligations and restrictions on materials charged to the furnace(s).[19] Any failures by Jupiter to demonstrate 100% capture during subsequent "Other Than Clean Charge" performance test demonstrations or otherwise demonstrate that its on-going operation is meeting 100% capture seems to constitute a "violation" of Subpart RRR that could subject Jupiter to reporting obligations, restrictions on materials charged to the furnace and furnace hearth, a shutdown of production, substantial stipulated penalties and/or a contempt motion.[20]

In contrast to the indoor Visible Emission obligations in the Proposed Consent Decree, which are essentially requirements to eliminate all fugitive emissions from Subpart RRR-regulated furnaces, the only regulatory condition that could apply to such fugitive emissions can be found in the general conditions of NESHAP (i.e., 40 CFR §63.6(e)(1)(i)). That condition requires the operation and maintenance of all affected sources at all times in a manner consistent with safety and good air pollution control practices for ***minimizing emissions***.[21] Moreover, the EPA has publicly acknowledged

---

*§63.1505(h)(2)(rotary dross cooler); 40 CFR §63.1505(i)(5)(group 1 furnace); 40 CFR §63.1505(j)(4)(in-line fluxer).*
[15] *40 CFR §63.2.*
[16] *Articles One.A.3. and One.B.1. of the Proposed Consent Decree.*
[17] *Id.*
[18] *Articles One.A.3. and Nine.A. of the Proposed Consent Decree; Section VIII.Paragraphs 25-26 of the Proposed Consent Decree.*
[19] *Articles One.B.3., One.G.2., and Nine.A. of the Proposed Consent Decree; see also, Article One.C. of the Proposed Consent Decree.*
[20] *Articles One.B.4, One.D. - H. and Nine.A. of the Proposed Consent Decree; Section VIII. Paragraphs 25-26 of the Proposed Consent Decree.*
[21] *40 CFR §63.6(e)(1)(i)(emphasis added).*

- Page 5

September 14, 2007

that an effective and Subpart RRR-compliant capture and control system that meets the minimum exhaust rates as published by the American Conference of Governmental Industrial Hygienists at a secondary aluminum plant will minimize fugitive emissions, not eliminate them.[22]

Outside of the secondary aluminum manufacturing process, the EPA has already expanded upon how fugitive emissions should be regulated from similar types of sources in the recent promulgation of National Emission Standards for Hazardous Air Pollutants for Iron and Steel Foundries, 40 CFR Part 63, Subpart EEEEE ("Subpart EEEEE"). Like secondary aluminum manufacturing, iron and steel foundries use indoor furnaces to melt scrap, ingot, or other forms of iron or steel.[23] However, unlike Subpart RRR, which does not expressly regulate fugitive emissions, Subpart EEEEE does.[24] While Subpart EEEEE specifically regulates fugitive emissions, it is important to note that such emissions are not regulated indoors at the point of the furnace, but are instead regulated at the point of discharge from a building or structure housing the emission sources.[25]

In promulgating Subpart EEEEE, it is also important to note that the EPA originally proposed the installation and operation of a capture and control system with prescriptive emission capture requirements,[26] in part, to capture and control indoor fugitive emissions from furnaces.[27] When issuing the final rule, the EPA ultimately eliminated those requirements based on comments received from the public.[28] Specifically, commenters had convinced the EPA that 200 fpm is not universally applicable and is not consistent with good engineering design.[29] Furthermore, the commenters went on to remind the EPA that indoor air quality is regulated by other agencies (i.e., Occupational Safety and Health Administration) and, when such requirements are being met; there is no basis for stricter capture and ventilation standards imposed by the EPA.[30] In response, the EPA acknowledged the comments and concluded, in relevant part, that fugitive HAP emissions from un-captured fumes from indoor metal melting operations have been effectively addressed by state-based regulations that apply opacity limits

---

[22] *65 Fed. Reg. at 15698; Summary of Public Response to Comments and Responses on Secondary Aluminum NESHAP, Docket No. A-92-61, Item No. V-C-1, Comment/Response 3.2.3, December 14, 1999; 40 CFR §63.1506(c)(1) ; see also 40 CFR §63.6(e)(1)(i).*
[23] *40 CFR §63.7765.*
[24] *40 CFR § 63.7682(b).*
[25] *40 CFR § 63.7690(a)(7); 40 CFR §63.7732(d); 40 CFR §63.7734(a)(7); 40 CFR §63.7743(a)(7).*
[26] The proposed capture requirements were 200 foot per minute (fpm) face velocity when all access doors (if present) were in the open position. *67 Fed. Reg. 78274, 78279, 78303, 78306, and 78307 (December 23, 2002)(see proposed conditions 40 CFR §63.7690(b)(1), 40 CFR §63.7733(a)(5), 40 CFR §63.7734(b)(1)).*
[27] *67 Fed. Reg. at 78279, 78303, 78306, and 78307 (see proposed conditions 40 CFR §63.7690(b)(1), 40 CFR §63.7733(a)(5), 40 CFR §63.7734(b)(1)).*
[28] *69 Fed. Reg. 21906, 21916-21917 (April 22, 2004).*
[29] *Id.*
[30] *69 Fed. Reg. at 21917.*

● Page 6

September 14, 2007

at the point of discharge from buildings that house that type of process equipment.[31] Based on the strong similarities between secondary aluminum manufacturing under Subpart RRR and iron and steel foundry manufacturing under Subpart EEEEE, we contend that the EPA should maintain a consistent position. Stated another way, if the Government ultimately decides to regulate fugitive emissions from Subpart RRR Sources, it should do so at the point of discharge from the building or structure housing the affected sources subject to Subpart RRR and after the appropriate rulemaking procedures are met.

- *Subpart RRR does not require the testing of "Clean Charge"*

In addition to the absence of Visible Emission obligations as suggested by the Proposed Consent Decree, Subpart RRR also does not require the testing of "Clean Charge" as set forth in the Proposed Consent Decree. Based on the difference between the language used in Article One.A.3. and Article One.B.1.-2., it is clear that the Proposed Consent Decree requires Jupiter to test Furnaces 2 and 6 using "Clean Charge" without using flux for purposes of demonstrating 100% capture. However, if the Jupiter facility is using clean charge, as defined in 40 CFR §63.1503, and no flux, then Furnaces 2 and 6 would be considered "Group 2 furnaces," by definition.[32] A "Group 2 furnace" is defined in Subpart RRR, in pertinent part, as "a furnace of any design that melts, holds, or processes only clean charge and that performs no fluxing."[33] Since Group 2 furnaces are not subject to any emission limitations or testing requirements in Subpart RRR,[34] any emission limitations or testing requirements related to "Clean Charge" in the Proposed Consent Decree clearly exceed the limited requirements in Subpart RRR for such furnaces.

- *Using Method 22 or video monitoring is inappropriate for Subpart RRR compliance demonstrations*

Certain tests included in the Proposed Consent Decree to purportedly assess and confirm "compliance" with indoor Visible Emission obligations have no applicable technical or regulatory basis. Several provisions of the Proposed Consent Decree[35] suggest that Visible Emission evaluations should be conducted using U.S. EPA Method 22 ("Method 22") to demonstrate that the furnaces "comply" with Visible Emission standards of Subpart RRR. However, as stated above, furnaces are not subject to specific visible emission standards under Subpart RRR. Furthermore, Method 22 is improper and inappropriate to assess visible emissions from such furnaces because the use of Method 22 is limited, in pertinent part, "as specified in an applicable subpart of the regulations." Since Subpart RRR does not specify the use of Method 22 to take measurements from furnace hoods, doors or charge wells, it is an inappropriate test method to cite or use for purposes of demonstrating compliance with Subpart RRR.

---

[31] *Id.; 40 CFR §63.7690(a)(7); 40 CFR §63.7732(d); 40 CFR §63.7734(a)(7);* and *40 CFR §63.7743(a)(7).*
[32] *40 CFR §63.1503.*
[33] *Id.*
[34] *See, generally, 40 CFR Part 63, Subpart RRR.*
[35] *See, e.g., Articles One.E.4. and Eight.C.7-8. of the Proposed Consent Decree.*

- Page 7

September 14, 2007

The Proposed Consent Decree also inexplicably suggests that compliance with indoor Visible Emission obligations can be assessed and determined using video images generated by a camera installed at the facility, rather than by taking direct observations at the Jupiter facility.[36] Not only is the use of a video camera not expressly included in Subpart RRR, but the use of a video camera to assess visible emissions would also clearly fail to meet the minimum requirements of Method 22, even if that test method was legitimate for observing indoor emissions from furnace hoods, doors or charge wells. Furthermore, from a technical standpoint, such images cannot be relied upon to ensure that they are depicting a compliance issue due to possible interference and other factors that could affect the recorded image.

Malfunctions

The definition of "Malfunction" in Paragraph 8.m. of the Proposed Consent Decree exceeds the regulatory requirements of Subpart RRR and should be deleted or corrected to be entirely consistent with 40 CFR §63.2 in any final consent decree to avoid confusion about what a regulated malfunction is. Specifically, the definition of "Malfunction" in the Proposed Consent Decree cites the wrong regulation (i.e., 40 CFR §60.2) and eliminates a key element of the applicable regulatory definition of "malfunction" found in 40 CFR §63.2; the missing element is that regulatory malfunctions are limited to circumstances that cause or have the potential to cause applicable emission limitations to be exceeded.[37] By eliminating that key component of the definition, the Government has arguably changed and expanded the meaning of "malfunction" for Subpart RRR compliance purposes and thus increased regulatory obligations imposed upon Jupiter and Subpart RRR Sources related to such occurrences, if followed.

Maximum Charge Rates

All of the compliance obligations related to "maximum charge rates" found in the Proposed Consent Decree[38] have no regulatory basis, exceed the regulatory requirements of Subpart RRR, or unreasonably restrict the Defendant's ability to utilize inherent operational flexibility afforded by Subpart RRR. As such, the DOJ should delete those compliance obligations from the Proposed Consent Decree or, alternatively, clarify that those obligations are not required by Subpart RRR in any final consent decree.

Several of the test protocols and corresponding "compliance" tests require the Defendant to specify the "maximum charge rates" to be charged during each "compliance" demonstration.[39] According to the Proposed Consent Decree, the proposed and tested "maximum charge rates" will ultimately be used as

---

[36] *Articles One.E. and Five of the Proposed Consent Decree; Section VI.Paragaph 12. of the Proposed Consent Decree.*
[37] *See, also, 71 Fed. Reg. 20446 (April 20, 2006).*
[38] Relevant provisions include *Article One.A.2., Article One.B.2., Article One.D., Article One.H.2., Article Seven.F. and H., and Section VII.Paragraph 14.h. of the Proposed Consent Decree.*
[39] *Article One.A.2., Article One.B.2.,and Article One.H.2.*

● Page 8

September 14, 2007

Jupiter's compliance parameters, exceedances of which will constitute a "violation" of Subpart RRR and subject Jupiter to substantial stipulated penalties or a contempt motion.[40]

There are several reasons why these provisions are inappropriate. First, "maximum charge rates" are not regulated anywhere in Subpart RRR, nor are such rates necessarily directly relevant to demonstrating compliance with Subpart RRR.[41] In fact, using "maximum charge rates" to establish operating parameters is not always appropriate to meet the applicable testing conditions required by Subpart RRR. Those conditions require the owner or operator to "conduct each test while the affected source or emission unit is operating at the highest production level with charge materials representative of the range of materials processed by the unit and, if applicable, at the highest reactive flux rate."[42]

To clarify this issue in the past, the EPA stated that the intent of Subpart RRR is "to ensure that concentrations of the identified hazardous pollutants are emitted at or below the limits specified."[43] "Test data must establish the highest level of PM, HCl, and D/F that will be emitted from the furnace. This may be determined by conducting performance tests and monitoring operating parameters while charging the furnace with feed/charge materials containing the highest anticipated levels of oils and coatings and fluxing at the highest anticipated rate."[44] Thus, the EPA and Subpart RRR recognize that maximum charge rates are not necessarily appropriate for identifying the highest levels of regulated emissions from a furnace or for establishing the appropriate compliance parameters.

Performance Tests

Certain compliance obligations related to performance tests found in the Proposed Consent Decree[45] have no regulatory basis, exceed the regulatory requirements of Subpart RRR, unreasonably restrict the Defendant's ability to utilize inherent operational flexibility afforded by Subpart RRR, or impose test methods that have no applicable technical or regulatory basis. As such, the DOJ should delete those compliance obligations from the Proposed Consent Decree or, alternatively, clarify that those obligations are not required by Subpart RRR in any final consent decree.

---

[40] *Article One.D. of the Proposed Consent Decree; Section VIII of the Proposed Consent Decree.*
[41] *See, generally, 40 CFR Part 63, Subpart RRR..*
[42] *40 CFR §63.1511(b)(1).*
[43] *Letter from B. Banister, Director, Air, Pesticides and Toxics Management Division, EPA, Region 4, to B. Stephens, P.E., Director, Division of Air Pollution Control, Tennessee Department of Environment & Conservation, February 6, 2004 ("Region 4 Applicability Determination"), p. 4.*
[44] *Region 4 Applicability Determination, p. 4; 40 CFR §1510(o)(1)(while 40 CFR §1510(o)(1) applies to furnaces without air pollution control devices, the EPA provided the guidance generally in the Region 4 Applicability Determination).*
[45] *Article One.A.2., Article Three.A.1., and Section VIII.Paragraph 28 of the Proposed Consent Decree.*

● Page 9

September 14, 2007

Specifically, the Proposed Consent Decree includes multiple and frequent tests that are not required by Subpart RRR and arguably have no tangible value to demonstrate compliance with Subpart RRR. As discussed above, the intent of Subpart RRR is "to ensure that concentrations of the identified hazardous pollutants are emitted at or below the limits specified."[46] "Test data must establish the highest level of PM, HCl, and D/F that will be emitted from the furnace."[47] Article Three.A.1. requires the preparation of test protocols and testing under both "Clean Charge" and "Other Than Clean Charge" scenarios. Based on the description of the "Clean Charge" test in the Proposed Consent Decree, it is clearly not being used to establish the highest level of PM, HCl, and D/F that will be emitted from the furnace and is thus not required by Subpart RRR. Furthermore, the testing protocol described in the Proposed Consent Decree (i.e., "perform one three-hour performance test run . . . to demonstrate compliance with the emission standards in 40 CFR §63.1505(i)") does not even meet the minimum testing standards described in 40 CFR §63.1511(b)(2)-(3), which requires "three separate runs."

Moreover, the annual performance tests required by the Proposed Consent Decree are not required by the regulations.[48] From a practical standpoint, annual performance test requirements will place the Jupiter facility in a constant state of preparing and negotiating test protocols, submitting test notifications, testing, and submitting post-test results to the Government. Thus, the Proposed Consent Decree's testing regime is excessive and unreasonable in order to demonstrate compliance with Subpart RRR because Subpart RRR only requires performance tests for major sources of HAP initially, contemporaneous with particular modifications and every five years thereafter.[49]

<u>Mandatory Capture and Control Design Standards</u>

Certain compliance obligations related to capture and control designs found in the Proposed Consent Decree[50] exceed the regulatory requirements of Subpart RRR and unreasonably restrict the Defendant's ability to utilize inherent operational flexibility afforded by Subpart RRR. As such, the DOJ should delete those compliance obligations from the Proposed Consent Decree or, alternatively, clarify that those obligations are not required by Subpart RRR in any final consent decree.

Articles One.G. and One.I. require Jupiter to upgrade the capture and collection systems on Furnaces 2 and 6 if it cannot demonstrate 100% capture during an initial or subsequent "Other Than Clean Charge" performance test. The list of upgrades in Appendix A clearly exceed the requirements of Subpart RRR because, as explained above, 100% capture is not required. Furthermore, the upgrades in Appendix A unreasonably restrict the Defendant's ability to utilize inherent operational flexibility

---

[46] *Region 4 Applicability Determination, p. 4.*
[47] *Id.; 40 CFR §1510(o)(1)(while 40 CFR §1510(o)(1) applies to furnaces without air pollution control devices, the EPA provided the guidance generally in the Region 4 Applicability Determination).*
[48] *Compare Article One.A.2., Article Three.A.1., and Section VIII.Paragraph 28 of the Proposed Consent Decree. to 40 CFR Part 63, Subpart RRR.*
[49] *40 CFR §§63.1511(b), (e) and (g).*
[50] *Article One.I. and Appendix A of the Proposed Consent Decree.*

● Page 10

September 14, 2007

afforded by Subpart RRR because they far exceed the applicable regulatory requirement to "[d]esign and install a system for the capture and collection of emissions to meet the engineering standards for **minimum** exhaust rates as published by the American Conference of Governmental Industrial Hygienists in chapters 3 and 5 of *Industrial Ventilation: A Manual of Recommended Practice*". ("ACGIH Manual").[51] In addition to other detrimental effects, the upgrades could also result in a significant waste of natural and economic resources.

In adopting Subpart RRR, it is important to understand that the EPA did not prescribe a clear regulatory limit or a fixed number that has to be met for collection systems. Instead, the EPA requires that sources subject to Subpart RRR provide a certification that their capture and collection systems meet the **minimum** exhaust rates set forth in Chapters 3 and 5 of the ACGIH Manual.[52] Furthermore, the fact that the ACGIH Manual is cited and incorporated by reference in Subpart RRR does not change the fact that it is a reference manual to be used as a guideline, rather than a regulation.[53] As discussed more fully above, the EPA previously eliminated prescriptive emission capture requirements for similar types of sources proposed during the rulemaking for Subpart EEEEE. Notably, prescriptive emission capture requirements were never even proposed during the rulemaking for Subpart RRR. As such, imposing specific mandates on Jupiter for ventilation design for Furnaces 2 and 6 based on a 100% capture trigger that has no regulatory basis is unreasonable.

Besides the general reasons why these compliance obligations should be deleted, we have identified other specific items in Appendix A that also warrant attention and change. First, based on the requirements to increase the volumetric flow rate from 43,900 actual cubic feet per minute (acfm) to at least 70,746 acfm at the Furnace 2 and 6 charge well hoods, we assume that Jupiter is being required to use a high canopy hood calculation to develop that particular volumetric flow rate.[54] However, use of the high canopy hood calculation may be inappropriate for such capture and collection systems.

The high canopy hood equation presented in the ACGIH Manual is not applicable for charge well exhausts on sidewell reverberatory furnaces used in secondary aluminum manufacturing because the application of high canopy hood equations is generally limited to free standing hot sources.[55] A typical sidewell reverberatory furnace is not considered a free standing hot source because the "source" is the charge well and the charge well has two sides (i.e., the furnace wall to one side and, in many cases, a solid wall between the well and the pump). Thus, the system is a partial enclosure, rather than a free standing hot source, and the capture and control of hot air from such a source would be entirely different than from a free standing hot source due, in part, to directional restrictions on the rising

---

[51] *40 CFR §63.1506(c)(1)(emphasis added).*

[52] *40 CFR §63.1515(b)(5).*

[53] *"Industrial Ventilation: A Manual of Recommended Practice," American Conference of Governmental Industrial Hygienists,* (23rd *edition, 1998), Forward* ("The [ACGIH] Manual is not intended to be used as law, but rather as a guide."); *see also 69 Fed. Reg. at 21916-21917.*

[54] *See Appendix A.(4) and (6) of the Proposed Consent Decree.*

[55] *See "Industrial Ventilation: A Manual of Recommended Practice," American Conference of Governmental Industrial Hygienists,* (23rd *edition, 1998), Chapter 3.*

● Page 11

September 14, 2007

plume from the two solid walls and the related fact that the plume is not influenced by room air currents as much. Consequently, using the high canopy hood equation for sidewell reverberatory furnaces typically results in the development of an overly conservative estimate of the thermal plume rising from the horizontal well and, in turn, the construction of an oversized charge well hood. In fact, the misuse of the high canopy hood calculation in designing the capture and collection system for Furnaces 2 and 6 could result in the installation of a system with a volumetric flow rate that is an order of magnitude greater than what is required. Consequently, the installation of such a system would unnecessarily result in a significant increase in energy consumption and initial capital and ongoing operating costs for a compliance obligation that is not clearly required by Subpart RRR or, for that matter, the ACGIH Manual.

In addition to the capture and collection system sizing issue, Aleris has also identified a possible error that could require a correction. Specifically, the Proposed Consent Decree includes a minimum air to cloth ratio for control equipment to potentially be used to pick up flows at the furnace dross door hood, furnace flue hood and furnace hearth door hood.[56] Based on our understanding of baghouses and the description in Appendix A, Aleris believes that the air to cloth ration of "4.73 to 1" is likely a maximum, not a minimum.

Scrap Weighing Requirements

Certain compliance obligations related to weighing feed/charge rates found in the Proposed Consent Decree[57] exceed the regulatory requirements of Subpart RRR, unreasonably restrict the Defendant's ability to utilize inherent operational flexibility afforded by Subpart RRR and impose test methods that have no applicable technical or regulatory basis. As such, the DOJ should delete those compliance obligations from the Proposed Consent Decree or, alternatively, clarify that those obligations are not required by Subpart RRR in any final consent decree.

Subpart RRR includes two options to determine the total weight of feed/charge to, or the aluminum production from, an affected source or emission unit subject to an emission limit in kg/Mg (lb/ton) or μg/Mg (gr/ton) of feed/charge.[58] A Subpart RRR Source can either install, calibrate, operate, and maintain a measurement device or, alternatively, use another procedure acceptable to the applicable permitting authority.[59]

If a measurement device is chosen for compliance, the accuracy of that device must generally be ±1 percent of the weight being measured.[60] In lieu of meeting ±1 percent, a Subpart RRR Source can

---

[56] *Appendix A.(6) of the Proposed Consent Decree.*
[57] *Article Four, Article Five, Section VI.Paragraph 12., and Section VIII.Paragraphs 27 and 35 of the Proposed Consent Decree.*
[58] *40 CFR §63.1510(e).*
[59] *Id.*
[60] *40 CFR §63.1510(e)(1).*

● Page 12

September 14, 2007

"apply to the permitting agency for approval to use a device of alternative accuracy if the required accuracy cannot be achieved as a result of equipment layout or charging practices."[61] The key for approval to use a device of alternative accuracy is to assure the permitting agency that the alternative device will still allow the affected source or emission unit to meet the relevant emission standard.[62] Calibration of measurement devices must be performed in accordance with manufacturer specifications or at least once every six months if the manufacturer does not specify a calibration schedule.[63]

Based on Subpart RRR, the prescriptive use and excessive testing of weigh cells on the front end loaders is inappropriate and improper. In particular, the Proposed Consent Decree requires the use of weigh cells on the front end loaders during an initial six month demonstration period to prove that they are reliable and sufficiently accurate to meet ±1 percent of the weight being measured.[64] During that six month demonstration period, Jupiter is required to hire an "independent contractor experienced in testing weighing equipment for accuracy" to conduct comprehensive "blind tests" of each front-end loader and of each front-end load operator at least three times with Government observers.[65] If the weigh cells fail to meet ±1 percent during the "blind tests," the Government may require Jupiter to subsequently install an in-ground truck scale or a feed hopper weighing system in lieu of the weigh cells.[66]

Not only are these requirements clearly excessive when compared to the applicable Subpart RRR requirements, but they also do not focus on what is important for purposes of compliance. As Subpart RRR states, the most vital aspect of weighing is not whether a measuring device can meet ±1 percent, it is whether the device can reasonably be used to demonstrate that the affected source or emission unit meets the relevant emission standard.[67] The conditions in the Proposed Consent Decree entirely miss that purpose and fail to include Jupiter's ability to propose and utilize other viable compliance options allowed by Subpart RRR.

Moreover, regardless of the existence of manufacturer calibration specifications for the dross scale and front end loader weigh cells, the Proposed Consent Decree requires the weighing devices to be calibrated, at a minimum, at least once per month.[68] This clearly contradicts Subpart RRR's requirements of first following manufacturer specifications and then, if they don't exist, calibrating the scales and weigh cells at least once every six months.[69]

---

[61] *Id.; See, also, 65 Fed. Reg. at 15700.*
[62] *40 CFR §63.1510(e)(1).*
[63] *40 CFR §63.1510(e)(2).*
[64] *Article Four.A. of the Proposed Consent Decree.*
[65] *Article Four.D. of the Proposed Consent Decree.*
[66] *Article Four.A. of the Proposed Consent Decree.*
[67] *40 CFR §63.1510(e)(1).*
[68] *Article Four.C. of the Proposed Consent Decree.*
[69] *40 CFR §63.1510(e)(2).*

● Page 13

September 14, 2007

<u>Bag Leak Detection Alarms</u>

Certain compliance obligations related to bag leak detection alarms found in the Proposed Consent Decree[70] have no regulatory basis and exceed the regulatory requirements of Subpart RRR. As such, the DOJ should delete those compliance obligations from the Proposed Consent Decree or, alternatively, clarify that those obligations are not required by Subpart RRR in any final consent decree.

Specifically, Article Six.E. states that Defendant shall "operate each baghouse... such that the bag leak detection system alarm does not sound more than 5 percent of the operating time during a calendar month." However, according to Subpart RRR, baghouses servicing furnaces must be operated "such that the bag leak detection system alarm does not sound more than 5 percent of the operating time during a 6-month block reporting period."[71] Thus, the compliance obligations in the Proposed Consent Decree are not included in Subpart RRR and clearly exceed the requirements of Subpart RRR.

<u>Independent Monitoring Contractor</u>

All of the compliance obligations related to Jupiter's hiring of an independent monitoring contractor found in the Proposed Consent Decree[72] have no regulatory basis and exceed the regulatory requirements of Subpart RRR. As such, the DOJ should delete those compliance obligations from the Proposed Consent Decree or, alternatively, clarify that those obligations are not required by Subpart RRR in any final consent decree.

The Government's imposition of a compliance obligation for Jupiter to select and retain a Government-approved "independent" environmental professional who, in essence, would monitor compliance with Subpart RRR as an agent of the Government, obviously sets a dangerous precedent for the regulated community. We are not aware of any legal basis for the imposition of such a provision based in Subpart RRR or any other legal authority founded upon the federal Clean Air Act. Although Article Eight.F. states that neither Jupiter nor the Government are bound by the statements, conclusions or opinions of the "independent" environmental professional, it is clear that the Government will enforce stipulated penalties against Jupiter for noncompliance with the Proposed Consent Decree identified by the "independent" environmental professional.[73] As such, the hiring of a government agent to work at a regulated facility for a minimum of forty hours a week, at the Defendant's cost, is clearly unreasonable and the Government may not have the legal authority to impose such a condition.

---

[70] *Article Six.E. and Section VIII.Paragraph 30 of the Proposed Consent Decree.*

[71] *40 CFR §63.1506(i)(1)(ii); 40 CFR §63.1506(m)(1)(iii).*

[72] Relevant provisions include *Article Eight, Section VII.Paragraph 13., and Section VIII.Paragraph 34 of the Proposed Consent Decree.*

[73] *Article Eight.F. of the Proposed Consent Decree; Section VII.Paragraph 20. of the Proposed Consent Decree.*

● Page 14

September 14, 2007

## CONCLUSION

Based on the comments, views and allegations concerning the Proposed Consent Decree described herein, Aleris contends that the DOJ must withdraw, withhold consent for, or reasonably revise the Proposed Consent Decree, in accordance with 28 CFR §50.7, because such comments, views and allegations disclose facts or considerations which indicate that the Proposed Consent Decree is inappropriate, improper or inadequate.

Please contact me if you'd like to discuss the above-described comments in more detail. I can be reached by telephone at (216) 910-3507 or by e-mail at ken.willings@aleris.com.

Very truly yours,

Kenneth J. Willings
Vice President, Health, Safety & Environmental
Aleris International, Inc.