IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT, | ) | Civ. Action No. 2:07CV262PS |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| HAMMOND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT | ) | |
| | ) | |
| Plaintiff-Intervenor | ) | |
| v. | ) | |
| | ) | |
| JUPITER ALUMINUM CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

_____)

## JUPITER ALUMINUM CORPORATION'S MOTION TO MODIFY CONSENT DECREE AND ABATE PENALTIES

### INTRODUCTION

In November 2004, Jupiter Aluminum Corporation ("Jupiter"), with representatives of federal, state, and local environmental protection agencies (the "Agencies") present, conducted an air emissions test on the furnaces at its Hammond, Indiana, secondary aluminum recycling facility (the "Facility"). That test demonstrated that the furnaces met the level of emission control required by applicable federal standards. For the next two years, Jupiter conducted its recycling business with the understanding that its operations complied with those standards. During that time, none of the Agencies questioned the adequacy or accuracy of that test.

Nearly two years later in October 2006, the United States Environmental Protection Agency ("U.S. EPA") sent Jupiter a letter declaring that the October 2004 test was unreliable, unacceptable, and that Jupiter was in violation of federal air standards. After taking Jupiter on a regulatory roller-coaster ride, the Agencies forced Jupiter to enter into a Consent Decree to resolve alleged noncompliance. But, instead of providing certainty, the Consent Decree merely redirected Jupiter's focus to chasing an elusive Consent Decree standard. Since then, Jupiter has spent hundreds of hours and more than $3,000,000 to upgrade and reconfigure its air pollution control equipment to the meet design specifications that the Agencies cannot – or will not – clarify.

Despite achieving a level of pollution capture and control at the Facility beyond that achieved by, or required of, any other comparable aluminum recycling facility in the country, the Agencies take the position that the Consent Decree restricts Jupiter to melting only "clean" scrap aluminum in its furnaces. The Agencies further assert that the Consent Decree prohibits Jupiter from melting scrap designated as "other than clean" ("OTC") in either of its two melting furnaces for one year or more – until such time as Jupiter can add additional capacity to or replace its existing pollution capture and control equipment to meet Agency-imposed specifications that are technically infeasible to achieve. Even more egregiously, the Consent Decree imposes a technically infeasible "no visible emissions" standard on Jupiter's indoor furnace operations that could force Jupiter into a never-ending expansion of its already sufficient control equipment with little environmental benefit.

To be sure, Jupiter signed the Consent Decree. Ordinarily, the U.S. EPA could not have imposed such draconian requirements on Jupiter. Jupiter executed the Consent Decree only because it had no choice after the U.S. EPA refused to grant Jupiter approval to rebuild its

emission control equipment or restart its furnace operations that were damaged in a devastating November 2006 fire until it entered the Consent Decree.  U.S. EPA additionally reassured Jupiter that its expert was confident that the "no visible emissions" control requirements the Agencies were demanding was technically feasible and would similarly be imposed on Jupiter's competitors.  Having already suffered a shut down its operations for eight months because of the fire, Jupiter acceded to the Consent Decree.  Adding insult to injury, the Agencies are now demanding that Jupiter pay $3.365 million in stipulated penalties for its alleged failure to meet those Consent Decree requirements which were forced upon it.

Equity dictates that the Consent Decree be modified and the Agencies' penalty demand be abated.  To continue to impose technically infeasible obligations that provide little environmental utility is inequitable.  Accordingly, Jupiter respectfully requests this Court to exercise its Rule 60(b), Fed. R. Civ. P. 60(b), authority to modify the Consent Decree in the interest of justice.  Jupiter further moves that this Court, pursuant to Section X, ¶54 of the Consent Decree and in the interest of justice, abate penalties demanded by the Agencies for alleged violations by Jupiter of the Consent Decree.

## FACTUAL BACKGROUND

I.    Facility Operations

Jupiter operates a secondary aluminum recycling facility in Hammond, Indiana (the "Facility").  The Facility manufactures aluminum coil used in the housing industry and for license plates by melting down "clean" and "other than clean"[1] ("OTC") aluminum scrap in the

---

[1]  The terms "clean" and "other than clean" ("OTC") scrap refer to regulatory classifications of aluminum scrap which generally differentiate between scrap that is covered with paintings, coatings or lubricants which may volatilize when melted (OTC) and that which is free of such substances (clean scrap).  *See* 40 C.F.R. Subpart RRR, §63.1503.

Facility's furnaces.  Declaration of Mark Volkmann, Jupiter Aluminum Corp. with attachments, May 21, 2008, at ¶5 ("Volkmann Decl.")(Exh. A).

The Facility operates two melting furnaces, furnaces #2 and #6.  Emissions from scrap charging and drossing activities at each furnace are captured via a hood over the charge well/dross area.  Captured emissions are then routed through ductwork to baghouses, equipment which controls emissions by filtering pollutants before they can be emitted into the atmosphere.  Previously, emissions were routed to two baghouses, baghouses #6 and #9.  *Id.* at ¶6.  On April 28, 2008, the Facility began routing furnace emissions to a third baghouse, baghouse #7, as well.  This modification was done in furtherance of a proposal Jupiter submitted to the Agencies on March 31, 2008, to reassure the Agencies that air flows to the Facility's control devices at least meet – and, as Jupiter believes, exceed – applicable regulatory standards.  *Id.* at ¶ 7.

II.     <u>Applicable Environmental Regulatory Scheme</u>

The U.S. EPA, the Indiana Department of Environmental Management ("IDEM") and the Hammond Department of Environmental Management ("HDEM") each exert environmental regulatory authority over the Facility's operations.  As a secondary aluminum production facility, the Facility is subject to a federal environmental regulatory program known as the National Emission Standard for Hazardous Air Pollutants for Secondary Aluminum Production (the "Secondary Aluminum Production NESHAP" or "Secondary Aluminum MACT"), 40 C.F.R. §1500 <u>et</u> <u>seq.</u> (2007), more commonly referred to as "Subpart RRR."  Subpart RRR limits the amount of pollutants that may be emitted from certain furnace operations at secondary aluminum production facilities, including the types of operations conducted at Jupiter's Facility.  To meet those limits, owners of such facilities must design, install and operate capture and control equipment that meets the design guidelines for minimum exhaust rates

developed by the American Conference of Governmental Industrial Hygienists ("ACGIH").  40

C.F.R. §63.1506(c).  The ACGIH guidelines provide limited examples that may be applied to

particular furnace operations and allow for modification of the equations, consistent with sound

engineering practices and taking into account site-specific conditions, to reach appropriate design

specifications.[2]  Declaration of Bruce Miller, IES Engineers, May 21, 2008, at ¶ 9 (Miller Decl.)

(Exh. B).  At the same time, Subpart RRR imposes a 10% opacity standard on emissions exiting

a control device stack (i.e., into the outdoor atmosphere), 40 C.F.R. §63.1505(i)(5), but places no

limits on visible emissions from indoor furnace operations.  In fact, the only reference to indoor

visible emissions is found in the preamble to the final Subpart RRR rulemaking where U.S. EPA

acknowledges that application of the ACGIH guidelines will "minimize" fugitive emissions from

furnace operations.  Nowhere does it suggest – or require – 100% control of those emissions.  65

Fed. Reg. 15,690, 15,698 (Final Subpart RRR Rulemaking, Mar. 23, 2000).

       In approximately May 2004, the U.S. EPA, IDEM and HDEM first alleged that

the Facility's operations were in violation of various Subpart RRR requirements.  Volkmann

Decl. at ¶8.  In October 2004, Jupiter conducted a stack test on its baghouses to measure

emissions from its furnace operations.  The test demonstrated that the Facility's furnace

operations complied with Subpart RRR's emissions standards.  Representatives of the Agencies

were present during the test and did not raise any concerns.  On December 10, 2004, Jupiter

submitted those test results to U.S. EPA.  *Id*. at ¶9.  During the ensuing two years, Jupiter

conducted its business with the unchallenged understanding that its operations complied with

Subpart RRR's standards.  Not until October 2006 – two years later – was Jupiter informed that

---

[2] For example, ACGIH's capture velocity equation does not, on its own, take into account the fact that emissions from heated sources naturally rise, a situation present at the Facility's furnaces.  ACGIH's high canopy hood for hot processes equation, on the other hand, recognizes that heated air/emissions rise, but assumes the source is open on all sides (and that its emissions could be impacted by air currents from all sides), unlike the Facility's furnaces which have walls on three sides.  Application of either equation to Jupiter's operations requires modification.

the Agencies had any concerns about the compliance test it had conducted.  At that time, Jupiter

received a letter from U.S. EPA stating that based on a perceived deficiency in certain

calculations submitted by Jupiter, it "views any testing Jupiter has conducted on Furnaces 2 and

6 as unreliable and unacceptable" and would "consider Jupiter to be in continuous

noncompliance" with Subpart RRR emission standards.  It cited to no contemporaneous test data

or other evidence in support of its contention.  *See* Letter from Sarah Dauk, U.S. EPA, Region 5

to Mark Volkmann, Jupiter Aluminum Corp., Oct. 10, 2006 ("Oct. 10 2006 EPA letter") (Exh.

C).

III.     Facility Fire and Consent Decree Negotiations

On November 24, 2006, the Facility suffered a catastrophic fire which virtually

destroyed the Facility.  Property damage exceeded $100 million and forced the facility to

completely shut down operations.  Every day that the Facility remained closed resulted in

significant lost revenues and threatened long-term loss of customer support.  Declaration of Paul-

Henri Chevalier, Jupiter Aluminum Corp., May 21, 2008, at ¶¶6-7 ("Chevalier Decl.")(Exh. D).

At the same time, Jupiter was making significant expenditures to keep its employees on the

payroll to minimize economic hardship to them.  In short, to remain viable, Jupiter needed to

rebuild the Facility on an expedited basis.  *Id.*

Recognizing the unique position these circumstances presented for the Agencies

to resolve their Subpart RRR allegations in a manner favorable to them, the Agencies refused to

allow Jupiter to rebuild its pollution control equipment or resume furnace operations until Jupiter

resolved all of its Subpart RRR issues.  Letter from Lisa Cherup, U.S. DOJ, to Anthony Sullivan,

Barnes & Thornburg LLP, Jun. 8, 2007, at ¶8 ("Jun. 8 2007 DOJ Letter")(Exh. E).  Faced with

this scenario of grossly-imbalanced negotiating leverage, Jupiter had no choice but to acquiesce

to all of the Agencies' demands.  On July 11, 2007, it signed a Consent Decree that, according to

one industry comment submitted during the public comment period, "includes many compliance

obligations that have no regulatory basis, far exceed the regulatory requirements of Subpart

RRR, … or inexplicably impose test methods that have no applicable technical or regulatory

basis."  Public Comment, Aleris International, Inc., Sept. 14, 2007, p. 2 ("Aleris

Comment")(Exh. F).  The Aluminum Association, the secondary aluminum industry trade group,

further expressed concern that "some of the provisions of the Consent Decree may not be

technically feasible"; specifically, it commented that the Consent Decree's "insistence of 100

percent capture at all times under all conditions is in our view excessive and unrealistic."  Public

Comment, The Aluminum Association, Sept. 19, 2007, pp. 1,3  ("AA Comment")(Exh. G).

While Jupiter had expressed similar concerns to the Agencies during negotiations, in acquiescing

to the Consent Decree as written,  Jupiter relied on U.S. EPA's assurances that it had worked

with its expert and were confident that (a) 100% capture of all emissions from the furnaces,

100% of the time was feasible and (b) other U.S. EPA regions would be imposing similar

requirements on Jupiter's competitors.[3]  Chevalier Decl. at ¶10.

IV.     The Consent Decree

Pursuant to its express provisions, "[t]he express purpose of the parties in entering

into this Consent Decree is to bring [Jupiter] into compliance with" Subpart RRR and "to assist

in maintaining [Jupiter's] compliance with" Subpart RRR.  Consent Decree ("CD") at ¶7.  While

the Consent Decree contains a substantial civil penalty to penalize Jupiter and deter others from

similar violations of Subpart RRR, it was not intended to serve as a mechanism for continual

---

[3] After attempting in good faith to meet the "no visible emission" standard of the Consent Decree, Jupiter has come
to discover that U.S. EPA's assurances were wrong.  In fact and as discussed in more detail below, that requirement,
among others, is technically infeasible to implement.  Moreover, time has shown that U.S. EPA has *not* imposed
similar requirements on any of Jupiter's competitors.  Chevalier Decl. at ¶11.

punishment.  The Consent Decree's penalty provisions are for the purpose of effectuating the

Decree's intent, and not to provide a vehicle for imposing additional substantial and onerous

penalties.  Further, the Agencies have repeatedly assured Jupiter that it is not their intent that

Jupiter be forced out of business by operation of the Consent Decree.  Chevalier Decl. at ¶12.

A.      *Capture demonstrations and Visible Emissions*

Virtually all of the Consent Decree's provisions exceed Subpart RRR

requirements for regulatory compliance.  Pursuant to the Consent Decree, each of Jupiter's

furnaces must pass a "capture demonstration" utilizing OTC scrap under specified conditions.[4]

CD at § V.A.3.  In order to pass the capture demonstration, the Facility must achieve 100%

capture of all emissions during the test from the furnace area; in other words, the Facility fails

the test if any smoke from furnace operations escapes being captured by the hood, no matter how

small.  *Id.*  If a furnace passes the capture demonstration, it may thereafter melt clean and/or

OTC scrap.  *Id.* at V.B.1.  But, if Jupiter experiences two or more visible emission events (i.e.,

visible emissions – no matter how small –present anywhere in the furnace area) within a 24-hour

period that each exceed 30 seconds in length, Jupiter must pay a stipulated penalty and the

Agencies may require Jupiter to conduct a new capture demonstration.  If the furnace fails that

capture demonstration, it must upgrade its respective capture and control systems, as specified in

Appendix A to the Consent Decree ("Appendix A Upgrades"), regardless of whether the visual

emission event was unavoidable or whether its system is adequately designed.  *Id.,* at V.E.  If a

furnace does not pass the initial capture demonstration after three attempts, it must similarly

implement Appendix A Upgrades.  *Id.* at V.G.  As explained in subpart D. *infra*, these upgrades

exceed RRR regulations and are technically infeasible.

---

[4] As its name suggests, the purpose of a capture demonstration is to determine whether installed equipment (a) adequately captures emissions and (b) has adequate air flows to route those emissions to air pollution control devices.

B.     *Furnace #2*

On November 2, 2007, Jupiter passed the requisite capture demonstration test and begin charging OTC scrap to Furnace #2. Volkmann Decl. at ¶10. Shortly thereafter, on November 14, 2007, the Agencies claimed that two visible emission events occurred at Furnace #2. As a result, the Agencies claimed that Jupiter was required to revert to melting only clean scrap in that furnace and to conduct a new capture demonstration. Jupiter disagreed with the Agencies' interpretation but, without prejudice to its position, agreed to conduct a capture demonstration. Furnace #2 failed the capture demonstration. As a result, the Agencies maintain that the Consent Decree now requires Jupiter to implement Appendix A Upgrades and that during the interim, until the Appendix A Upgrades have been installed, the Consent Decree precludes Jupiter from utilizing OTC in Furnace #2. Volkmann Decl. at ¶11. Jupiter also disagrees with this interpretation because, prior to the test, Jupiter's outside engineer had concluded that the capture and control equipment for Furnace #2 complies with ACGIH guidelines, as adopted and incorporated into the governing Subpart RRR regulations. Miller Decl. at ¶10

C.     *Furnace #6*

During its third initial capture demonstration attempt utilizing OTC on October 19, 2007, the furnace achieved the requisite 100% capture and control requirements, thereby demonstrating that it met applicable Subpart RRR and ACGIH airflow requirements. Nevertheless, the Agencies erroneously determined that Jupiter failed the test because a dross door on the furnace was open during part of the test.[5] While Jupiter disagreed with that

---

[5] U.S. EPA's interpretation of the Consent Decree as requiring the dross door to be closed during the activities that were being undertaken at that point in the cycle underscores Jupiter's frustration with the Agencies' demands which are based on an interpretation of terms that make its implementation infeasible, and are inconsistent with common industry usage, all without prior notice to industry. The Agencies concluded that Jupiter failed the test because the

conclusion, it elected not to invoke the dispute resolution provisions of the Consent Decree in an effort to maintain a cooperative and positive working relationship with the Agencies. Volkmann Decl. at ¶13. Pursuant to a provision of the Consent Decree limiting to three the number of initial capture demonstrations that could be attempted at each furnace, CD at § V.G., the Agencies further determined that Jupiter had triggered the requirement to design and implement Appendix A Upgrades to its capture and control equipment, despite the fact that an open dross door had no bearing on whether the equipment was designed appropriately. The Agencies further maintain that, until the Appendix A Upgrades have been installed, the Consent Decree precludes Jupiter from utilizing anything other than clean scrap in Furnace #6. Volkmann Decl. at ¶14. Jupiter also disagrees with this interpretation. Similar to the situation with Furnace #2, prior to the test, Jupiter's outside engineer had concluded that the capture and control equipment for Furnace #6 complied with all relevant American Conference of Governmental Industrial Hygienists ("ACGIH") guidelines as adopted and incorporated into the governing Subpart RRR regulations. Miller Decl. at ¶10.

D.  *Appendix A Upgrades*

Appendix A includes detailed design specifications – including hood sizes and air flow requirements – for Jupiter's capture and control equipment. CD at App. A. According to U.S. EPA, Appendix A's specific requirements were derived using the ACGIH guidelines applied to site-specific furnace information. Volkmann Decl. at ¶15. During Consent Decree discussions, the Agencies insisted that the Appendix A specifications complied with ACGIH guidelines but did not allow Jupiter meaningful access to its engineers to examine those claims. Miller Decl. at ¶17.

---

dross door was open during charging. In fact, when the dross door was open, Jupiter was involved in *skimming* activities, activities which, in the aluminum recycling industry, are considered part of drossing and not part of charging.

Jupiter discovered that the site-specific data U.S. EPA used in its Appendix A calculations was outdated and did not reflect actual Facility configurations as they existed at the time of Consent Decree entry. Based on configurations at the Facility, the Appendix A Upgrades cannot be implemented. The Agencies have subsequently acknowledged as much and, at least implicitly, recognized that those calculations must be updated prior to implementation on any upgrades. To facilitate those adjustments, Jupiter and the professional engineer it has hired have tried to make sense of the original calculations U.S. EPA undertook to ensure that any revised calculations would be technically sound and would meet with Agency approval.

E.    *Jupiter's Equipment Upgrade Proposals*

Between December 2007 and March 2008, Jupiter submitted to the Agencies several separate proposals for adjusting the Appendix A requirements, each fully compliant with both the relevant ACGIH guidelines and Subpart RRR requirements. The Agencies rejected the proposals, claiming that they did not meet ACGIH guidelines. *Id.* at ¶17. Despite repeated requests by Jupiter, the Agencies have steadfastly refused to give Jupiter access to their expert.[6] Miller Decl. at ¶17. On March 28, 2008, Jupiter submitted its most recent Appendix A adjustment proposal to the Agencies for consideration, and corrections to that proposal were submitted on April 1, 2008 (collectively, the "March 2008 Proposal"). Technical Revisions to Appendix A Corrective Actions Proposal, March 28 and rev. April 1, 2008 (Exh. H). Like the others, it is fully compliant with both the relevant ACGIH guidelines and Subpart RRR. It provides for both interim and long-term upgrades to the Facility's capture and control equipment.

_____

[6] Not only have the Agencies refused to let Jupiter's third-party engineering expert discuss the relevant issues with their expert, but they terminated the contract of the outside consultant upon whose purported expertise they had been relying. This effectively brought all Appendix A discussions to a standstill; Jupiter's hands were tied and it had no way of either understanding or resolving its technical disagreements with the Agencies. Recently, the Agencies informed Jupiter that they have re-retained their expert. They have yet to provide Jupiter access to him, however. They have further refused to provide engineering information requested by Jupiter to enable it to better understand how the Agencies' calculations work as its professional engineering firm could not sort out inconsistencies in the Agencies' calculations. The Agencies kept refusing to meet to discuss the issues.

Pursuant to the March 2008 Proposal, Jupiter would be immediately permitted to burn OTC in both furnaces.  The Proposal additionally allows Jupiter to bring operations to the level the Agencies claim is required by Appendix A as soon as possible pursuant to the interim proposal while the final, long-term engineering and implementation processes is still on-going.  Both the interim and long-term proposals provide for control far in excess of relevant ACGIH guidelines and Subpart RRR requirements.  Miller Decl. at ¶12.  More than one month after Jupiter submitted its March 2008 Proposal, the Agencies still have not responded, despite assurances that they would get back to Jupiter quickly.  Volkmann Decl. at ¶16.

V.      Jupiter's Additional Efforts to Comply with the Consent Decree

Over the past nine months, Jupiter has spent more than $3,000,000 on compliance-related capital improvements under the Consent Decree.  Chevalier Decl. at ¶13.  It has modified the hoods on each of its furnaces to obtain greater capture of emissions.  In an effort to further improve performance and achieve the results the Agencies claim are required by ACGIH in a more timely fashion, on April 28, 2008, installation of the interim corrective measures outlined in the March 2008 Proposal were completed.  Miller Decl. at ¶12.  Specifically, as of that date, Jupiter has installed a third baghouse, baghouse #7, on its furnace operations to obtain greater emission control.  With the addition of the third baghouse, the control capacity available to each furnace has essentially doubled.  *Id.* at ¶13.[7]  The Facility has experienced fewer visible emissions events and no fugitive emissions have escaped the building or the baghouse stacks.  Most recently, on May 16, 2008, Jupiter conducted an OTC capture demonstration on the interim configuration.  Volkmann Decl. at ¶17.  As required, Jupiter

---

[7] With this latest addition, the equipment has been reconfigured so that emissions from Furnace #2 are routed to baghouses #7 and #9 (with roughly 50% of the emissions going to each baghouse).  Emissions from Furnace #6 are routed to baghouses #6 and #7 (again, with roughly 50% of the emissions going to each baghouse).  *See* March 2008 Proposal.

provided advanced notice to the Agencies that it was going to conduct the capture demonstration. E-mail from M. Volkmann, to U.S. EPA Region 5, IDEM, and HDEM, May 9, 2008 ("May 9, 2008 Volkmann E-mail")(Exh. I).  The Agencies refused to attend the capture demonstration test.  Letter from D. Rosskam and L. Cherup to R. Olian, May 14, 2008 ("May 14 DOJ Letter")(Exh. J).  Both furnaces passed the test, demonstrating that they meet the applicable air flow design standards of Subpart RRR and ACGIH guidelines and achieved 100% capture of furnace emissions during the test.  Volk, ¶17; Declaration of Tim Claus, ENVIRON Corp., May 21, 2008 at ¶4 ("Claus Decl") (Exh. K).  Nevertheless, without any regulatory or environmentally-beneficial support for their position, the Agencies continue to maintain that Jupiter may not melt OTC in either of its furnaces until implementation of the final Appendix A Upgrades, a scenario that is not only infeasible (as discussed above) but also cannot occur for at least one year given the time it will necessarily take for the equipment to be finally designed, manufactured and installed.

VI.     The Consent Decree's Impacts on Jupiter's Operations

The Consent Decree, as interpreted by the Agencies, has had and will continue to have unforeseen and un-sustainable adverse impacts on Jupiter's operations.  As discussed above, the Agencies would have Jupiter melt only clean scrap from now until the final Appendix A Upgrades have been implemented, regardless of the fact that the Facility already meets the capture and control performance that will be achieved via any final upgrades.  Melting only clean scrap, however, is not a viable alternative.

Jupiter buys its aluminum scrap mix on the market.  In recent years, the market for clean and OTC scrap has been tighter than usual.  While a number of factors contribute to this fact, one of the primary causes is the economy's general slow down.  As manufacturing

operations slow down, clean scrap from manufacturing becomes more scarce.  As a result of these market realities, Jupiter cannot secure enough clean scrap to sustain operations in both furnaces in clean-scrap-only modes.  Chevalier Decl. at ¶14.  As a result of these circumstances, Jupiter has been forced to use OTC and clean scrap in its furnaces, pending resolution of the Appendix A matters with the Agencies.

Jupiter cannot reduce its operations to either furnace #2 or #6; its equipment requires the Facility to operate both furnaces.  Jupiter's aluminum recycling is a continuous operation.  Equipment downstream from the furnaces – the caster and hot mill – are designed to operate continuously.  They cannot be frequently stopped and started without placing additional strains on the equipment which it was not built to withstand and which can potentially lead to significant equipment damage.  Yet, such frequent stopping and starting is precisely what would occur at the Facility were it only able to operate one furnace as a result of the clean-only demand from the Agencies; enough clean scrap would simply not exist to keep a steady and constant flow of molten aluminum to the caster.  Chevalier Decl. at ¶15.  No less importantly, operating in a sporadic fashion would render it nearly impossible to attract and retain valuable and skilled employees who need a regular job.    *Id*. at ¶16.

Even assuming that Jupiter were able to secure enough clean scrap to run both furnaces, Jupiter has discovered that even having only one furnace dedicated to only clean scrap increases production problems because adequate mixing of the clean and OTC molten aluminum is difficult to achieve.  *Id*.. at ¶17.  In addition, the price difference between clean and OTC scrap is significant.  By Jupiter's Executive Vice President's estimate, restricting furnaces to only clean scrap will increase operational costs by up to $600,000 per furnace per month.  He estimates that since inception of the Consent Decree, Jupiter has expended millions of dollars to

14

obtain clean scrap.  *Id.*  This money could have otherwise been invested in reconstruction and

maintenance activities of environmental utility.  *Id.* at ¶19.

## ARGUMENT

I.     Equity Dictates that this Court Modify the Consent Decree Under the Authority of Rule
       60(b)(5).

       Pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure, consent

decrees may be modified where "it is no longer equitable that the judgment should have

prospective application."[8] In order to avail itself of this relief, a party seeking to modify a

consent decree bears the burden of establishing that a "significant change in circumstances

warrants revision of the decree."  *U.S. v. Krilich*, 303 F.3d 784, 789 (7th Cir. 2002).  Qualifying

changes can be changes in either fact or law.  *Id.,* (citing *Rufo v. Inmates of the Suffolk Country

Jail*, 502 U.S. 367, 378 (1992)).  They include: (1) when changed factual conditions make

compliance with the decree substantially more onerous; (2) when the decree proves to be

unworkable because of unforeseen obstacles; or (3) when enforcement of the decree would be

detrimental to the public interest.  *See Rufo*, 502 U.S. at 384.  If that burden is met, the court

"should consider whether the proposed modification is suitably tailored to the changed

circumstances."  *Krilich*, 303 F.3d at 790 (citing *Rufo, 502 U.S. at 383*).

       A.     *Equity Requires Modification of the Consent Decree Because Significant Changes
              in Circumstances Make the Consent Decree Unworkable and Substantially More
              Onerous.*

       Over the past nine months, Jupiter has attempted in good faith to comply with the

onerous provisions of the Consent Decree.  The longer it undertakes those efforts, however, the

clearer it becomes to Jupiter that compliance with the Consent Decree is unworkable, infeasible

---

[8] Rule 60(b) provides that a court may provide relief from a "final judgment, order or proceeding."  Consent decrees
are treated as final court judgments, subject to Rule 60(b).  *Rufo v. Inmates of the Suffolk Country Jail*, 502 U.S.
367, 378 (1992).

and substantially more onerous than envisioned by the parties.  As drafted, the Consent Decree punishes Jupiter for things beyond its control, potentially forcing Jupiter to undertake countless capture demonstrations and equipment redesigns, with the effect of mandating ever-increasing hood size and air flows to chase an elusive requirement of 100% capture at all times.  Many of its provisions are inequitable, draconian and serve no environmental purpose.  It is additionally inequitably detrimental to Jupiter because it puts Jupiter at an unfair competitive disadvantage. Such treatment of Jupiter is unwarranted and must be corrected.

1.      Implementation of Appendix A is Technically Infeasible Given Current Facility Conditions.

Appendix A of the Consent Decree purportedly requires Jupiter to modify the hoods over its furnaces to meet specific size requirements and to modify air flow to its baghouses to meet specific flow requirements based on Facility-specific charge well and hood configurations.  Each of the requirements laid out in Appendix A was purportedly further devised using the engineering standards found in the appropriate ACGIH guidelines, the same guidelines that Subpart RRR requires capture and control equipment meet.

The ACGIH include various engineering equations to assist facilities in designing capture and control equipment that is appropriately-sized.  Those equations are meant to serve as guidelines, with appropriate adjustments made to tailor the equations to site-specific conditions. With respect to capture and control equipment on melting furnaces, the ACGIH manual includes two potentially relevant equations, a face/capture velocity equation and a high canopy hood for hot processes equation.  Unmodified, neither equation mirrors Facility operations and equipment precisely.  Good engineering practice and judgment therefore dictate that the ACGIH equations be modified to design the most appropriate system for the Facility.

16

Jupiter learned that the charge well and hood sizes that the Agencies used to develop their Appendix A specifications for the capture and control equipment for Furnaces #2 and #6 were inaccurate and did not reflect true configurations.  The Appendix A design criteria developed by the Agencies' engineer does not make engineering sense because it insists on hood dimensions and air flows that are not appropriate for Jupiter's current operations.  For example, the Agencies proposal appears to have Jupiter installing hoods to capture emissions above its furnaces in such a way as to extend behind and beyond walls on the outside of the furnace and into areas where it is impossible that furnace emissions would emanate; and appears to require installation of hoods oriented 90 degrees from how ACGIH calculations would require them to be installed.  Additional examples abound.  Miller Decl. at ¶14.  Because the data U.S. EPA used to develop its Appendix A Upgrade calculations were flawed and outdated, the design details included in Appendix A are obsolete, inapplicable and technically infeasible to implement under current Facility conditions.  Also, because Jupiter was effectively denied access to the Agencies' engineer during Consent Decree discussions, it did not discover the full impact and extent of these errors until after the Consent Decree was entered into.

2.     The Agencies Interpret the Appendix A Upgrade Requirements in a Manner That is Technically Infeasible.

In light of the fact that Appendix A cannot be implemented as drafted, with the Agencies' knowledge, Jupiter requested that its outside, third-party engineering expert, Bruce Miller of IES Engineering,[9] a Professional Engineering firm, undertake an engineering exercise to design new ACGIH-compliant hoods and control equipment based on the Facility's current configurations and dimensions.

---

[9] IES Engineering is a Professional Engineering firm.  As such, their work is signed and guaranteed.

17

Without prejudice to its prior conclusion that the Facility's existing designs met Subpart RRR requirements and ACGIH guidelines, between December 2007 and March 2008, IES undertook renewed evaluations to develop a new equipment upgrade proposal to replace the Appendix A Upgrade requirement.  Each time, IES used appropriately-modified ACGIH equations that took into account specific details of Jupiter's operations and equipment to develop and design its equipment upgrade proposal.  In an effort to accommodate the Agencies, IES adjusted the requisite hood size and air flow requirements, even though its engineering calculations demonstrated that such adjustments were not necessary.  The air flow and capture velocity calculations in each of its proposals, including its most recent March 2008 Proposal, are fully compliant with Subpart RRR requirements and the ACGIH manual and, therefore, meet or exceed the standards and recommendations upon which U.S. EPA claims its Appendix A Upgrade were derived.

Defying good engineering judgment and contrary to the ACGIH manual itself, however, the Agencies have staked out the unsupported position that Jupiter cannot tailor the ACGIH equations and has rejected each of Jupiter's proposals for modifying Appendix A requirements.  They insist that Jupiter apply the ACGIH guidelines unchanged, something the Agencies have not yet proven possible.  Despite its best efforts, however, IES cannot determine how the Agencies reached their design numbers.  Miller Decl. at  ¶16.  For over ten months, the Agencies have refused to let Jupiter or IES speak with its consultant to resolve the issues and allow Jupiter's redesign efforts to proceed.  *Id*. at ¶17.  Jupiter is therefore left in the untenable position of not being able to determine what design parameters meet the government's requirements.

      3.        The Consent Decree Standard of 100% Capture of Furnace Emissions, 100% of the Time that the Agencies are Demanding is Technically Infeasible.

Equally indefensible is the Agencies' insistence that the Consent Decree requires that there be no visible emissions from Jupiter's furnace operations at any time.  During the Consent Decree negotiations, Jupiter expressed concern to the Agencies that 100% capture 100% of the time was not possible.  Jupiter's concerns were mirrored by industry members Aleris and the Aluminum Association.  Further, Subpart RRR does not require that all fugitive emissions be eliminated, or even include capture efficiency requirements at all.  *See* 65 Fed. Reg. at 15698. The only visible emissions requirements in the regulations relate to emissions from add-on control technologies; none apply to emission sources themselves.

Contrary to U.S. EPA's assertions, Jupiter's experiences over the course of the past nine months have demonstrated that while 100% capture of emissions is possible some of the time – and perhaps even most of the time – such performance cannot be guaranteed at all times.  Capture efficiencies can be impacted by numerous factors, including surrounding air flows, eddies, currents and operator movement near the furnaces.  At some point designs will reflect the law of diminishing returns: excessive air flows will become less productive and waste energy and capital but still not guarantee 100% capture at all times.  Thus, even with the over-sized hoods and excessive air flows incorporated by IES into Jupiter's current configuration, some visible emissions events have and will continue to occur.  *See* Miller Decl. at ¶18.

This requirement is thus technically infeasible to meet and should be stricken.  It is inequitable for the government to insist on retaining this provision in the Consent Decree where it is impossible for Jupiter – or any secondary aluminum production company for that matter – to meet it.  Requirements under the Consent Decree that would further force Jupiter to

pay stipulated penalties and conduct new capture demonstrations each time it experiences two

visible emission events exceeding 30 seconds in a 24-hour period, are similarly inequitable and

serve no environmental purpose other than to continue punishing Jupiter for things beyond its

control.[10] .

       4.     The Consent Decree's Requirements that Would Preclude Jupiter from
           Melting OTC Scrap Until it can Implement the Final Appendix A
           Upgrades are Inequitable.

Precluding Jupiter from melting OTC until it can figure out what the Agencies'

final Appendix A Upgrades entail, apparently without their assistance, serves no practical or

environmental purpose.  In insisting that Jupiter cannot melt OTC, the Agencies ignore the fact

that Jupiter has undertaken significant and costly upgrades to its capture and control equipment

over the past nine months, all to ensure to everyone's satisfaction that it meets Subpart RRR

requirements and ACGIH guidelines.  On May 16th, it passed a capture demonstration based on

its current configuration, identified as its interim proposal in its March 2008 Proposal, to comply

with the intent of Appendix A.

The burdens that these provisions of the Consent Decree place on Jupiter are

weighty.  Frustratingly, Jupiter has no corresponding environmental benefit to show for its

significant expenditures.  More significantly, however, Jupiter cannot run its Facility with just

one furnace. In short, it cannot maintain its business under the operating parameters demanded

by the Agencies.  As the Agencies have indicated that it is not their intent to put the Facility out

of business, equity dictates that the Consent Decree be modified to ensure that does not occur.

       B.     Jupiter's Requested Modifications to the Consent Decree are Tailored to Address
           Specific Inequities in the Consent Decree and are Thus Appropriate.

---

[10] Added to this injustice is the fact that each time it conducts a capture demonstration, Jupiter is forced to incur the additional expense of using clean scrap until such time as the test can be conducted.  Given that finding a time to schedule the tests when all three Agencies are available can take time, such additionally incurred scrap expenses can be significant.

The modifications to the Consent Decree that Jupiter is seeking are narrowly tailored, make sense and serve justice.  Specifically, Jupiter requests the following:

- Strike Appendix A, as it currently exists;

- Add a provision requiring Jupiter to install ACGIH-compliant hoods with ACGIH-compliant air flows, the specifications for which are developed using good engineering judgment;

- All prohibitions on Jupiter utilizing OTC in either of its furnaces, pending implementation of the final March 2008 Appendix A Proposal, be deleted;

- All requirements in the Consent Decree requiring Jupiter to achieve 100% capture at all times be deleted;

- All requirements that Jupiter perform additional capture demonstrations that are triggered by visible emission events be deleted;

- All requirements that Jupiter redesign its capture and control equipment following visible emissions events be deleted if Jupiter can demonstrate that its system still meets the Subpart RRR requirements and ACGIH design guidelines; and

- All provisions providing for stipulated penalties for visible emission events be deleted.

Each of these changes is narrowly-tailored to the problematic provisions of the Consent Decree. Even with these modifications, Jupiter's operations will exceed Subpart RRR standards. Environmental quality will not be sacrificed.  As such, the modifications are appropriate, equitable, and should be granted.  *See Krilich*, 303 F.3d at 789-90.


II.     Equity further Dictates that the Consent Decree Be Modified Pursuant to the Court's
        Authority under Rule 60(b)(6).

Federal Rule 60(b)(6), the "catchall" clause, further authorizes the Court to modify the Consent Decree. Pursuant to that clause, courts may grant relief from a consent decree for "any other reason justifying relief." Fed. R. Civ. P. 60(b)(6). Movants may be entitled to relief under this provision even absent changed circumstances since the time of consent decree entry. *See L.M. Leathers' Sons v. Goldman*, 252 F.2d 188 (6th Cir. 1958). For each of the reasons Jupiter outlined above with respect to Rule 60(b)(5), modification is appropriate and Jupiter is entitled to modification of the Consent Decree pursuant to Rule 60(b)(6).

III.    Equity Dictates that this Court Abate the Stipulated Penalties Demanded by the Agencies

The Agencies' demand that Jupiter pay $3.365 million in stipulated penalties that it alleges accrued under the Consent Decree is excessive and disproportionate to the alleged violations. Accordingly, Jupiter respectfully moves, pursuant to Section X, ¶54 of the Consent Decree, for this Court to resolve the parties' penalty dispute and abate such penalties to no more than $100,000, with the potential for additional penalties to accrue and become owing if Jupiter fails to implement long-term modifications to its pollution capture and control equipment, as detailed more specifically in its February 21, 2008 Statement of Position.

A.    Background

On December 21, 2007, U.S. EPA sent a letter to Jupiter demanding it pay stipulated penalties of $1,838,000 that it claims were due pursuant to the Consent Decree through the date of the letter ("Demand Letter"). Demand for Stipulated Penalties, G. Czerniak, to M. Volkmann, December 21, 2007 (Exh. L). Pursuant to ¶51 of the Consent Decree, the parties engaged in informal dispute resolution, including attending a meeting on February 7, 2008. At that meeting, the U.S. EPA raised its penalty demand to $4,231,000 to include amounts it alleged

22

had accrued since the date of its Demand Letter.  Letter from L. Cherup, to R. Olian, February 7, 2008 ("Feb. 7 2008 DOJ Letter")(Exh. M).   Pursuant to the terms of the Consent Decree, the informal dispute resolution period ended February 7, 2008.

Jupiter thereafter invoked formal dispute resolution relating to U.S. EPA's penalty demand, pursuant to ¶52 of the Consent Decree, by timely submitting a Statement of Position on February 21, 2008 ("Jupiter's SOP").  Statement of Position of Jupiter Aluminum Corporation Regarding Resolution of Dispute Over Plaintiff's Demand for Stipulated Penalties, Feb. 21, 2008 (Exh. N).  In its SOP, Jupiter proposed settling the agency's stipulated penalty demand for an amount not to exceed $100,000, with certain additional provisions allowing for additional penalties in the event of certain contingencies.  U.S. EPA responded with its Statement of Position on April 17, 2008 ("U.S. EPA's SOP").  United States' Statement of Position for Dispute Over December 21, 2007 Demand for Stipulated Penalties, Apr. 17, 2008 (Exh. O).  In its submittal, U.S. EPA revised its penalty demand downward only marginally, still demanding penalties of $3,365,000.  Given ongoing discussions between the parties and the length of U.S. EPA's SOP, the agency extended the period in which Jupiter was required to seek judicial review of the dispute, pursuant to ¶54, making Jupiter's request for judicial resolution of the matter due by May 21, 2008.

Pursuant to ¶56(b) of the Consent Decree, Jupiter is entitled to prevail if it can demonstrate that its position complies with the Consent Decree and better furthers the objectives of the Consent Decree.

B.    Jupiter's Proposal for Settling U.S. EPA's Penalty Demand Complies with the Consent Decree and Furthers its Objectives

Jupiter's SOP and settlement proposal will enable the Consent Decree's intent to be fulfilled of allowing Jupiter to come into and maintain compliance with Subpart RRR

requirements.  As detailed above, the stated purpose of the Consent Decree is not to exact harsh penalties from the company.  Yet, that is precisely what U.S. EPA's demand will do.  While the Agencies have repeatedly assured Jupiter that they do not intend to force it out of business, if left unabated, the excessive penalty demanded by the Agencies will bring it one step closer to that end.  Jupiter cannot realistically sustain its operations in the highly-competitive secondary aluminum production industry if it must bear the cumulative weight of restricted operations at its furnaces, increased operating costs and capital improvements, while still paying a $3.365 million penalty to the Agencies.  Those penalties are based on standards that go above-and-beyond what is required by the Agencies of others in the industry.  Exacting such penalties will further allow the Agencies to continue treating Jupiter differently prospectively, even absent any Subpart RRR compliance basis for doing so.  Nevertheless, U.S. EPA refuses to exercise its discretion to reduce its penalty demand to a more appropriate level.  In recognition of the significant resources – in excess of $3,000,000 – that Jupiter has expended on compliance-related capital improvements and for all the reasons detailed in its SOP, Jupiter respectfully requests this Court abate the U.S. EPA's penalty demand, consistent with and as detailed in Jupiter's SOP.

**CONCLUSION**

WHEREFORE, Jupiter Aluminum Corporation respectfully request an order from this Court (1) modifying the Consent Decree as outlined in Section I.B., *infra*, (2) abating U.S. EPA's penalty demand as detailed in Jupiter's SOP proposal, and (3) ordering any further relief it deems just and proper.

Respectfully submitted,

JUPITER ALUMINUM CORPORATION

By:  ___Robert M. Olian_____

Robert M. Olian (IL Attorney No. 2101408)

John M. Heyde (IL Attorney No. 6229432)
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Phone:  (312) 853-7000
Fax:     (312) 853-7036
Email: rolian@sidley.com
        jheyde@sidley.com
*Appearing Pro Hac Vice*

Dated:  May 21, 2008

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| Sharon J. Johnson<br>sharon.johnson2@usdoj.gov<br>Assistant United States Attorney<br>Hammond Division<br>UNITED STATES DEPARTMENT OF JUSTICE<br>5400 Federal Plaza, Suite 1500<br>Hammond, IN 46320<br>*Counsel for Plaintiff*<br>*The United States of America* | Valerie M. Tachtiris<br>vtachtiris@atg.state.in.us<br>Office of the Indiana Attorney General<br>STATE OF INDIANA<br>Indiana Government Center South<br>302 West Washington Street, 5th Floor<br>Indianapolis, IN 46204<br>*Counsel for Intervenor Plaintiff*<br>*Indiana Department of Environmental*<br>*Management* |
| Alan R. Faulkner<br>law@gohammond.com<br>Law Department<br>CITY OF HAMMOND<br>5925 Calumet Avenue<br>Hammond, IN 46320<br>*Counsel for Intervenor Plaintiff*<br>*The City of Hammond, Indiana* | Michael V. Knight<br>mknight@btlaw.com<br>Barnes & Thornburg LLP<br>100 North Michigan Street<br>600 1st Source Bank Center<br>South Bend, IN 46601<br>*Counsel for Defendant*<br>*Jupiter Aluminum Corporation* |
| Robert T. Grand<br>bob.grand@btlaw.com<br>Anthony C. Sullivan<br>tony.sullivan@btlaw.com<br>Barnes & Thornburg LLP<br>11 South Meridian Street<br>Indianapolis, IN 46204<br>*Counsel for Defendant*<br>*Jupiter Aluminum Corporation* | Robert M. Olian<br>rolian@sidley.com<br>John M. Heyde<br>jheyde@sidley.com<br>Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, IL 60603<br>*Counsel for Defendant*<br>*Jupiter Aluminum Corporation* |

I also hereby certify that on May 21, 2008 I caused the foregoing Motion to Modify Consent Decree and Abate Penalties to be sent via United States first-class mail to the following.

| UNITED STATES DEPARTMENT OF JUSTICE | |
|---|---|
| Chief, Environmental Enforcement Section<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>Box 7611 Ben Franklin Station<br>Washington, D.C. 20044-7611<br>(Re:  DOJ No. 90-5-2-1-08734) | Lisa A. Cherup<br>Trial Attorney/Environmental Enforcement Section<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>Box 7611 Ben Franklin Station<br>Washington, D.C. 20044-7611 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | |
| Sara Breneman<br>U.S. Environmental Protection Agency<br>Region 5<br>Mail Code AE-17J<br>77 West Jackson Boulevard<br>Chicago, IL 60604 | Cathleen Martwick<br>U.S. Environmental Protection Agency<br>Region 5<br>Mail Code C-14J<br>77 West Jackson Boulevard<br>Chicago, IL 60604 |
| Office of Enforcement and Compliance Assurance, Air<br>U.S. Environmental Protection Agency Headquarters<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Mail Code 2242A<br>Washington, D.C. 20460 | |
| INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT | |
| Lynne Sullivan<br>Office of Enforcement/Air Section<br>Indiana Department of Environmental Management<br>100 North Senate Avenue<br>Mail Code 60-02<br>Indianapolis, IN 46204-2251 | |

| _**H**AMMOND **D**EPARTMENT OF **E**NVIRONMENTAL **M**ANAGEMENT_ | |
| --- | --- |
| Thomas Nyhan<br>Hammond Department of Environmental Management<br>Hammond City Hall, Room 304<br>5925 Calumet Avenue<br>Hammond, IN 46320 | |

    s/ Robert M. Olian
_____

Counsel for Defendant Jupiter Aluminum
Robert M. Olian (IL Attorney No. 2101408)
John M. Heyde (IL Attorney No. 6229432)
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Phone:  (312) 853-7000
Fax:      (312) 853-7036
Email: rolian@sidley.com
        jheyde@sidley.com
_Appearing Pro Hac Vice_