UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT, CITY OF HAMMOND, | ) CAUSE NO. 2:07-CV-262 PPS |
| Plaintiff-Intervenors, | ) |
| v. | ) |
| JUPITER ALUMINUM CORPORATION, | ) |
| Defendant. | ) |

**OPINION AND ORDER**

When a company signs a consent decree with environmental agencies and then eight months later does an about face and wants to substantially amend the terms of the deal, eyebrows get raised. That is just what happened in this case. On October 10, 2007, the Court entered a Consent Decree reflecting the Parties' settlement of this environmental litigation. But in the months that followed, Defendant Jupiter Aluminum racked up a whopping amount of stipulated penalties for violating the Decree – more than $3.3 million in all. Evidently motivated by buyer's remorse, Jupiter now asks the Court to relieve it from certain obligations under the Consent Decree and to modify many of its key provisions. It also asks me to reduce the multi-million dollar penalty obligation that it currently faces to the more modest sum of $100,000. (DE 21.) The Agencies meanwhile ask the Court to enforce the Consent Decree by imposing sanctions and injunctive relief above and beyond what the Consent Decree provides. (DE 26.) For the reasons that follow,

1

Jupiter's Motion to Modify the Consent Decree is denied in part, and its request to abate accrued penalties is denied. The Agencies' motion is also denied because the consent decree itself already gives the Agencies all the protection they need.

**FACTUAL BACKGROUND**

Jupiter operates a secondary aluminum production facility in Hammond, Indiana, where it manufactures aluminum products using recycled aluminum. Jupiter reprocesses aluminum in its Hammond facility by melting down clean and "other than clean" ("OTC") aluminum scrap in two of its furnaces. As the name indicates, OTC scrap is scrap that is coated with paint, oils, solvents or other coatings that emit hazardous pollutants into the air when melted.

As a secondary aluminum production facility, Jupiter is subject to the U.S. Environmental Protection Agency's national emissions standards for that industry, known as Subpart RRR. *See* 40 C.F.R. § 1500 *et seq.* Subpart RRR imposes limits on emissions from furnace operations and mandates that secondary aluminum production facilities maintain capture and control equipment according to certain guidelines. *See id.* Jupiter is also subject to the regulatory authority of the Indiana Department of Environmental Management and the Hammond Department of Environmental Management.

Around May 2004, the Agencies first informed Jupiter that its furnace operations were not in compliance with Subpart RRR. This prompted Jupiter to conduct an emissions test with representatives of the Agencies present. Jupiter submitted those test results to the EPA in December 2004. Years passed without a word from the Agencies. So according to Jupiter, it continued its business operations thereafter under the impression that it was in compliance. But this was a false sense of security; in October 2006, the EPA finally got around to informing Jupiter

that it was rejecting the December 2004 test results as unreliable and that the EPA would therefore consider Jupiter to be in continuous noncompliance with Subpart RRR.  (DE 21-2 at 30-31.)  Why it took the EPA a staggering 22 months to reject the test results is not clear from the record.

Then on November 24, 2006, Jupiter's Hammond facility suffered a catastrophic fire that caused significant property damage forcing Jupiter to shut down its operations at the facility.  In order to remain viable, Jupiter sought to quickly rebuild the facility.  The Agencies approved Jupiter's plans to repair its furnaces on the condition that Jupiter would not charge the repaired furnaces with aluminum until the company's Subpart RRR issues were resolved.  (DE 21-2 at 38.)  Over the next several months, Jupiter negotiated a resolution of the Subpart RRR issues with the Agencies.  According to Jupiter, they had a gun to their head.  In Jupiter's words, the company was "[f]aced with this scenario of grossly-imbalanced negotiating leverage [and] had no choice but to acquiesce to all of the Agencies' demands."  (Def. Mot., DE 21-1 at 6-7.)

On August 9, 2007, the Agencies filed the instant case against Jupiter under the Clean Air Act alleging violations of Subpart RRR.  Immediately thereafter, the Agencies lodged a proposed consent decree with the Court and submitted the document for public comment.  (DE 10.)  During the public comment process, the parties received comments criticizing the proposed consent decree from one of Jupiter's competitors (Aleris International) and from an industry trade association (the Aluminum Association).  These industry peers argued that the proposed consent decree imposed inflexible obligations that exceeded regulatory standards and may not be technically achievable.  (DE 19-2; DE 19-3.)  Nevertheless, on October 10, 2007, the Agencies – with the support of Jupiter – moved for entry of the Consent Decree, which I approved.

The Consent Decree focuses on the operations of Jupiter's two melting furnaces at the

Hammond facility. The core agreement is as follows: if Jupiter could demonstrate the ability to capture OTC scrap emissions with 100% efficiency (i.e., no visible emissions), then it could continue to charge OTC scrap. (DE 20, Consent Decree at 9-12.) If Jupiter failed to pass this standard, it would not be allowed to further melt OTC scrap until it first modified its capture and control system in accordance with negotiated specifications set forth in Appendix A to the Consent Decree. (*Id.* at 17-18.)

The Consent Decree provided Jupiter with several initial opportunities to pass the performance test. (*Id.* at 9-12.) If Jupiter passed the initial series of performance tests, and visible emissions were later observed, the Consent Decree required Jupiter to take certain steps to determine the cause and prevent the recurrence of visible emissions including: performing a root cause analysis, reporting the causes and corrective steps, and ceasing the charging of OTC scrap until required steps were completed. (*Id.* at 14-16.) Based on the presence of visible emissions, the Agencies could require Jupiter to pass further performance tests or implement the Appendix A modifications before resuming the melting of OTC scrap. (*Id.*) The Consent Decree provides a variety of additional remedial measures including leak detections systems, an approved Operation, Maintenance and Monitoring ("OMM") Plan, and employment of an independent monitoring consultant. (*Id.* at 30-39.)

The Consent Decree also contains a detailed Stipulated Penalties provision, which imposes penalties for thirteen categories of violations of the Consent Decree. (*Id.* at 48-56.) The penalties are calculated per-day and per-instance of noncompliance, depending on the violation. (*Id.*) For example, the penalty for operating a furnace during a time not permitted by the Consent Decree is $10,000 per violating furnace for the first day, with escalating fines each additional day. (*Id.* at

4

49.)

Problems emerged soon after the Consent Decree was approved. By December 21, 2007 – a scant two months after its approval – the Agencies identified numerous violations of the Consent Decree and demanded $1,838,000 in stipulated penalties. (DE 21-6 at 41-45.) In February 2008, the independent consultant retained by Jupiter submitted a report further finding Jupiter in violation of the Consent Decree. (DE 26-8 at 2-12.) The Agencies have demanded stipulated penalties for the following violations: impermissibly charging OTC scrap; failure to submit root cause reports; visible emissions; failure to respond to baghouse pressure readings; and failure to keep the furnace dross door closed during a performance test. (DE 21-3 at 32-36.) The Agencies allege that Jupiter further violated the Consent Decree by loading one of its furnaces with zinc-coated scrap, overloading the melting furnaces and failing to comply with the OMM Plan. (DE 26 at 12-14, 16-19.) The Agencies calculated that the stipulated penalties, accrued through February 5, 2008, had totaled $4,231,000. (DE 21-3 at 38-40.) Jupiter challenged this finding by invoking the Consent Decree's formal dispute resolution process, whereby the EPA reduced the amount to $3,365,000. (DE 21-6 at 5-28.)

Seeking relief from what they contend is an onerous deal, Jupiter filed a motion with the Court requesting that the Consent Decree be modified and that a substantial portion of the $3,365,000 penalties be abated. (DE 21.) The Agencies responded with a motion of their own asking me to enforce the judgment and seeking contempt sanctions in order to compel Jupiter's compliance with the Consent Decree. (DE 26.) On September 2, 2008, I held oral argument on the Parties' motions. Since then, the parties have attempted to settle this case through mediation before Magistrate Judge Andrew P. Rodovich. At the parties' request, I withheld my rulings on these

motions pending the outcome of mediation. On January 30, 2009, Judge Rodovich reported that the Parties were unable to resolve this matter through mediation. (DE 54.)

On the eve of my entry of this Order, Jupiter filed a motion seeking a declaratory judgment and preliminary injunction. (DE 57.) Much of what Jupiter has to say in that new motion is a rehash of its earlier briefing. But some of it is more forward looking and presents me new information. Jupiter's requests in that motion do not affect the instant ruling. It is important to keep in mind that all that is before the Court at this time is a request to modify the Consent Decree as it originally existed, and the extent of the penalties for violating the Decree for the months of December 2007 through February 2008. For the reasons I explain below, penalties are appropriate for that three month window of time. But whether penalties are appropriate for alleged violations after February 2008 may be a horse of different color. In any event, that is not the subject of this Order.

**DISCUSSION**

Three motions are before the Court: Jupiter's Motion to Modify the Consent Decree; Jupiter's Motion to Abate the Penalties; and the Agencies' Motion to Enforce the Consent Decree. While there is substantial overlap in the pending motions, I take them up separately.

**A.     Jupiter's Motion to Modify the Consent Decree**

A consent decree is a judgment of the court that embodies the parties' negotiated settlement of litigation. *See United States v. Alshabkhoun*, 277 F.3d 930, 934 (7th Cir. 2002). It is true that under Federal Rule of Civil Procedure 60(b)(5) I have discretion to grant a party relief from a judgment "if applying it prospectively is no longer equitable." FED R. CIV. P. 60(b)(5). But considering the importance of finality that judgments bring, courts should exercise that discretion

only in exceptional situations. *See Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006). That is why a party seeking a modification must first establish a significant change in circumstances. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383-84 (1992). This can be demonstrated in three ways: (1) where changed factual conditions make compliance with the consent decree substantially more onerous; (2) where a consent decree proves to be unworkable because of unforeseen obstacles; or (3) where enforcement of the consent decree without modification would be detrimental to the public interest. *Id.* If the moving party meets the initial burden, the court should then consider whether the proposed modification is suitably tailored to the changed circumstance. *Id.*

In this case, Jupiter tries to make its case using the first two criteria. It asserts that, over the eight months since the Consent Decree was entered, the agreement has proved to be unworkable and more onerous than the parties envisioned. Jupiter's primary complaint is Appendix A of the Consent Decree. The Consent Decree requires Jupiter to modify its capture and control systems in the event that Jupiter's two melting furnaces fail the initial or subsequent performance tests. Appendix A prescribes certain dimensions, air flow rates and compliance standards for these modifications. (DE 20, Consent Decree at 79-80.) The Agencies must approve any proposals for Appendix A modifications before they are implemented. (*Id.* at 17-18.)

The requirement to implement Appendix A has been triggered for both of Jupiter's melting furnaces. In its original motion, Jupiter asserted that it submitted numerous Appendix A proposals between December 2007 and March 2008 and that the Agencies had been stonewalling approval of these proposals. But the Parties have informed me in their recent filings that the Agencies approved Jupiter's most recent Appendix A proposal on December 28, 2008. (DE 55 ¶ 5; DE 57 at

7

9.) Notwithstanding the recent developments, Jupiter still challenges Appendix A. It argues that the engineering configurations in Appendix A, as drafted, do not make sense for Jupiter's equipment and facility operations. It also contends that the Agencies' strict interpretation of Appendix A is technically infeasible to implement. It therefore asks that Appendix A be stricken and replaced with more flexible guidelines.

It is clear the Parties do not see eye-to-eye on how Appendix A should be implemented. They also disagree whether Appendix A is technically workable as written. Jupiter argues that these problems were unforeseen for two reasons. First, Jupiter complains it was not given meaningful access to the Agencies's technical consultants during the negotiation process. This, Jupiter argues, prevented it from verifying that the configurations made good engineering sense. Second, Jupiter says it expected the Agencies to be more cooperative in applying Appendix A. It contends that the Agencies' inflexibility was unforeseen. Neither argument is persuasive.

First, as Jupiter readily admits, it had an opportunity to consult with its own engineering experts *before* agreeing to the specifications in Appendix A. (Def. Rep. Mem., DE 34 at 5.) And more persuasive still is the fact that during the public comment process, an industry peer raised lengthy concerns about applying the Appendix A configurations to Jupiter's furnaces. (DE 21-2 at 50-52.) So there is no conceivable way that the problems Jupiter faces were unanticipated. Moreover, if Jupiter disputes the Agencies' interpretation of Appendix A, it is not without remedy. The Consent Decree provides that such disputes be contested through the formal dispute resolution process. (DE 20, Consent Decree at 59-61.) And that process has not yet occurred.

Next, Jupiter argues that the Consent Decree holds Jupiter to an unobtainable performance of "100% capture efficiency, 100% of the time" that exceeds Subpart RRR standards. According

8

to Jupiter, it is possible to obtain 100% capture most of the time. But over time, capture efficiencies are affected by a variety of technical and human factors that render it impossible to achieve 100% capture all the time. Jupiter therefore asks that this provision be removed.

Jupiter mischaracterizes its capture efficiency obligations. In truth, there is no provision in the Consent Decree mandating zero emissions at all times. Instead, the Consent Decree prescribes procedures for responding to visible emissions and imposes penalties for certain levels of emissions. (DE 20, Consent Decree at 14-17.) The Consent Decree only assesses penalties for visible emission events that exceed 30 seconds more than once during a 24-hour period or more than three times in a seven-day period. (*Id.* at 50.) For all other visible emissions, Jupiter is required to take corrective steps and prepare root cause reports. (*Id.* at 14-17.) There are no penalties or corrective steps for non-visible emissions.

These provisions have required Jupiter to undergo numerous performance tests and prepare reports every time a visible emission occurs. There is no question that Jupiter's obligations under these provisions have proven onerous. But Jupiter cannot demonstrate that its hardships complying with these provisions were unforeseen or due to changed circumstances. In fact, Jupiter candidly admits that it raised these same concerns about the visible emissions provisions *prior* to entry of the consent decree. (Def. Mot., DE 21 at 19.) And Jupiter's industry peers were also sounding the alarm warning Jupiter of these provisions. (DE 21-2 at 45-47; DE 21-3 at 3-4.)

To the extent that the visible emissions standards under the Consent Decree exceed regulatory standards, Jupiter is also without remedy. A consent decree may exceed the relief that would have been available if the case was litigated on the merits, so long as the consent decree does not conflict with or violate the statute upon which the complaint was based. *See Local No.*

9

93, *Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525-26 (1986). Jupiter negotiated and freely agreed to do more than it was required to do by the regulations. These regulations create a floor, not a ceiling. So agreeing to more stringent air pollution control standards does not conflict with or violate the Clean Air Act. There are an assortment of reasons why a company may agree to do more than what the regulations require. Perhaps Jupiter was trying to head off additional governmental scrutiny. Perhaps it agreed to do more to avoid costly litigation. Whatever its motives, Jupiter made a rational choice well knowing that it was doing more than what Subpart RRR required. They are therefore bound by those heightened standards, not the regulatory minimum.

The remaining question is what should happen in the interim – i.e., while the recently agreed upon modifications to Appendix A are being implemented. Jupiter claims that the Consent Decree's ban on charging OTC scrap in its melting furnaces pending the Appendix A upgrades is unworkable and financially prohibitive. Jupiter insists that it will incur substantial financial loss and will no longer be economically viable if it must stop charging OTC scrap altogether until the Appendix A modifications are completed. It also fears potential equipment damage. It is true that Jupiter knew going in that it may have to stop charging OTC scrap if it did not meet certain obligations. But Jupiter contends that it has submitted numerous proposals to the Agencies for their approval and, in each instance, the Agencies took longer than the thirty days allotted them in the Consent Decree to review and comment on the proposals. (*See* DE 20, Consent Decree at 17-18.) If one believes Jupiter, then the Agencies have dragged their feet while Jupiter has been fighting for its life to stay afloat in an industry that has been ravaged by a deteriorating economy.

According to Jupiter, this situation forced the company to take matters into its own hands.

In April 2008, Jupiter implemented interim short-term upgrades to its equipment and insists that the current configurations now meet the Subpart RRR standards. As explained earlier, Jupiter has agreed to do more than the regulatory minimum and it appears the Parties recently have come to an agreement on an Appendix A plan. But Jupiter represents that the agreed upon modifications will take more than a year to implement. And if what Jupiter says is true – that it is in full compliance with Subpart RRR – then I am troubled by the Agencies' insistence that Jupiter not be allowed to process OTC scrap while the additional modifications are being implemented. Jupiter is no doubt bound to the restrictions it agreed to. But if Jupiter is correct that the Agencies were responsible for delaying approval of an Appendix A plan, it seems fundamentally unfair to prevent Jupiter from melting OTC scrap while the upgrades are taking place especially if Jupiter is accurate in stating it is currently in compliance with Subpart RRR.

Before deciding whether this predicament merits a modification of the Consent Decree, I need to hold an evidentiary hearing to determine what the truth of the matter is. Meanwhile, in its most recent motion, Jupiter has requested a preliminary injunction prohibiting further accrual of penalties for charging OTC scrap while the Appendix A modifications are being completed. But that puts the cart before the horse. The Agencies have yet to move for any additional penalties, so Jupiter's request is premature. In any event, because of overlap in these requests, I will reserve judgment on this issue for the time being and address the modification issue with the preliminary injunction motion together at a later date.

Setting aside my reservations on this latter issue – i.e., whether Jupiter should be allowed to melt OTC scrap while the new Appendix A is being implemented – I am unpersuaded that the Consent Decree should be otherwise modified. Simply put, Jupiter anticipated what it was getting

11

into. The Consent Decree reflects months of negotiation involving sophisticated counsel on both sides of the table with vast experience in environmental law. Before committing to the agreement, Jupiter's industry peers weighed in on the consequences of entering into such a strict agreement. They argued, like Jupiter does now, that the Consent Decree imposed inflexible obligations that exceeded regulatory standards and may be technically infeasible to implement. Rule 60(b)(5) is not intended to relieve litigants who are disappointed with the consequences of their settlements. *See McCormick v. City of Chicago*, 230 F.3d 319, 327 (7th Cir. 2000) ("[W]hen a party makes a deliberate, strategic choice to settle, [it] cannot be relieved of such a choice simply because [its] assessment of the consequences was incorrect."). In hindsight, Jupiter may have underestimated the consequences, but that is not enough to meet its burden under Rule 60(b)(5).

Jupiter also seeks relief under Rule 60(b)(6), the catch-all provision that allows courts to provide relief from judgment "for any other reason that justifies relief." FED R. CIV. P. 60(b)(6). Similar to subsection (5) of the rule, relief under this provision is reserved for exceptional circumstances. *See Neuberg v. Michael Reese Hosp. Found.*, 123 F.3d 951 955 (7th Cir. 1997). Jupiter does assert, nor does the Court find, independent reasons for granting relief under Rule 60(b)(6). Therefore, Jupiter's proposed modifications to the Consent Decree are denied in part.

**B.      Jupiter's Motion to Abate Penalties**

Since a consent decree is a judicially-approved agreement of the parties, its stipulated penalty provisions are construed as contractual obligations. *See Alshabkhoun*, 277 F.3d at 934. The Court may nonetheless find a penalty provision unenforceable if it is unreasonable or void as a matter of public policy. *See id.* The Seventh Circuit has repeatedly upheld large stipulated penalty awards in situations where the penalty provisions were rationally related to the environmental harm

12

that they were directed to prevent. *See, e.g., United States v. Rueth Dev. Corp.*, 335 F.3d 598, 605-07 (7th Cir. 2003) (affirming award of $4,018,500 in accrued penalties); *Alshabkhoun*, 277 F.3d at 935-36 (affirming stipulated penalties totaling $507,850.40); *United States v. Krilich*, 126 F.3d 1035, 1037-38 (7th Cir. 1997) (directing award of $1,257,500 in accrued penalties).

In this case, the Parties have submitted their dispute over stipulated penalties to the formal dispute resolution process as prescribed by the Consent Decree. The EPA determined that Jupiter violated the Consent Decree and is liable for $3,365,000 in stipulated penalties. (DE 21-6 at 5-28.) Jupiter appeals that determination and argues that the amount is excessive and unreasonable. Jupiter therefore asks the Court to reduce the penalty amount to $100,000.

The bulk of the penalty amount – $3.2 million – relates to Jupiter's loading of one of its melting furnaces with OTC scrap when the Consent Decree prohibited it from doing so. (DE 21-6 at 14-22.) The furnace passed initial performance tests after the Consent Decree was entered, but soon thereafter Agency inspectors observed visible emissions. (*Id.* at 16.) Under the Consent Decree, Jupiter was prohibited from charging the furnace with OTC scrap until certain remedial steps were taken. (Consent Decree at 14-16.) Jupiter did not complete these steps and later failed an emissions performance test. (DE 21-6 at 18.) The EPA found that Jupiter nonetheless charged OTC scrap in this furnace on 66 different days from November 15, 2007 through February 5, 2008. (*Id.* at 17-18.)

Jupiter does not deny that the violations occurred. But it contends that the $3.2 million in stipulated penalties is excessive. But how could they be excessive when they were agreed to by Jupiter a few months earlier after extended negotiations? Moreover, I found the penalties to be reasonable when I signed the Decree. *See Cook v. City of Chicago*, 192 F.3d 693, 698 (7th Cir.

13

1999). Jupiter agreed to the conditions that would trigger the stoppage of melting OTC scrap. It also agreed to endure the consequences (up to $50,000 per day) for violating this penalty provision. The penalties were likely set at a high enough level to create a disincentive to Jupiter to charge the OTC scrap. Indeed, the penalty provision goes to the heart of the environmental harm that the Agencies are trying to prevent – emissions caused by the melting of OTC scrap. But evidently the disincentive was not high enough because Jupiter charged the OTC scrap nonetheless. While there is no question that the stipulated penalties for these violations are substantial, they are not unreasonable. In sum, Jupiter's decision to regularly charge OTC scrap, even when the Consent Decree prohibited such action, directly implicates the harm that the Consent Decree was trying to avoid. Accordingly, the $3.2 million in stipulated penalties for these violations should not be abated.

As discussed earlier, Jupiter places blame on the Agencies for the delay in approving Appendix A. And if one believes Jupiter, it appears that the Agencies weren't exactly Johnny-on-the-spot once Jupiter starting proposing Appendix A modifications. To the extent the Agencies are at fault for unnecessarily delaying the Appendix A approval process, that would weigh against the reasonableness of any penalties that would accrue for charging OTC scrap during such delay. But that is an issue for another day should the Agencies seek further penalties. Again, it bears repeating, that the penalties currently before the Court are for violations occurring within the first few months after entry of the Consent Decree. It can scarcely be said that the Agencies did anything to cause these early violations.

Jupiter also incurred the following penalties: (a) $137,000 for failure to submit root cause analysis reports for two visible emissions events for 60 days; (b) $2,000 for a second visible

14

emission event exceeding 30 seconds in November 2007; (c) $2,000 for failure to keep the furnace dross door closed during a capture demonstration; and (d) $24,000 for failure to respond to baghouse pressure readings. (DE 21-6 at 4-10, 23-28.) Once again, Jupiter does not deny these violations or explain why these penalties were unreasonably levied. Per the Consent Decree, these penalties were calculated per-day or per-instance. There is no indication that the penalties were unfairly calculated. The Court therefore finds the entire $3,365,000 in stipulated penalties reasonable.

C.      **The Agencies' Motion to Enforce the Consent Decree**

Finally, the Agencies ask the Court to find Jupiter in contempt of court for violating the Consent Decree. The Agencies point to the infractions that have resulted in penalties. They further allege that Jupiter impermissibly charged zinc-coated scrap, overcharged the melting furnaces during more than 150 cycles, failed to respond to over 200 visible emissions events, and failed to follow and update its OMM Plan. (Plfs' Mot., DE 26 at 10-19.) Jupiter denies any liability and argues that the Agencies' allegations are based on an overbroad interpretation of the Consent Decree. In addition to a contempt order, the Agencies asks the Court to enforce the Consent Decree through compliance orders that would: (a) enjoin Jupiter from engaging in any activities that would violate the Consent Decree; (b) compel Jupiter to perform certain obligations under the Consent Decree; and (c) make specific Jupiter employees personally responsible for carrying out the company's obligations under the Consent Decree. (DE 26 at 21-24.)

District courts have equitable discretion to enforce consent decrees through contempt and compliance orders. *See O'Sullivan v. City of Chicago*, 396 F.3d 843, 867-68 (7th Cir. 2005). But parties to a consent decree may cabin a court's equitable discretion through stipulated remedies.

*Cook*, 192 F.3d at 698 (7th Cir. 1999). If such remedies are reasonable, "then the stipulation will fix the measure of relief to which the victim of a breach is entitled." *Id.* As discussed in the preceding section, the Consent Decree prescribes penalties for each of the violations alleged by the Agencies. (Consent Decree at 48-56.) Where alleged violations are in dispute, as they are here, the Consent Decree provides a formal dispute resolution process to facilitate enforcement. (*Id.* at 59-61.) There is no indication that the Parties have submitted the additional allegations of noncompliance to the dispute resolution process. The Agencies nonetheless claim that, without Court intervention, Jupiter will not comply with the Consent Decree. But since the parties have negotiated adequate procedures for resolving their disputes, I will defer to those procedures before fashioning additional equitable remedies.

## CONCLUSION

For the foregoing reasons, Jupiter's Motion to Modify the Consent Decree and to Abate Penalties [DE 21] is **DENIED IN PART** and the Agencies' Motion to Enforce Judgment and for Contempt Sanctions [DE 26] is **DENIED**. The Court further **SETS** this matter for a status hearing on **March 24, 2009 at 10:00 a.m. Hammond/Central time** in the Courtroom of Judge Philip P. Simon, United States Federal Courthouse, 5400 Federal Plaza, Hammond, Indiana. The Court **ORDERS** all parties, through counsel, to appear at the hearing.

    **SO ORDERED**.

    ENTERED: February 18, 2009

                                        s/ Philip P. Simon
                                        PHILIP P. SIMON, JUDGE
                                        UNITED STATES DISTRICT COURT